

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-19-00206-CR

———————————————

KEVIN WAYNE POWELL, Appellant

V.

THE STATE OF TEXAS

———————————————————————

On Appeal from the 213th District Court
Tarrant County, Texas
Trial Court No. 1563875R

———————————————————————

Before Sudderth, C.J.; Womack and Wallach, JJ.
Memorandum Opinion on Rehearing by Chief Justice Sudderth

## MEMORANDUM OPINION ON REHEARING

## I.  Introduction

Twenty-eight-year-old Kasey Nutter had been in an abusive relationship with her fiancé, Appellant Kevin Wayne Powell, when she disappeared at the end of 2015. Not quite a month before Kasey vanished, Powell was charged with aggravated assault for strangling Kasey with a cable wire and striking her with his fist.  A few weeks after the assault, on November 20, 2015, Kasey signed an affidavit of nonprosecution in which she claimed that someone else had caused her injuries and that she had been on methamphetamine and not in her right mind when she accused Powell of injuring her. But the State did not dismiss the case.  After December 12, 2015, Kasey disappeared and was never heard from again.

In April 2016, Kasey's grandmother filed a missing person report.  When the police asked Powell about Kasey, he told them that the last time he had seen her was before Christmas, when she and a Middle Eastern man came to his residence to pick up Kasey's belongings.  Later that month, Powell's son Peter (a pseudonym)[1] informed police that Powell had told him that Kasey was dead and that he had killed her, chopped her into pieces, and dissolved her body in a barrel in his back yard.

Powell was arrested on May 5, 2016, and he was later charged with murdering Kasey by manner and means unknown in the course of committing or attempting to commit the offense of retaliation or obstruction (capital murder).  *See* Tex. Penal Code

---

[1]Peter was a minor in 2015 but was 21 years old at the time of the trial.

Ann. § 19.03(a)(2).  A jury found Powell guilty of the charged offense, and the trial court sentenced him to confinement for life.  *See id.* §§ 12.31, 19.03(a)(2), (b).

In six points with multiple sub-points,[2] Powell challenged the sufficiency of the evidence to support his conviction, the denial of his right to a speedy trial, the denial of his various motions to suppress evidence, the admission of out-of-court statements and bad acts evidence, and the trial court's prohibiting Peter's impeachment with prior inconsistent statements.  We affirmed the trial court's judgment.

After we affirmed the trial court's judgment, on rehearing, Powell requested supplementation of the record and then argued that we should reconsider (1) two suppression subpoints—whether the search warrants for his Camaro and a cell phone found in his Camaro were supported by probable cause—(2) our corpus delicti analysis, and (3) our forfeiture-by-wrongdoing analysis.  We have done so, and although we deny Powell's motion for rehearing, we withdraw our prior memorandum opinion and judgment of September 2, 2021, and substitute the following in its place.  We deny as moot Powell's motion for reconsideration en banc on the same issues.

## II.  Sufficiency

In his first point, Powell argues that the record lacks evidence independent of his extrajudicial confession to Peter that makes it more probable than not that Kasey

---

[2]We review Powell's points in the order of greatest-to-least potential relief.

3

is dead and that someone killed her and that makes the commission of the underlying offense of retaliation or obstruction more probable than not.

## A. Standard of review

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman*, 520 S.W.3d at 622. When performing a sufficiency review, we must consider all the evidence admitted at trial, even if it was improperly admitted. *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016); *Moff v. State*, 131 S.W.3d 485, 489–90 (Tex. Crim. App. 2004).

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Queeman*, 520 S.W.3d at 622. We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court

4

conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). That is, each fact need not point directly and independently to guilt if the cumulative force of all incriminating circumstances is sufficient to support the conviction. *Nisbett v. State*, 552 S.W.3d 244, 262 (Tex. Crim. App. 2018).

We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Murray*, 457 S.W.3d at 448–49. The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing guilt. *Jenkins*, 493 S.W.3d at 599.

## B. Corpus delicti rule

The corpus delicti rule is one of evidentiary sufficiency affecting cases in which there is an extrajudicial confession. *Miller v. State*, 457 S.W.3d 919, 924 (Tex. Crim. App. 2015). The rule, which exists to prevent a conviction based on a defendant's extrajudicial confession to an imaginary crime, provides that when the burden of proof is "beyond a reasonable doubt," a defendant's extrajudicial confession does not constitute legally sufficient evidence of guilt absent independent evidence that the essential nature of the charged crime was committed by someone. *Id.* at 924, 927. In this case, the rule requires, in addition to Powell's confession to Peter, evidence that Kasey is dead and that someone killed her.

5

## C. Evidence

Before trial, the trial court held a hearing on evidence that the State sought to admit under the doctrine of forfeiture by wrongdoing, admitted the evidence, and granted Powell a running objection. The State also proffered a list of extraneous conduct and bad acts. We address the admissibility of these items of evidence later, but we recount them here because even if they were admitted improperly, we must consider them in our sufficiency review. *See Jenkins*, 493 S.W.3d at 599. The record is lengthy, but we summarize the evidence that leads us to conclude that sufficient evidence supports the conviction.

### 1. Kasey's background

Kasey, the child of alcoholic parents, was born in 1987. She had a troubled youth, marked by a suicide attempt, hospitalization for mental health issues, attendance at an alternative school, and teen pregnancy. Andrew Yeager was the father of her son Benjamin (a pseudonym), who was 14 years old at the time of the Powell's 2019 murder trial.[3]

After high school, Kasey became a dental assistant. From 2010 to 2012, she was engaged to Taylor Johnson, a Lockheed Martin quality inspector, whom she had known since high school. Johnson attributed their eventual break up to Kasey's drug use, unstable and self-destructive behavior, and dishonesty.

---

[3]Kasey lost custody to Yeager when she went to jail in 2014. Kasey's cousin Diana Potter testified that Yeager had threatened that if Kasey did not voluntarily sign over custody, he would take it from her while she was incarcerated.

As to Kasey's unstable and self-destructive behavior, Johnson testified that Kasey sometimes harmed herself and then thought that he had done it. He recounted an incident when he and Kasey had been drinking and arguing, and she later fractured her foot after climbing on the other side of a balcony and falling off. Johnson took her to John Peter Smith hospital (JPS) for treatment, where she reported it as a fall, yet later she posted on Facebook that Johnson had thrown her from the balcony. Kasey's medical records reflect that she had been taking Neurontin, Zoloft, Ambien, and Seroquel[4] at the time and had reported to the hospital that she suffered from multiple sclerosis.

Johnson also related another occasion when he had left Kasey's apartment when she was intoxicated and she ended up with a black eye. According to Johnson, Kasey later asked him if he had hit her, but she apparently believed him when he assured her that he had not, because when her friend called the police, Kasey refused to press charges. Johnson did not know how Kasey got the black eye but

---

[4]Neurontin is a medication to treat nerve pain, *see Smith v. State*, No. 03-09-00270-CR, 2010 WL 2788880, at *6 (Tex. App.—Austin July 14, 2010, pet. ref'd) (mem. op., not designated for publication); Zoloft treats depression and anxiety, *see In re V.S.*, No. 02-18-00195-CV, 2018 WL 6219441, at *3 (Tex. App.—Fort Worth Nov. 29, 2018, no pet.) (mem. op.); Ambien treats insomnia, *see Farmer v. State*, No. 02-09-00278-CR, 2011 WL 1601311, at *2 (Tex. App.—Fort Worth Apr. 28, 2011) (mem. op., not designated for publication), *judgm't vacated*, PD-1041-11, 2011 WL 4072126 (Tex. Crim. App. Sept. 14, 2011) (not designated for publication); and Seroquel treats mood disorders, *see In re D.S.*, No. 02-15-00350-CV, 2016 WL 1267808, at *5 (Tex. App.—Fort Worth Mar. 31, 2016, no pet.) (mem. op.).

hypothesized that she got it from falling or passing out. He added that he had also seen Kasey hit herself in the face with a closed fist.

As to Kasey's propensity toward dishonesty, Johnson and some of Kasey's friends testified that she was dishonest. Johnson characterized Kasey as fifty percent honest, while her friend Nick Fawcett, who she had met through Yeager, gave her an "eighty-five percent" honesty rating. Fawcett's former roommate Kate Drake agreed that Kasey tended to say whatever would benefit her. And even Kasey's medical records from 2011 note, "The patient is a poor historian."

Kasey's family and friends also described her as "very needy."[5] According to Rebecca Elliot, an old acquaintance with whom Kacey became friends when the two were bunkmates in jail, Kasey had no problem reaching out to others if she needed something. Normally, if she needed something, she would turn to Fawcett, Elliot, or her maternal grandmother Sharlean Ledel. Johnson related that in 2014, Kasey reached out to him to help her research her birth parents because she suspected that James Nutter[6] was not her biological father. Johnson declined to help her, and Kasey did not speak to him much—perhaps once a year—after that.

---

[5]For example, when Kasey had a vehicle, her father paid for her gas. By 2015, she had no vehicle and relied on friends, and later Powell, for transportation.

[6]We will refer to James Nutter by his first name to avoid confusing his last name with that of Tarrant County District Attorney's Office criminal investigator Danny Nutt, who investigated this case and later testified at trial.

8

As for employment, Kasey had bounced around working for various dental offices, and she struggled financially. But she eventually quit working as a dental assistant and took up dancing at local strip clubs, including Illusions, a club in Fort Worth.

At the end of August 2013, Kasey was admitted into JPS for methamphetamine withdrawal and depression. While there, she reported a history of bipolar disorder.[7] JPS put Kasey back on Zoloft and added Risperdal and Vistaril.[8] Two months later, Kasey returned to JPS while an inmate at the Tarrant County Jail and was observed to be experiencing methamphetamine withdrawal. During this period of time, Kasey's mother died of alcoholism.

---

[7]James acknowledged that Kasey's mother and Sharlean had believed that Kasey was bipolar, but he was unaware that any doctor had actually diagnosed her with this disorder.

[8]Risperdal is an antipsychotic medication used to relieve or improve symptoms such as hallucinations, irrational beliefs and fears, disorganized thinking, severe anxiety, apathy, emotional or social withdrawal, and mood swings. *See In re J.P.-L.*, 592 S.W.3d 559, 569 & n.11 (Tex. App.—Fort Worth 2019, pet. denied). Vistaril is prescribed to treat post-traumatic stress disorder. *See Travis v. State*, No. 04-14-00560-CR, 2015 WL 6876830, at *4 (Tex. App.—San Antonio Nov. 10, 2015, pet. ref'd) (mem. op., not designated for publication).

Kasey had a brief relationship with Jordan Nick Fakas, and in June 2014, four days after she began a six-month stay in jail for having violated her felony probation for a theft conviction,[9] Kasey learned that she was pregnant with Fakas's child.

Kasey's longest period of sobriety occurred during those six months that she was in jail.[10] But while in jail, she also lost custody of Benjamin, who was nine or ten years old at the time. Fawcett described Kasey as having been so "broken up" about losing custody of Benjamin that upon her release in November 2014, "it was like her main mission to get him back." And, according to her cellmate Elliot, Kasey wrote to Benjamin every day while she was in jail.

One week after Kacey was released from jail, she accepted a plane ticket that her cousin Diana Potter had sent so that Kasey could visit her in Florida. Kasey had planned to stay in Florida for three days, but after she and Potter argued, Kasey returned home early, using a one-way ticket back that Fakas bought for her. As for Kasey's premature departure, Potter explained, "Kasey's decisions were not the best. And I . . . was upset with my sister[11] about decisions she was making." According to

---

[9]Kasey had been accused of stealing a ring from her grandmother Sharlean, although others believed that Kasey's mother had actually stolen the ring and that Kasey had only pawned the ring for her.

[10]Kasey had struggled with a methamphetamine addiction since 2005.

[11]Although they were first cousins, Potter testified that she thought of Kasey as her sister. Potter had lived with Kasey and her family for a couple of years during high school.

Potter, those bad decisions included Kasey's living situation and her drug use, particularly the use of methamphetamine at least once while pregnant. Potter explained, "I expected better from her and I told her so. And she did not like to be corrected and she left." The two did not speak again until November 2015, although they continued to monitor each other through Facebook.

Kasey gave birth to a daughter in February 2015. For a brief time, Kasey and her daughter joined Fakas in Pennsylvania. But ultimately, Kasey returned to Tarrant County and to stripping at Illusions, although she hated to do so because she knew it "would only lead [her] back to meth."

On the night that Kasey returned to Illusions, she ran into Powell, who became one of her regulars.[12] Powell's ex-wife Cheryl, who also performed administrative work for Powell's remodeling business, had moved out two months before, and Powell asked Kasey to take over those responsibilities for him. She agreed. Kasey also put her daughter up for adoption with Powell's help.

According to James, and as set out in some of Kasey's medical records, Kasey brought Powell to her father's house in early 2015 when she came to pick up her

---

[12]According to Kasey's Facebook message to Powell's friend Rhonda Wright in October 2015, Kasey had first met Powell three years earlier while working at Illusions. We combine information from that message with other facts in the record to present the background of how and when Kasey became involved with Powell. Kasey gave varying accounts of the duration of her relationship with Powell, ranging from ten months to three years. She also stated that she had lived with him beginning in February 2015 but also beginning in September 2015. As noted in her medical records, Kasey was a poor historian.

11

belongings. At that time, she indicated that she was going to move in with Powell. Powell's son Peter lived in Powell's house, as did Powell's grandson Max (a pseudonym), who was 11 or 12 years old at the time.[13] According to Fawcett, Kasey stopped dancing when she started working for Powell, and Fawcett lost contact with Kasey for the first three months that she lived with Powell.

In the meantime, Elliot and Kasey reconnected through Facebook. According to Elliot, Kasey's administrative work for Powell did not require much time or energy, but for her work, Kasey received room and board. Although Elliot observed that Kasey still had friends during this time, "she just didn't talk to them often." Elliot explained that while Powell did not let Kasey speak with very many people, he did allow Kasey to speak to her "[b]ecause [she] was a girl maybe." Elliot shared methamphetamine with Kasey[14] and Xanax[15] with Powell. To Elliot's knowledge, Kasey had no other job when she lived with Powell, she was no longer stripping, and she was "[a]bsolutely not" prostituting because Powell would not have allowed that.

---

[13]Powell had three children, each with a different mother, from oldest to youngest: Max's mother, Misty Bottoms; Dylan Torres; and Peter.

[14]Elliot said that she sold methamphetamine in small amounts to Kasey, usually "under a gram" for "[m]aybe $20," and that she was sure Kasey had other drug dealers.

[15]Xanax is a common brand name for benzodiazepine. *J.P.-L.*, 592 S.W.3d at 571 n.14. Benzodiazepine is a central nervous system depressant prescribed for anxiety. *Hoff v. State*, No. 09-15-00188-CR, 2016 WL 6110904, at *5 (Tex. App.—Beaumont Oct. 19, 2016, pet. ref'd) (mem. op., not designated for publication). Elliot said that Powell told her "something about being in the military and maybe post-traumatic stress or something like that" to explain why he needed Xanax.

## 2. Events of September 11, 2015–January 4, 2016

### a. The September 11, 2015 assault and its aftermath

On September 11, 2015, at around 4:03 p.m., Fort Worth Police Detective A. Green responded to an assault call involving Kasey and Powell at the Pilot Truck Stop at Alliance Gateway in Fort Worth. Powell had already left the scene by the time the police arrived, but Kasey told the police that Powell had beaten her and choked her with a wire and that she had escaped from him at the gas station.

Detective Green observed injuries to Kasey, including a thin cut above her eyebrow and a dime-sized bloody mark under one of her eyes. She had some scratches near her mid-spine area, as well as two thin cuts on her upper back and the nape of her neck that Detective Green also described as "just scratches." Additionally, Kasey had bruises on her inner arm close to her shoulder and elbow. Detective Green took photos of these injuries, and these photos were admitted into evidence as State's Exhibits 36–40 and published to the jury.

While Detective Green testified that Kasey's injuries were generally consistent with what she said had occurred, the officer who had written the report noted that Kasey's story had changed several times. For example, the record indicates that Kasey initially requested a rape exam but then denied that Powell had ever forced her to engage in sexual intercourse against her will. One inconsistency that Detective Green observed was her claim that "she was choked with a wire" when she has no marks on

13

her neck. However, an ER nurse who treated Kasey in September 2015 later testified that strangulation may not always leave visible signs.

Kasey was released to Fawcett, who came to pick her up. Fawcett described Kasey as very upset when he arrived and "sincere in her fear and her reaction to the situation." Detective Green's testimony contradicted Fawcett's. According to Detective Green, Fawcett told the police that Kasey had a drug addiction and that he thought she was lying. Fawcett, on the other hand, said that he recalled telling the police that Kasey had a drug addiction but not that she had made up her story. According to Fawcett, he had simply told the officer, "I don't know what's true. I don't know what's not true." Detective Green noted that no assault case was filed with the district attorney because Kasey had been uncooperative.

Fawcett said that he was concerned enough about the events of September 11 that he took Kasey to Harris Methodist hospital, where she spent five or six hours before calling him to pick her up again. When Kasey arrived at the hospital, Kasey complained of "anxiety fear confusion cognition Sto[ck]holm Syndrome," and she reported that she used illegal drugs in addition to her prescribed Zoloft. She denied that she had a history of schizophrenia but admitted to a history of depression.

The 70 pages of Kasey's medical records from Harris Methodist that were admitted into evidence documented Kasey's report that her boyfriend had been mentally, physically, emotionally, and sexually abusing her since February, that he had started being violent in July, and that the last time he had abused her was the week

14

before, when he pushed her and grabbed her by the arms when she tried to take his car to go to the grocery store. She stated that her boyfriend had told her that he would hunt her down and kill her and that he had strangled her with a "wire cord" two weeks before. A medical note indicated that there were no strangulation marks on Kasey's neck but that—as shown in the photos taken by the police the day before—there were bruises on her arms.

Kasey reported that she had not taken her Zoloft for a couple of days[16] and stated, "I am crazy," but she also reported that her boyfriend had been "feeding her drugs—including meth and marijuana." Kasey admitted that two days before, she had taken methamphetamine and Xanax, and her urine test confirmed her account of drug use, showing positive results for amphetamine,[17] benzodiazepine, and cannabinoids.

Kasey claimed that her boyfriend had "been drugging [her] to keep [her] with him," even though he knew that she had a history of drug abuse and that he had kept her in a room where he would "have sex with [her]" and then leave. According to Kasey's account, when she tried to leave, he had threatened her life and told her that he was going to get rid of her, "leave [her] body in the back yard and chop it up and get rid of it." Nurse Lisa Slaughter-Stovall, a 15-year veteran of the ER, testified that

---

[16]Zoloft withdrawal symptoms could include dizziness, headaches, nausea, and vomiting.

[17]Amphetamine is a metabolite of methamphetamine. *Miller v. State*, Nos. 09-18-00378-CR, -00379-CR, 2020 WL 2045785, at *6 (Tex. App.—Beaumont Apr. 29, 2020, no pet.) (mem. op., not designated for publication).

15

Kasey's situation stood out to her because of these reported statements by Kasey's boyfriend that he was going to chop up her body to get rid of it.

Kasey told hospital personnel that she had filed a police report the day before and stated, "I don't feel safe. I don't have anywhere to go." Although attempts were made to find a placement for her at a shelter, they proved unsuccessful.

Kasey's symptoms at the hospital improved with Ativan,[18] although she was initially resistant to taking it because she wanted to be clear-headed to give her account. The police verified that Kasey had made a police report the day before, but Kasey's protective order had not been filled out properly, so they sent an officer to the hospital so that it could be properly completed.

Kasey left the hospital with Fawcett, but after just a few hours' stay at Fawcett's house, Kasey returned to Powell. According to Fawcett, this was not unusual. He recalled that there were several other occasions when Kasey had run away to Fawcett's house in fear of Powell, but each time Powell came looking for her and she returned to him. And on some of those occasions he had seen wounds to her face and body. Drake, Fawcett's roommate at the time, confirmed Fawcett's account, testifying that on at least three different occasions Kasey had shown up at Fawcett's house after having fought with Powell. Drake testified that she usually left when

---

[18]Ativan is an anti-anxiety drug. *Boyer v. State*, No. 02-09-00092-CR, 2010 WL 3432843, at *8 (Tex. App.—Fort Worth Aug. 31, 2010, pet. ref'd) (per curiam) (mem. op., not designated for publication). Kasey's positive result for benzodiazepine could have been from the Ativan administered by the hospital.

16

Kasey showed up because she "didn't want to deal with the drama" that would play out when Powell showed up looking for Kasey, which caused Kasey to "freak[] out" and Fawcett to try to "alleviate all those issues."

Kasey called SafeHaven of Tarrant County[19] shortly before midnight on the same day that she was released from the hospital, went to Fawcett's house, and then returned to Powell. According to SafeHaven records, Kasey spoke with Kathryn Bradley, a "client advocate" who was answering the hotline that evening. In that conversation, Kasey reported that

- her abuser had strangled her the previous day and had given her a black eye;

- she had left and gone to a friend's house;

- her abuser found her;

- she asked him to take her to the hospital, but he took her home first and then back to her friend's house;

- her friend ultimately took her to the hospital; and

- she had obtained a protective order.

Kasey also told Bradley that her abuser, with whom she had been involved in a two-year relationship, had "threatened to kill her and chop her up and that no one would ever find her." Kasey further recounted that a week before Labor Day, he had

---

[19]SafeHaven is a nonprofit organization that serves domestic violence victims, has two emergency domestic violence shelters, and operates 24/7 hotlines.

used a metal wire with plastic handles to choke her until she almost passed out. She also added that he had three guns in the home and had threatened to kill other people.

Kasey described herself to Bradley as a recovering drug addict, and she reported that over the previous five to seven months, her abuser had been physically and verbally abusive to her, had kept her isolated from her friends and family, had taken away her phone, had kept her locked in a room for several days, and had kept her drugged.[20] Kasey also expressed to Bradley that she needed psychiatric services, that she was in fear for her life, and that she needed a safe place to stay. Bradley noted that Kasey was approved for the shelter but that it was already at capacity for singles, and so Kasey was provided the phone numbers for homeless shelters but refused to take referrals for places outside of Fort Worth.

Elliot testified that sometime later that month, on a couple of occasions when she ran into Kasey at a store, or in a visit to Powell's home, Kasey told her that she was afraid of Powell and that she thought he could kill her. Elliot never saw Powell do anything aggressive with Kasey or physically hurt her; nevertheless, Elliot twice offered to help make a plan for Kasey to escape and hide, but Kasey never took her up on it.

---

[20]Kasey also told Bradley that she had just been released from jail after a six-month stay, which Bradley noted in the intake notes "conflict[ed] with the timeline [Kasey] provided during the call."

### b. Events of October and November 2015

#### (1) Kasey's last interactions with Elliot

The last time Elliot spoke with Kasey was in October 2015, when they ran into each other at a store. According to Elliot, Kasey had been driving Powell's silver Camaro and was "kind of erratic, but . . . really excited and happy to see [Elliot]."

The last time Elliot saw Kasey was in mid-November 2015, when she saw Kasey sitting in a car with Powell in front of Fawcett's house. Because Elliot was just the passenger in a car driving by, she did not stop and speak to them. Elliot said she never saw Kasey again, nor did Powell ever come by or call her to ask where Kasey might be. At trial, Elliot testified that she believed that Kasey was dead.

#### (2) Kasey's Facebook activity

During the month of October, Kasey actively communicated through Facebook:

- On October 8, Kasey posted on Facebook a photograph of a hand wearing an engagement ring and commented, "O!M!G! 2.34-Carat Emerald Diamond J-color S12-clarity GIA certified. Classic Tiffany setting. Better than my dream ring, from my better than my dream man."[21] On the same day, Kasey also posted a photo of over $700 in cash with the title, "Ricks" (the name of a strip club) and some photos of herself.

---

[21]Sharlean commented, "I hope congratulations are in order. Who is your dream man? Are you allowed to speak to your grandmother yet?"

- On October 17, Kasey sent a lengthy Facebook message to Powell's friend Rhonda Wright[22] in which she recounted a heated telephone conversation between Kasey and Powell's ex-wife Cheryl and some text messages that Cheryl had sent to Powell afterwards. Kasey described Cheryl as "screeching like a banshee continuously, without pausing to hear anything [Kasey] said in response or defense of her INSANE allegations," and she complained that Cheryl had trashed Kasey's name and reputation to Powell's colleagues, friends, and family.

- On October 19, Sharlean messaged Kasey via Facebook, "I am assuming you are imprisoned again. Since you are not allowed to use the phone or post on FB. Call me when you can. You still sound a little hyper."

- On October 21, Kasey replied to Sharlean's message and stated that she was not imprisoned or restricted from using the phone but that she had been extremely busy with work "and also personal bureaucratic bs associated with medical and ssi and child custody case and managing a household with 3 males to cook for and clean up after," on top of her multiple-sclerosis-related cognitive and fatigue issues and the side effects from the medicine she took to treat those issues. Kasey sent seven more messages to Sharlean over the next two hours. In one of the messages, Kasey asked her grandmother to "call when you get this message and we can talk." Sharlean sent Kasey four more messages during the following three hours, in one of which she explained that one of the reasons she had not called was that she "felt like [Kasey]'s 'man' did not want [Kasey] on the phone," and that she "did not want to cause a problem."

### (3) Powell's statements to James

James testified that in October and again in November 2015, Powell called him to tell him that he thought Kasey was going crazy and ruining his business. Powell told James that his goal was to get her off drugs, and James had believed him. James later told the police that Powell was the best thing that had ever happened to Kasey,

---

[22]According to Investigator Nutt, Rhonda was "associated originally" with Powell's daughter Misty Bottoms and later with Powell's ex-wife Cheryl.

20

because, according to James, at the time he believed Powell was trying to help Kasey and did not suspect that Powell had anything to do with her disappearance. However, James also testified that after November 2015, Powell never came by his house to look for Kasey.

### (4) The November 3 assaults

Drake testified that the last time that she saw Kasey was on November 3, when Kasey drove Powell's silver Camaro to Fawcett's house. Fawcett was already at work when Kasey arrived between 8:30 and 9:00 that morning. Drake was at home, and she called Fawcett when Kasey arrived.

According to Drake, Kasey had stolen Powell's car and had run away from him. She appeared to be "scared" and "sober," and it seemed to Drake that Kasey was "frantically trying to run for her life." Kasey had with her "the vehicle, a gun, a license plate, and a folder with a bunch of paperwork" that appeared to be invoices and receipts, including a written statement to the effect that if she died, Powell was the one who killed her. Kasey told Drake that the gun was Powell's and that Powell was going to kill her because "[s]he knew too much."

When Fawcett arrived at the house shortly thereafter, he perceived Kasey to be "[i]ncredibly paranoid, fearful, distraught." According to Fawcett, "she was just a mess. . . . She was going on and on about how [Powell] was going to kill her. She knows too much. And he's never going to let her get away." But, after moving

Powell's car[23] and instructing Kasey to "lock the doors and don't do anything until [Fawcett got] off work," Fawcett left Kasey at the house and returned to work.

Fawcett returned home from work around 2:30 p.m. Kasey was still at his house, and at that point she "sort of explained [to him] what was going on." In the meantime, Powell had reported to the White Settlement Police Department that Kasey had stolen his Camaro, and then at about 4:00 that afternoon, Powell showed up at Fawcett's door. Although Fawcett was unaware that Powell had reported the car stolen and testified that Powell had displayed no anger at Kasey for having taken his car, Sharlean's Facebook message to Kasey about her conversation with Powell that same day tells a different story:

> Kasey, I hope you get this. I just got off the phone with Kevin Powell. You have a couple of hours if the police do not find you before that, to get that car back and all it[s] contents. I don't know how much you have been told but there are witnesses and video[s] of you in the car. Mr. Powell is pulling no punches and contacted me in the hope that I might be able to reach you. If you do not return the car and contents, over what the law will do, he is going to burn everything you left at his house and take a video of it for you to see. I truly don't want you to go to prison so please at least leave the car somewhere and call that guy and tell him where it is if you are afraid to go back. If you want to see your stuff again, do it quickly.

According to Fawcett, after Powell arrived, he and Kasey began to argue "in general about stuff, about him abusing her and everything." Fawcett described how

---

[23]Fawcett testified that he was worried about what would happen to Kasey or Drake if Powell showed up, so he helped Kasey move the car "[b]ecause [they] didn't want [Powell] showing up while" Fawcett was not home.

the argument escalated and became violent, culminating in Powell's placing a gun in

Kasey's mouth and threatening to kill her:

> There was an argument and Kasey stormed off and he came inside.  I
> followed him.  Said, Whoa, dude, you can't come in.  And as soon as he
> turned the corner to the hallway, Kasey is at the other end, pointing his
> gun at him.  And [Powell] darts back out back around through the living
> room.  I'm guessing toward the front door.[24]  I'm confronting Kasey,
> I'm, like, What are you doing, dude?  You're going to shoot someone in
> my house?  She tried to explain and, I'm, like, I don't care.  You don't do
> that stuff.
>
> And immediately after that, we are yelling at that point.  And
> [Powell] pushes me and . . . So sort of arguing with Kasey.  Why are you
> doing this?  Why are you going to shoot someone in my house?  And
> [Powell] knocks me into the wall.  Knocks her onto the ground.  And
> has a stub-nosed revolver and he sticks it in her mouth.[25]  And he is
> hunched down over her saying, how he is saying -- he said exactly, he
> said, You going to point my own f[-]cking gun at me, b[-]tch?  I'll
> f[-]cking kill you.

Fawcett said that at that point, Kasey was crying hysterically and apologizing to

Powell while Fawcett was trying to decide how to handle the situation.  Eventually

Kasey and Powell left his house together, but Kasey had still been in an emotional

state:

> She is crying hysterically. . . .  She can't say much at that point.  I'm
> freaking out.  And I'm trying to, like, they are in the hallway.  I'm trying
> to defend – I'm trying to think what the heck to do.  My gun is maybe in

---

[24]During cross-examination, Fawcett said that when Kasey tried to shoot
Powell, Powell bolted out the front door to his truck, grabbed his gun, and came back
into the house.

[25]At trial, Fawcett testified that he recognized the two guns seized during a
search of Powell's home—a black gun, which Kasey had held, and a snub-nosed
revolver that Powell put in Kasey's mouth.

my bedroom, so I'm trying to squeeze by them. And as soon as I do, I feel [Powell] kind of stand up and at this point he got off of her. She is bawling and hysterically [sic]. She is crying. She's saying, I'm sorry. I'm sorry. I'm so sorry. And kind of pacing around myself and trying to figure out what to do. And he is, like, [Powell] is, like, Let's go. Let's go. And he reaches his hand down and picks her up and they gather their stuff. And I'm like, Yeah, Go. . . . And that was the last I heard from her for four or five hours.

When Kasey and Powell left Fawcett's, they took the papers she had brought with her. Fawcett did not call the police, but on cross-examination, he agreed that he should have.

Later that evening, around 8:00 p.m., Kasey called 911 from Powell's house. During the call, Powell took the phone away from her, but the call continued to record. In the recording, Powell told Kasey, "Now you're going to jail, you're a stupid f[-]ck. You are so stupid." He could also be heard saying, "Hey [Peter], she called 911, man, from this phone, they're coming right now. I'm going to have her locked up now. Go, go, go, go. Huh? Go, go, you ain't got time, go, go."

Powell then got on the line and told the operator that Kasey had stolen his vehicle and had pulled a firearm on him. He stated, "She's in the truck with me right now this second and I brought her back over here because the other guy at the other house did not want her there." He added, "[T]he guy kick[ed] her out of his house because he didn't want the drama." Kasey then chimed in that Powell was a liar, that she had lived with him since February, that her belongings were inside the house, and that she had marks on her where he had hit her in the head with a gun.

24

White Settlement police officers were dispatched to respond to the domestic disturbance. About two and a half hours later, a search warrant was obtained and executed to search the premises for marijuana and other evidence of drug dealing.[26] Kasey was given a criminal trespass warning shortly before midnight.[27]

Before Kasey left Powell's house, she was allowed to gather her belongings. According to Fawcett, Kasey called him and told him that Powell had hit her and choked her again, that the police were there, and that she needed a ride. So Fawcett drove to Powell's house and picked her up, along with some luggage and trash bags full of her belongings. But a few hours later Powell showed up at Fawcett's house. Kasey went outside to talk with him, and she eventually left with him, taking only her purse and leaving all of her other possessions behind.

### (5) The November 4 assault in Powell's truck

The very next day, two strangers—Traci Ruthesell and Cody Scribner— witnessed Powell physically abuse Kasey.

Ruthesell had been on her way to a doctor's appointment at around 11:00 a.m. that day when she stopped at an intersection and noticed some commotion inside a truck in the lane beside hers. According to Ruthesell, she saw Powell and Kasey

---

[26]Police found a marijuana grow lamp.

[27]White Settlement Police Officer Payne explained that if a girlfriend lived in a house (had established a residence there), the homeowner would have to seek an eviction, but "[i]f she has agreed to move out without any incident, you know, gather her things and leave, many times the homeowner . . . will have [a criminal trespass warning] issued so [she] can't come back."

"going back and forth," and then Kasey "scream[ed] at [her] for help." At first Ruthesell rolled down her window and "tried to yell at him to stop." When that did not work, she intervened:

> So I got out of my car and I stood there trying to talk to him. And she – the door was still open, so I went to her side of the car, opened the door, and just tried to say, Let's, you know, stop. And she was screaming bloody murder and that's when she said, "He is going to kill me."

Ruthesell grabbed Kasey, whom she described as "black and blue," with a black eye and scratches and bruising on her body, and tried to pull her out of the truck, but Powell was holding onto Kasey. With Ruthesell holding one of Kasey's arms and Powell holding on to Kasey from the opposite side, a tug of war ensued. By that time, there were other cars behind them at the red light, so Ruthesell turned around and yelled for help. Another man came to help, but Powell still refused to release his grip on Kasey.

While the tug of war continued, Powell attacked Ruthesell, kicking her "in the gut" and causing her to fall and cut her leg. Undeterred, Ruthesell rebounded and continued the struggle, but Powell eventually took off in the truck "like a bat out of hell," with both doors open and Kasey inside.

Scribner came upon the altercation in progress, which he described as "flailing arms" and "a lot of yelling and screaming." Although there were others already there, he pulled over to see if he could help. Scribner noted that the truck's side door was open and that another man was trying to settle down the driver, whom he identified at

26

trial as Powell. In the meantime, Powell was wrestling with the woman next to him, "trying to get her back in and trying to flee the scene."

Scribner saw Powell hit Kasey multiple times in the head, and he stepped in and tried to help her. She had a bloody face, begged for help, and was "just screaming the whole time, 'Save me, please. He is trying to kill me.'" Scribner said, "[I]t was a terrible sight to see," and he described Kasey as "tiny," stating, "She didn't have a chance."[28] He also recalled seeing Kasey's neck, which according to Scribner, looked "almost like someone took a Weed Eater to it."[29]

Scribner stated that while he was on the left ledge of the truck's running board, trying to pull Powell off of Kasey, Powell "got [the truck] in drive and . . . threw [him] off," and he saw Ruthesell get pushed back. Scribner called 911[30] when Powell took off, and because he "wasn't going to just let [Powell] leave at that point," Scribner pursued him. Echoing Ruthesell's description, Scribner also described Powell as

---

[28]One of the detectives described Kasey as very small—she was 5'2 and weighed about 100 pounds. Powell was roughly 6 feet tall and well over twice her weight.

[29]State's Exhibits 41–46, photographs taken of Kasey at the scene after the police apprehended Powell, were admitted into evidence. State's Exhibits 41 and 42 show a tearful Kasey with a black eye and scratches on her neck. State's Exhibit 43 is Kasey's profile, showing several thin scratches on her face and multiple, crisscrossing cuts on her neck. State's Exhibits 44–45 are photos of Kasey's neck, showing the crisscross cuts. State's Exhibit 46 is the other side of Kasey's profile, showing redness on her cheek. Scribner and Ruthesell both testified that the photos showed how Kasey looked that day, although Scribner added that "it looked a lot worse in person that day."

[30]Scribner's 911 call was published to the jury.

27

driving "like a bat out of hell" and "driving like crazy." Powell's vehicle eventually came to a stop across two lanes of traffic on Interstate 820, just before it reached the express lane, in a 70 mile-per-hour zone.

North Richland Hills Police Sergeant Chad Hobson and his partner, who were in plain clothes and in an unmarked vehicle, arrived on the scene at that point. When Sergeant Hobson exited their vehicle, he pulled out his badge, approached the truck, and yelled, "Police. Stop." He could see a physical altercation occurring inside the vehicle, but as he started toward the driver's side, the truck took off. He and his partner took over the chase, while radioing for emergency assistance. The officers reached speeds of up to 114 miles per hour during the pursuit.

When Powell's truck exited onto Interstate 35 toward downtown Fort Worth, construction traffic forced him to stop. The marked units arrived, lights and sirens active, and several uniformed officers took Powell to the ground and detained him in handcuffs, while Kasey cried hysterically. Powell was transported to jail.

An ambulance was requested for Kasey, and her MedStar records were admitted into evidence at trial. According to MedStar records, Kasey had a contusion on her left eye with swelling, a small hematoma on her left ear, multiple scratch marks on her head, chain type marks on her neck, multiple abrasions on her arms and legs, and a red mark on her upper back. Those records also reflect Kasey's version of the events that had transpired:

- [Patient] reports a torture session that had been going on for over a week, including being drugged and poisoned.

- Patient stated, "They were going to kill me. He said he was suppose[d] to last night but he passed out. They have been drugging and poisoning me. I was raped a couple days ago as well. I stopped eating and drinking 2 days ago because I thought they were poisoning me."

Meagan Preissinger was working as an ER charge nurse at Harris Methodist Hospital-Downtown Fort Worth when Kasey was brought in by ambulance and admitted. She remembered Kasey even though the hospital's ER department averaged almost 400 patients a day and she had worked there for 11 years. She described Kasey as having been distraught, crying, and yelling.

After spending several hours at the hospital and learning what a sexual assault exam would entail—a pelvic exam with "prodding and poking and swabbing and collecting specimens"—Kasey declined the exam and said that the sexual intercourse had been consensual. Preissinger said that the ligature marks on Kasey's neck seemed consistent with strangulation, and she stated that being unconscious during points of trauma could affect an individual's ability to tell a linear story, although she agreed that being on drugs could also affect the thought process. The medical records from that day were admitted into evidence, and they reflect that Kasey admitted to using illicit drugs. Her toxicology screen was positive for amphetamine, benzodiazepine, opiates, and cannabinoids.

Amy Govea, a social worker, also interviewed Kasey at the hospital and her notes also reflect Kasey's statements to Govea and others about what had transpired between her and Powell:

- [Patient] came to the [emergency department] after being assaulted;

- [Patient] reported that she was raped and assaulted by a man named Kevin Wayne Powell; and

- Lisa with Women's Center . . . reported that the alleged abuser attempted to murder [patient] last night . . . .

Linda Franklin, a women's crisis advocate, spent three hours at the hospital with Kasey, an encounter she described as "unforgettable," and "the worst case" she had ever been involved in. According to Franklin, Kasey had expressed anger, anxiety, and fear, and Franklin had not perceived her to be intoxicated. To the contrary, Franklin testified that she "found her credible." Franklin described Kasey as having had "bruises and cuts around her face and other parts of her body. And she had marks around her neck where she said wire had been wrapped around her neck when someone tried to strangle her." Kasey identified Powell as her assailant and "fiancé turned captor."

Kasey told Franklin that Powell had caused her bruises with his hands and a gun and that he had threatened her. She also claimed that Powell had placed plastic bags over her head and had tried to drown her in the shower. Kasey told Franklin that she had been held captive for the past few months after she and Powell became

close. Kasey said that Powell had admitted to her that he "was supposed to kill her the previous night but he couldn't do it because he loves her." Kasey reported having been tortured and compared living with Powell to being in the movie "Texas Chainsaw Massacre." Nevertheless, Franklin said that Kasey did not indicate that she was interested in seeking retribution against Powell or seeing justice done. Instead, Kasey had been "in fear of her life" and "adamant that she was not going to be part of any prosecution."

White Settlement Police Officer Darrel Payne also met with Kasey and took photos of her injuries. He stated that when he first arrived, Kasey "appeared to be terrified, very untrusting of anyone in the room, thought there were connections with everyone to the suspect. She was crying. She was upset, agitated, and it took [him] quite a bit to calm her down enough to talk to her." Because she was afraid that Powell was going to appear in her doorway, she had Officer Payne check the hallway several times.

During the interview, Kasey told Officer Payne that Powell had assaulted her the day before by striking her with a pistol on the right side of her head. She said that she had been at Fawcett's house, and when Powell came to get her, she felt she had no choice but to leave with him. Her statements to Officer Payne were similar to the statements she made to Franklin.[31]

---

[31]Officer Payne also took photographs of Kasey's injuries, which were admitted into evidence. State's Exhibit 57 showed Kasey as she appeared that day in the

31

According to Officer Payne, Kasey told him that once she and Powell had arrived back at Powell's house, he had punched her in the face several times and repeatedly threatened to kill her. Kasey reported that Powell had also strangled her with "a metal cable wire that had handles on each end," causing her to pass out, and once she resumed consciousness, he began strangling her again. In addition to strangling her with a wire, Powell had also tried to suffocate her several times with a plastic bag over her head, and he had put her in a shower where he strangled her while running water over her face. Kasey also related that Powell had taken a razor and cut chunks of her hair out.

According to Kasey, at one point, she passed out and when she woke up, she joined Powell in bed. When Powell woke up an hour or so later, he seemed surprised and said, "You're alive?"

Kasey also told Officer Payne that she was "in fear for her life." Kasey shared with him some details explaining the precursor to the assault in the truck—an argument between her and Powell—and Powell's offer not to hurt her if she would cooperate with him. Kasey related that Powell wanted her to go to an attorney's

hospital. State's Exhibit 58 showed a closeup of Kasey's face, showing her black eye and the ligature marks around her neck and bruising on her face. State's Exhibit 59 showed Kasey's profile, including her facial bruises and the marks around her neck. State's Exhibit 60 showed the other side of Kasey's profile, highlighting the cuts near her eye and on her neck. State's Exhibits 61–62 showed the crisscrossing ligatures on Kasey's neck. State's Exhibit 63 showed the bruising on Kasey's hand and arms. State's Exhibit 64 showed the ligature marks on the back of Kasey's neck. State's Exhibit 65 showed Kasey's back.

office to make a statement in which she would claim that she had brought a gun into his home without his knowledge. According to Kasey, Powell told her that if she would go to the attorney's office and file an affidavit to that effect, that he would "spare her life." When Kasey refused his request, the assault began.

The family violence packet that Kasey completed that day with Officer Payne was also admitted into evidence. Officer Payne explained that the family violence packet is completed any time there is a family violence incident, and it contains questions that are scored to assess the risk factor associated with violence and behavior that could result in a homicide or serious bodily injury. Kasey answered "yes" to questions about whether Powell had ever been violent with her in the past; whether he had access to firearms or weapons; whether he had ever threatened to kill her; whether he had ever used weapons against her or threatened to do so; whether he had ever seriously injured her; whether things had recently gotten worse, more frequent, or more severe; whether he abused alcohol or drugs; whether he had ever been abusive when drinking or using drugs; whether he had ever been violent in front of others or in public; whether he had ever put hands or objects around her neck and squeezed (choked); whether he seemed unusually jealous or possessive or considered her to be his property; whether he had ever been violent when she left or talked about leaving him; whether she had recently left him; and whether the police had ever been called out regarding violence between her and the suspect. She denied that Powell had ever forced her to have sex against her will.

33

Kasey also gave a rambling written statement, which was read into evidence.  In that statement, she recounted the events surrounding the assaults on November 3 and 4, including a claim by Powell that Fawcett had wanted him to kill her:

> I was told over and over in between multiple blows that I would die tonight he used the wire to wrap around my neck and make me not be able to breathe and pass out over and over and over.  Then brought me inside and in restroom, he put my face under the stream of water, cho[k]ing me.  He used an object, hard, of some type[,] then kicked and got a razor and chopped out chunks of my hair, hit me in the teeth.  He used the cord a last time but I barely came back/was out for some unknown time as he had stopped to smoke a cigarette and fell asleep. When he woke up he acknowledged that Nick and he had known each other prior to me introducing them and [Powell] was supposed to kill me for him.[32]  But he would "spare" me if I would go to an attorney's office and sign an affidavit to take the charge for his gun.  I said no and while driving he started to beat and restrain me from escaping the vehicle at a stop.  I got the passenger door open and was trying to jump out.  I see all of the other car drivers getting out to help try and get me out and they had camera phones on him and I was screaming and somehow he got away and went around to express lane where I got out finally after traffic wouldn't allow a chase . . . .

Officer Payne said that Kasey had not appeared to be under the influence of narcotics or to be having a psychotic episode when he took her statement, but he agreed that none of the photos that he took showed razor cuttings or chunks of Kasey's hair having been cut out.  Kasey told him that Fawcett had been a good

---

[32]Drake said that Fawcett had loved Kasey and that she did not believe he would do anything to harm Kasey.

friend of hers but that she no longer believed him to be her friend and that she believed that he had been working with Powell and wanted her killed.[33]

After Kasey told a nurse that she wanted to file a police report on the November 3 assault at Powell's home, White Settlement Police Officer Shane Denham prepared a search warrant for Powell's home to look for evidence.

Kasey called her godfather, Christopher Hummell, from the hospital and told him that she needed help. In their 41-minute phone conversation, Kasey, whom Hummell described as "sobbing uncontrollably," with a "trembling" voice said that she had been beaten and strangled by her boyfriend—whom Hummell did not know—and that the boyfriend was in jail but that he had threatened to kill her when he got out. Kasey told Hummell that she was afraid, mentioned something about filing charges, told him that he was the "only person that she could trust," and pleaded with him to come get her. She indicated that she wanted to stay at Hummell's house because "she was in fear of her -- for her life."

Hummell could not pick Kasey up from the hospital because he was recuperating from back surgery at the time and could not drive. So, after an unsuccessful attempt to call her father, Hummell called Sharlean. Kasey was discharged to Sharlean at 8:25 p.m. That was the last time Hummell ever spoke to

---

[33]Officer Payne explained that he did not investigate Fawcett because his job had only been to take Kasey's statement at the hospital.

Kasey, even though Kasey traditionally contacted him at Thanksgiving, Christmas, Easter, and on his birthday.

### (6) The November 5 searches and SafeHaven phone call

Officer Denham filed the November 3 aggravated assault case with the District Attorney's office to place a hold on Powell while he was in the custody of the North Richland Hills police department for the November 4 assault. A protective order was requested on Kasey's behalf, and the White Settlement police executed a search warrant at Powell's home at 12:37 a.m.—the first of two searches on November 5.

State's Exhibits 48–56, which were admitted into evidence, are photographs of Powell's home taken during the first search. Although the bedroom scene changed after Kasey went missing, from the photos taken on November 5, it is evident that the bedroom walls on that day were not uniformly painted; they were a dingy eggshell color in some areas and white in others. Additionally, from State's Exhibit 56, a photograph of the bedroom from the hallway showing a window unit and keys in the exterior lock, the bed could be seen positioned perpendicular to the door upon entering the room.

State's Exhibit 52 showed Powell's bedroom with a black plastic bag on the floor, which Officer Denham testified met the description of the trash bag that Kasey described to Officer Payne as having been used over her head. To his knowledge, the black plastic bag was not submitted for forensic testing.

During the second search of Powell's home later that day, police found in Peter's room methamphetamine, marijuana, and two guns—a .38 and a 9 millimeter—which were seized. One of the guns was black and the other was a snub-nosed revolver; they were later identified by Fawcett as the two guns used by Kasey and Powell, respectively, during the November 3 assault in his home. The black gun that Kasey had held did not fire.

The police also found in Peter's room a large sum of cash, some check stubs, a bag of leafy green substance, Peter's driver's license, and a scale. Peter was arrested and charged with possession of marijuana. Both Peter and Powell later bonded out and returned to the house.

Shortly before midnight on November 5, Kasey called SafeHaven and spoke to Carrie Davis. Kasey told Davis that she had previously called SafeHaven but because it was full, she had to go back to her abuser, with whom she had been in a relationship for ten months. Kasey related the recent events to Davis, that:

- the previous night, she and her abuser had gotten into an argument over the abuser's drug use;

- he held Kasey at gunpoint before leaving for more drugs, so she used the opportunity to escape to a friend's house;

- her abuser found Kasey at her friend's house, pistol-whipped her, and stuck a gun down her throat;

- he took her back home and assaulted her all night, and the next morning he told her, "I was going to kill you last night";

- later that day, he was speeding down the highway and beating Kasey when the police began to chase them; and

- when he finally pulled over, the police took him to jail for possession of a firearm, and she pressed charges against him.

At that point in Kasey's story, the shelter's power went out, taking the phones down. After power was restored, Davis did not call Kasey back because of SafeHaven's policy not to endanger a victim by calling when the abuser could answer the phone.

### (7) Powell's indictment on November 6

On November 6, 2015, Powell was indicted for having committed the aggravated assault of Kasey by strangling her with a cable wire or striking her with his hand or fist. The indictment also contained a habitual offender notice, alleging that Powell had previously been convicted of aggravated robbery with a deadly weapon in 1986 and aggravated manufacture of a controlled substance in 1991.

### (8) Kasey's November 7 episode and brief stay at Freedom House

Shortly after midnight on November 7—barely over 24 hours after she had spoken to Davis at SafeHaven before the power outage—Kasey called SafeHaven again. This time she spoke with client advocate Monique Galvin. Again, Kasey related recent events, reporting that:

- her fiancé, with whom she had been in a relationship for three years, had attacked her for no reason, choked her with a cord, and put a bag over her head before forcing her to get in the car;

38

- he told her that he had meant to kill her the night before but had fallen asleep;

- when their vehicle came to a stop, he started attacking her again, but some bystanders saw the incident and pulled him off her;

- the police and an ambulance were called, she was taken to the hospital, and she did not know if he had been arrested; and

- while she was at the hospital, SafeHaven was called but that she had refused to go to the shelter.

At trial, Galvin testified that the Fort Worth and Arlington Shelters were at capacity for singles at the time, so although Kasey was approved for the shelter, she could not be brought in because there was no space.

It is unknown where Kasey was when she made the call to SafeHaven early that morning, but it is probable that she was at Fawcett's house and that she was high on methamphetamine when she made the call. According to Fawcett, who was granted immunity to testify at trial about his and Kasey's drug use, she was at his house on November 7 for seven or eight hours and the two had used methamphetamine together before the police arrived three to four hours after her call to SafeHaven. And, Fawcett added, when Kasey was high, she sometimes—but not always—acted paranoid.

According to Fawcett, about ten minutes before the police arrived at his house, Fawcett heard "banging through the hallway," and saw Kasey—who had been in his back bedroom for several hours—carrying suitcases and heading toward the front

door. Fawcett described Kasey as having had a "weird expression on her face," and then she "just [went] out the front door." Ten minutes later, a police officer knocked at the door.

Fort Worth Police Officers Leticia Meyers and Robert Mask had been dispatched to Fawcett's house because, according to Officer Mask, a woman had called "saying she was basically trapped in a house, being held there against her will" and that "she didn't feel safe and she felt she was being held in the house. She didn't know if she was free to leave." Officer Mask also said that the call notes indicated that the woman, who was later identified as Kasey, had named Fawcett as her captor and at one point said that he wanted sex for methamphetamine.

When the police arrived, it was dark and raining, and as they neared the residence, Kasey, bags in hand, ran out in the street and tried to get into Officer Meyers's vehicle. Officer Meyers described Kasey as frantic, paranoid, and hysterical.

Kasey still had lines on her neck, and she told Officer Meyers that the previous week she had gone to the hospital because her boyfriend had been choking her out with piano wire. After Kasey told Officer Meyers that she had been doing methamphetamine all day and needed to go to the hospital, Officer Meyers contacted an ambulance. Once the EMT arrived, Officer Meyers overhead Kasey tell MedStar personnel that she had been strangled before and was supposed to go to a women's shelter but had gotten paranoid about going and ended up at Fawcett's house instead. MedStar transported Kasey to the hospital, but no police report was filed because to

40

Officer Meyers "it seemed like she was just under the influence of a drug and that was what was causing her to be very paranoid."

Officer Mask spoke with Fawcett to get his side of the story, and Fawcett "said something to the effect of that he was watching TV and she had r[u]n out the front door. She was supposed to be sleeping in one of the bedrooms." At trial Fawcett said that he told the officer that Kasey "kind of left in a huff," and he did not know what was wrong with her at the time. Fawcett said that Officer Mask told him, "Well, you just need to choose your friends a little bit better."

Fawcett testified that he assumed that Kasey had gone to a women's shelter but he was in a car accident one week later, and he testified that November 7, 2015 was the last time he "[p]hysically saw her, spoke to her, anything." Fawcett testified that he believed Kasey was dead, explaining that "[w]ithout a doubt," if she had still been alive, she would have at least tried to see her son Benjamin. Fawcett described one of Kasey's only possessions as an album with Benjamin's photos and testified that Kasey's main goal had been to see Benjamin.

Kasey was transported to Harris Methodist Southwest hospital, where she was screened by Weatherford's Freedom House, a temporary shelter program for victims of domestic violence. During the screening process, she briefly recounted the November 4 incident, identified Powell as her abuser, and said that he had put a wire around her neck, beat her in the face, and told her that he was "supposed" to kill her. Kasey described Powell as having been very angry and related that he "might try to

41

find her." Kasey was approved to stay at Freedom House, and at some point, she was transported from the hospital to the Weatherford police department and then from the police department to Freedom House.

Kasey was not at Freedom House for very long that day before the Weatherford police were dispatched to retrieve her. At around 8 p.m., Weatherford Police Officer David Bravo arrived at Freedom House in response to a "disturbance call in reference to a female subject there that the people wanted removed from the property." When he arrived, he met with Kasey, whom Freedom House personnel described as having exhibited very bizarre, methamphetamine-related behavior. Officer Bravo testified that he found communicating with Kasey to be very difficult, and the longer he spoke with her, the more evident it became that she needed a mental health detention. He escorted Kasey from the Freedom House premises and took her into custody. In the verified application for emergency detention, Officer Bravo described how Kasey "display[ed] signs of mental illness":

> [She] appears lost at times and at random times will act like she doesn't know who she is. Subject also stated she has recently use[d] methamphetamine. Subject gets irritated when officers ask her basic questions and follows with a response of she wants us to find out if she was adopted. Subject's mood will aggressively change when asked questions and makes no sense.

### (9) Kasey's mental health detention

The next day, on November 8, Kasey was admitted to JPS through the emergency room; two days later, on November 10, she was transferred to Trinity

42

Springs, JPS's mental health division. A photograph of Kasey that was taken when she was admitted shows a bad black eye and cuts on her neck. But the admission notes reflect that Kasey initially stated that she scratched herself on the neck and then later stated that she did not recall what happened or who had caused her injuries. The hospital inventoried her property, which included a cell phone, but the hospital records do not indicate whether the phone was functional.

Kasey recounted to the health care providers that she had binged on methamphetamine during the preceding three days—November 4, 5, and 6—and she said that if released, she would go to some other domestic violence shelter.[34]

The medical notes reflect that Kasey was confused and paranoid as to her identity—she stated that her name was "either Misty or Ka[s]ey.[35] I'm not sure"— and claimed that she did not trust her family because they had been "lying" to her about whether she was adopted to prevent her from inheriting from her deceased mother. Kasey reported that the black eye and ligature marks on her neck were caused by Powell's assault on her and said that she was not sure if he was still in jail, but she also stated that the assault "may have been related to her family's desire to conceal her true identity."

---

[34]Kasey was told that she could not return to Freedom House because of her behavior.

[35]At one point, Kasey claimed that her name was "Misty Manly."

The medical professionals spoke with James, who told them that Kasey had been intermittently psychotic over the past few years and that Powell had asked him to sign a statement that she was mentally ill so that he could avoid the assault charges. James told the doctors that when Kasey was not living with Powell, she was living with drug dealers, and that she had fired a handgun at Powell a few days prior to her arrival at JPS.

On November 9, Kasey told the JPS professionals that she had "done meth" and gotten into a physical altercation with her "friend," who she identified as Powell, and then went to Fawcett's house, where she used more methamphetamine and called the police, who took her to a "safe house." After she was evicted from the safe house for failing to follow the rules, the police brought her to JPS. She claimed that her drug use was why she could not remember anything, but she denied having an addiction problem. Her urine tested positive for benzodiazepine, amphetamine, and opiates.

### (10) Kasey's November 10 diagnosis and November 17 discharge

On November 10, Kasey was diagnosed with "unspecified psychotic disorder." In his certificate of medical examination, the examining physician opined that Kasey was mentally ill and presented a substantial risk of harm to herself or others if not immediately restrained. An application for temporary mental health services was filed, alleging that Kasey had been physically aggressive toward staff and had required

44

emergency medications, that her father had reported that she had recently fired a gun at her boyfriend, and that the mental status examination revealed that she exhibited illogical thought process at times, presented paranoid delusions, and had poor insight and poor judgment.

By November 17, Kasey "no longer me[t] inpatient criteria" and was discharged, notwithstanding James's warning the hospital staff that discharging her was the "wrong thing to do" and would mean "signing her death warrant."

James said that while Kasey was in the hospital, Powell called him, told him that he had rescued Kasey from a man named Dallas, and insinuated that Dallas had caused all of Kasey's problems. Kasey also told James that Powell had gone to Dallas's house, beaten up some people there, and rescued her from Dallas.[36] When James picked up Kasey from JPS, and she asked him to take her to a house on West Haven, James thought that Dallas could be the person who lived there.[37] But no one was at home when they arrived at the house, so James took her to his place.

According to James, Kasey had seemed lucid and in a good mental state when he picked her up. But shortly thereafter, when James refused to allow Kasey to exchange the sim card in his phone with the sim card in hers, they argued. Kasey became angry, and she slapped James and "walked out the door" without any of her

---

[36]Fawcett testified that he knew Dallas but that Dallas had not been in Kasey's life in September, October, and November 2015.

[37]James was mistaken. Fawcett lived on West Haven.

45

belongings or a functional cell phone. As of that date—November 17, 2015—James never saw or heard from Kasey again, even though prior to that time she had called him every Christmas.

### (11) Kasey and Powell contacted Johnson sometime after November 17

Kasey's former fiancé Johnson testified that in late 2015, he had learned that Kasey had taken up with Powell, and at some point in November 2015, Kasey and Powell called him. During their conversation, Johnson got the impression that Kasey and Powell had contrived a story that they wanted him to hear. Johnson noted that Powell did most of the talking during the conversation and when Kasey tried to say something, Powell would "interrupt[] her to change the narrative."

During the phone call, Powell and Kasey asked Johnson to give certain testimony to Donna Bakouris, a defense investigator who had been hired that month by Powell's defense attorney in the aggravated assault case resulting from the November 3 assault. According to Johnson, Powell asked him to give Bakouris information about Kasey's mental health, her drug abuse, and her having previously accused Johnson of a crime. As Johnson explained, in essence, Powell wanted Johnson to tell Bakouris that Kasey was crazy and that she was a drug addict. Because it appeared to Johnson that Powell was prompting Kasey during the conversation, Johnson refused their request "until [Kasey] called [Johnson] a separate time."

Then Powell told Johnson a story "again and again" about "a guy named Dallas, who was in the Mexican Mafia and the manager of a strip club that Kasey was supposedly working for." Powell claimed that Dallas was "feeding drugs to Kasey and abusing her and she would constantly disappear." Johnson related that every time Kasey tried to contribute to the story, Powell would interrupt her.

Powell claimed that Kasey had called him after Dallas and others in an SUV had tried to kill her and had thrown her body on the side of a road. Some of the details that Powell related to Johnson and that Johnson testified to at trial bore some resemblance to the events of the November 4 assault in Powell's truck, as related by other witnesses. According to Johnson, Powell told him that:

- after Kasey was left on the side of the road, she "managed to get to a phone and call [Powell] for help";

- Powell "went to pick her up";

- on the way home, "for some reason or another she freaked out on him at the stoplight and got out of the car";

- while she was out of the car, some people "saw that she was battered and bruised and bloody" and they "came to her aid";

- the people who came to Kasey's aid did not realize that "he was there to help her and [Powell] ended up in jail";

- after Powell was arrested, Kasey stole his Camaro, went to Dallas's house and got "strung out on drugs";

- Powell "traced the On Star or the GPS or whatever and located the vehicle," and went to Dallas's house;

47

- Dallas fired a gun at Powell, but somehow Powell "miraculously got the weapon away from [Dallas], subdued [him], left Kasey there, and took his car and took the gun with him";

- Powell "decided that he had had enough of Kasey and filed a restraining order against her";

- then Kasey "show[ed] back up to his house bloodied and battered again" and with a black eye;

- somehow Powell "became alert to the fact the police had been called";

- because Powell had a restraining order against her, Kasey "had to come in his house or she would get in trouble";

- Kasey went into Powell's house, but "the police weren't leaving and they realized that [Kasey and Powell] were in there, so they came in and they found her bloodied and battered, arrested him for some kind of an aggravated assault, and maybe arrested his children for that possession of that firearm" that Powell claimed he got from Dallas; and

- "that resulted in another charge."

Johnson testified at trial that the story "didn't really sound legitimate when it was being told" to him, and so Johnson asked some questions, such as, "Why did he let her get out of the car?" and "Why didn't he just hold her down if she was battered?" After all, as Johnson pointed out, Kasey was probably "half of his size and weight." He also queried why, "if she called him to help her, why did she jump out of the car and run away from him?" Johnson observed that when he confronted Powell with questions challenging the story, Powell did not like it and became defensive.

Johnson told Powell that it sounded to him at that time as though Kasey was "under duress" and that he would not speak to Bakouris until he had spoken to Kasey

privately to ensure that she was not under duress. When Kasey called Johnson a day or two later, she "sounded fine" to him, and she again asked Johnson to "do it," explaining that "if she got [Powell] out of trouble, that [he] agreed to pay for her to get long-term drug and mental health treatment." During that conversation, she never talked about the Mexican Mafia or Dallas.

Despite Johnson's several warnings about what he perceived might be negative consequences of him relating this information to Bakouris, Kasey insisted that she "didn't care," and she wanted him to do it. In an attempt to be supportive and to encourage her to reach out to him again if she ever needed help, Johnson agreed to her request.

Johnson spoke with Bakouris, and Powell later called him to follow up and confirm that he had. Johnson said that it seemed to him Powell "thought he was going to be able to get away from it, get out of it."

That private phone conversation he had with Kasey was the last time Johnson spoke to Kasey. When asked if he believed Kasey was dead, Johnson replied, "She would have to be." Johnson said that over the past four years since her disappearance and leading up to Powell's trial, she would "definitely" have reached out to him, explaining, "She never went longer than a year reaching out to me or needing some kind of help or her friends, definitely within a few months."

### (12) Cheryl's Facebook post and Kasey's November 18 letter

On November 18, Cheryl, who was living in Tennessee, posted on Kasey's Facebook wall, "Who let you out of the nut ward. You ruined [Powell's] family. Witch." According to Investigator Nutt, who worked for the district attorney's office in the special crimes division and who identified Cheryl's phone number, Powell and Cheryl had continuously communicated with each other through November and December 2015 using that number.

On that same day—November 18—Kasey wrote a letter, addressed "to whom it may concern." Bakouris read the letter aloud at trial. After stating her name and date of birth, Kasey claimed in this letter that Dallas was her assailant and that she had falsely accused Powell:[38]

> These are events that occurs during the early part of November of this year, 2015. I was I had recently started using methamphetamine, a drug that I have had problems quitting over the past 2 years.
>
> On or about my addmittance to JPS Hospital for treatment for the drug detox and drug triggered psychosis. I made allegations which implicate him in being the person(s) who had beat me and tried kill me, which I now know after my tretament and with a sound mind are not correct. The night that I was beaten was the early hours of November 5, 2015 after Kevin Powell had dropped me off at a club I used to work at in Aledo: temptations Cabaret. I still have some blockage of the actuall attack itself but the person(s) responsible I am certain now was man known to me as "Dallas" who is a "pimp" who I have in the past given reason for him to be angry with me and for not commlying with the way he "runs" the clubs and was warned that I was on his hit list. I was beaten and strangled my his men and dropped off on Cherry Lane. Because I was closed to Kevins residence I walked to his house trying to

---

[38]We have not corrected this letter for grammar or spelling.

50

get his help. When I showed up I was beaten and bloody and still confused due to the drugs that were in my system. Kevin tried to help me and get me to JPS, but in the process he had to stop for work and get some suppies to one of his workers. When it became apparent that he was not taking me directly to the hospital straight away I began having delusions again that made me think that he was not going to get me to the hospital, and then began to act erratic by jumping out of the moving vehicle while traveling 70 mph. Opening the door and trying to escape. He tried to tell witnesses that he was trying to help me and take to the hospital for mental problems and drug use. But his efforts were to keep me from getting out of the vehicle and harm myself or others. He was arrested at the schene and charged with family violence due to my codition, appearance, state of mind, and dellusional statements I was making.

Kevin Powell in no way hurt either physically or otherwise. I know this is fact after completeing 7 days in a psychiatric and drug dependency facility, wher I was able to detox and get on the right medication, had an mri which show I have no mental illness either from MS, drugs, or otherwise, and in a clear frame of mind want to make it known to authorities that Dallas is the person responsible. ANd that all of the allegations I made against Mr. Powell and or his son [Peter] Powell by association are completely unfounded and not true and retact any statements official or otherwise made in regards to either of them. During my drug induced state.[39]

Investigator Nutt testified that he found the timing of Kasey's November 18 letter interesting because she had just been released from the mental hospital the day before. He stated that he found the letter to be "extremely articulate" considering that on November 18, Kasey was still "[c]oming off of what she had come off of."

---

[39]At trial, Bakouris agreed that the letter contained "legal" language, such as "[o]n or before," "[a]llegations which implicate" and "person or persons," and that Bakouris did not know where a former dancer and dental assistant would have learned such legal jargon.

51

### (13) Kasey met with Bakouris on November 19

On November 19, Kasey met Bakouris for around an hour at the Starbuck's inside the Montgomery Plaza Target in Fort Worth. Bakouris had obtained Kasey's phone number from Powell. She did not know how Kasey had gotten to or from their meeting, and she did not ask Kasey how she had access to a computer and printer to type the letter she had left at Powell's house on November 18.

During their meeting, Kasey clarified some of the statements that she had made to the police about the November 4 aggravated assault and agreed to sign an affidavit of nonprosecution that Bakouris would prepare if it was consistent with what Kasey told her during their meeting. Bakouris said that Kasey had been anxious to meet with her and to help Powell but that it was not uncommon in family violence cases for a victim to decide not to press charges.

### (14) Kasey's November 20 affidavit of nonprosecution

On November 20, Kasey signed the affidavit of nonprosecution prepared by Bakouris, a notary public, who notarized it and made a photocopy of Kasey's driver's license as proof that Kasey had been present and had signed the affidavit. At trial, Bakouris read into the record the affidavit that Kasey had signed. In the affidavit, Kasey portrayed Powell as a supportive friend and again identified Dallas as the perpetrator of the crimes against her:

> I first met Kevin Powell (Kevin) approximately two to three years ago when I was working as a dancer at Illusions Cabaret, which now operates under the name Stars Cabaret on West Camp Bowie Boulevard

in Fort Worth, Texas. Kevin was not a customer at Illusions but frequented the establishment as he knew the owner of the club. Kevin and I established a friendship.

From May 30, 2014 through November 12, 2014, I was incarcerated and as a result, I was not working and did not see Kevin. However, Kevin contributed to me financially during my incarceration.

In February of 2015, I gave birth to my daughter and was struggling financially to support her. In April of 2015, I returned to dancing and upon doing so, I became reacquainted with Kevin.

Upon me advising Kevin that I wished to place my daughter up for adoption, as I could not adequately provide for her financially, he advised me he knew a family who was hoping to adopt a baby. Kevin was critical in facilitating the adoption of my daughter to a good home.

In addition, Kevin offered me a job with his company and we began an emotional and sexual relationship. I moved in to Kevin's home and worked for his company and performed the job duty of internet marketing. I worked from Kevin's home in White Settlement, Texas.

Kevin provided me a place to live, food for me to eat and other essentials. He did not pay me a regular salary but paid for attorney fees to assist me in being able to have visitation rights to my son, who is nine (9) years of age.

In approximately July of 2015, after a visit with my son, I left this visitation and went to purchase methamphetamine. I began using methamphetamine from this unknown date in July sporadically and without Kevin's knowledge.

On an unknown date in August of 2015 or September of 2015, I was dope sick and told Kevin I needed help and confessed my drug use to him. Kevin agreed to get me help. At this time, I also had bruises on me that I did not know where they came from. Kevin told me he believed the bruises came from me falling.

On this date, Kevin agreed to take me to the hospital and I went with him from his house in his truck. On the way to the hospital, an

employee called Kevin and said he needed some sort of supply or something from work. Kevin agreed to meet the employee in Southlake. On the way to Southlake, and while I was under the influence, Kevin and I began arguing over the fact I had not paid a speeding ticket he has received. This unpaid speeding ticket resulted in an outstanding warrant.

Kevin stopped at a gas station to get gas and upon doing so, I jumped out of his vehicle and ran inside the station and called Nick Fawcett (Nick), who is a long-time friend and a person whom provides me with methamphetamine. During my telephone conversation with Nick, I told Nick I needed help and I did not believe that Kevin was planning to take me to the hospital. I also told Nick that I had bruises on me and I did not know where they came from. At the time, I believe in my drugged state of mind, I did not understand that Kevin was in fact taking me for medical treatment. I believe I had a drug induced psychosis, which I have recently learned about since I have gone through drug treatment.

Nick advised me to call the police and I did so. I advised the police that Kevin had bruised me. At the same time Kevin also called the police and told them I was sick and needed help and had jumped out of his truck. Once the police got there, they took photos of my injuries. I do not know if Kevin was arrested or charged with bruising me. I know I told the police I did not want to press charges against Kevin and I believe I told them I was not certain if I was telling them the truth as to my allegations against Kevin, as I was under the influence of drugs.

Nick came and picked me up and I went to his house. I stayed the night and used more drugs. The following day, I woke up and again and felt like I needed to get medical help. I requested that Nick take me [sic] the hospital, but he did not want to do so since he is a drug dealer.[40]

I telephoned Kevin the following day and asked him to take me for medical treatment and he agreed. Kevin came to Nick's house with his grandson, [Max]. Kevin and [Max] allowed me to shower and eat some food and then Kevin took me to Harris Hospital Southwest. While in the hospital, the police came in and questioned me since I had

---

[40]Elliot said that while she was sure Kasey had drug dealers besides her, Fawcett had not been one of them.

made a report the previous day. I again told them I did not want to press charges against Kevin. I stayed in the hospital approximately one day and the[n] Nick picked me up and took me to Kevin's house.

Kevin assisted me in being sure I stayed clean and away from drugs until October of 2015. Kevin and I became engaged and had a healthy and happy relationship. Kevin again helped me with hiring a new attorney to assist with custody of my son. Kevin allowed me to drive his Camaro.

In October of 2015, I relapsed and again used methamphetamine. Once again, Kevin did not know about my drug use and I began having drug induced psychosis.

On November 3, 2015, I asked Kevin to help me get medical help for my drug issue. He agreed and stated he would take me to the hospital. Kevin broke my phone so I could not call Nick for drugs and told me I could no longer drive his Camaro. At an unknown time, but in the early morning hours, Kevin left the house to go to purchase cigarettes. I got the keys to the Camaro and left to go purchase methamphetamine.

I parked Kevin's Camaro behind a Haverty's Furniture store near Hulen Street and walked to Nick's house. I used drugs with Nick and then went to sleep. Upon waking up, I had e-mails from Kevin accusing me of stealing his car. I was under the influence of drugs and alcohol and could not recall what he was talking about.

Later that date, Kevin came to Nick's to pick me up and asked me to show him where his car was. I did so and we went back to Kevin's house. Kevin and I were arguing, as he was accusing me of stealing his Camaro. I went inside to get some of my personal belongings. I got the cordless phone from the house and called 9-1-1. I told the police I was scared of Kevin but I do not know why I said that.

The police came to Kevin's house and when doing so, they found a bag of marijuana in the corner of the room and asked to search Kevin's house. I believe they got a search warrant and searched his house, but only found the marijuana to the best of my knowledge. Kevin filed a criminal trespass warrant against me and I had to leave Kevin's house. Nick came and picked me up.

Late that evening, Kevin came to Nick's to bring me more of my clothes, as it was nearby the Haverty's store where I had parked his car. The details are very fuzzy, but I believe Nick opened the door and I shot what I thought was a real gun at Kevin. This gun was in fact a toy gun and did not hurt Kevin. Kevin and Nick wrestled this gun away from me.

I told Kevin I needed help and he again agreed to get me help. I left with Kevin and he took me to his house. Kevin and I argued again and I asked him to take me to Temptations, which is a strip club in Aledo, Texas. I wanted to work and make money. Temptations is open until 4:00 a.m.

Kevin left me at Temptations and I recall I drank alcohol. I recall seeing a male, who I know as Dallas LNU [last name unknown] (Dallas), but I am not sure if that is his real name. Dallas is a pimp at Temptations who wanted me to be a prostitute before, which I refused. As a result, Dallas and I do not get along. I recall Dallas and three other males were present at Temptations. I have no recollection of this evening after this point and believe it possible I was drugged by Dallas.

The following morning, November 4, 2015, I woke up on the side of the road near Las Vegas Trail and Cherry Lane. I was wearing blue cheerleading shorts and a white t-shirt and had only one shoe on. I observed I had been beaten up on my face and appeared to be kicked near my breasts, as I had bruising. I also felt as if I had been choked. I was bloody and did not have my purse.

I began walking toward Kevin's house and was picked up by a man, who gave me a ride to Kevin's. Upon arriving to Kevin's, he observed my injuries and agreed to help me. Kevin told me I was not allowed to be there since I had a criminal trespass warrant. He also told me the police were on the way to his house, as they were coming to see that the Camaro had been returned and to remove it from the stolen list. Kevin suggested I go and change clothes while he talked to the police.

Once the police left, Kevin agreed to take me to the hospital. Before going to the hospital, I rode with Kevin to meet a co-worker to deliver items for a job. However, on[] the way, I observed Kevin missed a turn in North Richland Hills and I thought he was not taking me for

medical treatment. I became upset and tried to jump out of his truck at a stop light. I began yelling for help and people in nearby cars began trying to help and some even took video on their phone. A lot of people gathered around and Kevin told them he was taking me to get help.

We left and got on the highway, where Kevin was pulled over by the police. I told the police he has injured me. I was completely under the influence and was not telling the truth. However, at that time, I think I was really convinced he had hurt me.

I was visited in the hospital by the police and I am not sure what I told them. I do not know if they asked me if I wanted to press charges and what I may have said if they asked. I do not know if I gave a written statement to the police. I was not at all in my right mind and was detoxing off of methamphetamine.

I was ordered to stay at [JPS] for 72 hours and then again ordered to stay another 7 days. I have received drug treatment and have been ordered to continue outpatient treatment for drug abuse. I am currently not under the influence of any substance and realize that I have suffered from drug induced psychosis.

On November 18, 2015, and in an effort to be helpful to Kevin, I left a written statement (copy attached) hereto, in his mailbox.

I believe I fabricated the allegations I have made against Kevin, which resulted in criminal charges against him. This was done under the influence of drugs.

Kevin has never hurt me, nor am I afraid of him. I love Kevin and would like to continue our relationship and at the very least have a friendship with Kevin.

Bakouris agreed that some of the statements in Kasey's affidavit appeared unlikely and inconsistent. For example, although Bakouris had met Kasey only twice, she testified that she could tell that Kasey was a methamphetamine user, and because Kasey had lived with Powell, it would have been a safe assumption that Powell had

57

known about her drug use, despite Kasey's statement to the contrary. She also agreed that hospitals were located near White Settlement, including Harris Methodist Southwest and Baylor, and that if someone said they needed immediate help from a hospital, it seemed out of the way to drive to Southlake first, as Kasey had claimed happened. Nor would she expect that a person who had seen Kasey's injuries, as described in her affidavit, to have run an errand from White Settlement to North Richland Hills before seeking medical treatment for her injuries, as Powell did, according to Kasey's statement.

Additionally, Bakouris agreed that it was unlikely that Kasey had lost her purse and had no permanent address on November 4, as she stated in the affidavit, because she likely would not have been able to obtain a new driver's license without a permanent address between November 4 and November 20, the date when Bakouris had personally seen and photographed Kasey's driver's license. Finally, Bakouris also agreed that if she was trying to help someone and others became involved, she would have asked for their assistance—instead of kicking and pushing them and fleeing from the police, as Powell did, according to Kasey's statement.

### (15) Kasey's November 22 Facebook post and events that followed

On November 22, at approximately 3:00 p.m., a Facebook post purporting to have been made by Kasey appeared and stated:

> My dad said to go to rehab. I said, No. No. Yes. Finally getting help.
> I need sobriety. I finally realize what a demon methamphetamine can

58

be.  Beautiful disaster.  Like I always said, now the only way to make this right is to fix the damage done to those who were really on my side from day one.  Everyone who never did a thing to hurt me, but under the influence the devil made me think they were.  Then I can start fresh.  I made accusations against people who were innocent and only trying to get me the medical attention I needed.  Now to make sure the right people are accused, I am determined to get you Dallas.[41]   Bet that biatch.  You will never do what you have done to me and countless other innocent girls again.  Game over.

According to Facebook records, 45 minutes before this post was made, a password change was made to Kasey's Facebook account.

On the same day, Kasey sent a Facebook message to Potter, told her that she loved her, asked Potter to call her, and gave Potter a phone number that Kasey had not previously provided.  Potter called and left Kasey a voicemail, and they played phone tag for a period of time.  Eventually, the two spoke to one another on the phone.  Kasey told Potter that she was safe and that she wanted to come to Florida to visit her but that there was something that she had to "finish" before she left and that she would call Potter when she got to Florida.  At the time Kasey told Potter this, Potter believed that Kasey was safe in temporary housing in Weatherford, and Potter asked Kasey to send her a cell phone number for Kacey's shelter "advocate."

Because Kasey had also told Potter that "she was in danger, that someone was after her and she did not feel safe and they had control of her communication," Potter also sent Kasey a message, advising her to "[m]ake sure" that she turned off her

---

[41]At trial, Casey's cousin, Potter, expressed doubt that this post was authored by Kasey and referred to her reference to Dallas as the "goose chase."

59

location on Facebook and on her cell phone. While Potter's testimony as to the dates when these exchanges occurred varied, ranging between November 22 and November 28, her testimony was clear that Kasey never came to Florida to visit her after November 28 and Potter never saw or heard from Kasey again, even though, prior to 2015, Kasey had always contacted her at Christmas.

On November 23, Powell bonded out on the November 3 aggravated assault charge.

On November 28, a week and a half after Kasey was discharged from JPS, Sharlean sent Kasey a Facebook message telling her about a message she had received from Powell and warning Kasey that she needed to be cautious because Powell had provided information that had led to Dallas's arrest:

> Kasey, I don't know where you are. Mr. Powell left a message on my answering machine today, I think, telling me to let you know that you should be very [precautious]. Your safety is in jeopardy because he has submitted evidence that got "Dallas" arrested and that a friend of yours to whom he had done the same thing was supporting this. He asked me to call him if I had any questions. I really don't have any questions for him unless you need me to ask something. If you can have visitors where you are, let me know. For some reason[,] Mr. Powell thinks you are in outpatient treatment in Weatherford with the assistance of MHMR. I have no way of confirming this. Stay dry and warm.

According to Peter, Kasey was living with Powell at his house after her discharge from JPS. Two days later, Kasey returned to JPS for a follow-up appointment with the outpatient behavioral health clinic.

60

### c. Events of December 2015 and January 2016

On December 4, Kasey returned to JPS once again. Kasey's December 4 visit was the last contact JPS had with Kasey, despite several attempts to locate her in December and January. On December 17, JPS attempted to reach Kasey through her father. James "expressed his displeasure with [Kasey's] discharge from the hospital" and told JPS that after she was discharged, Kasey "went home, showered[,] then left and hasn't been heard from since."

On that same day, JPS tried to reach Kasey through Fakas but there was no answer. According to JPS records, Fakas's outgoing voicemail message stated, "If this is Kasey, I still love you."

On December 9 and again on December 12, Kasey sent a Facebook message to Frank Manly, a man later identified as having had a relationship with Kasey's mother.[42] In both messages, Kasey requested that Frank call her. Kasey provided her cell phone number as the call back number in the December 9 message, but in the December 12 message, she provided the telephone land line at Powell's residence as the call back number.[43] As Investigator Nutt pointed out, because Kasey provided a

---

[42]On December 12, Kasey also sent a Facebook message to Frank's daughter, Ruby Manly, asking her to have her father call her. Ruby did not respond until two months later. On February 15, 2016, Ruby messaged back, stating, "Sorry am just now getting this."

[43]Kasey did not receive a response back from Frank, and by the time of trial, he was deceased.

land line as a call back number, Kasey would have had to have been at Powell's residence to receive Frank's return call on December 12. Kasey sent no more Facebook messages after December 12.

Sometime around December 10, Powell's defense attorney provided a packet containing Kasey's affidavit of nonprosecution to the district attorney, but the district attorney did not dismiss the case.

After December 10, Bakouris attempted to reach out to Kasey by email and text messaging several times, but despite having previously been responsive to Bakouris, Kasey never responded.[44] On January 4, 2016, Bakouris emailed Kasey, stating that she had tried to reach her a few times and asking her to please call her "ASAP." Bakouris called Sharlean, who told her that Kasey "kind of does this sometimes" and said that she would "probably resurface." According to Bakouris, Sharlean had not seemed too worried.

Potter said that the idea that Kasey had gone missing had arisen after Christmas when she did not contact anyone in the family. Potter had not been able to do anything about it at the time—she was in the hospital on January 4, 2016, for cancer treatment. During her recovery, Sharlean told Potter that Kasey was not responding and had not contacted her or James. Potter became concerned and started reaching

---

[44]According to Bakouris, Kasey's failure to respond was out of character from her previous experience with Kasey.

out to Kasey's friends to actively search for her, as did other friends and relatives seeking information from anyone who might have seen Kasey after December 9.

### 3. The investigation into Kasey's disappearance

#### a. The initial investigation, April–June 2016

At the beginning of April 2016, Fort Worth Police Officer Joshua Campbell met with Sharlean, who had reported Kasey as missing.[45]  After checking with JPS, Harris hospital, and the county morgue, the police could not locate Kasey.  When the police contacted Powell, he told them that the last time he had seen Kasey was before Christmas when "[s]he arrived with a Middle Eastern man.  She stayed in the car while the man approached to get [Kasey]'s belongings and then they left the residence."  Officer Campbell turned the report over to a detective and notified the Fort Worth Police Department's human trafficking task force.

White Settlement Police Detective Stephen Person received the case from the Fort Worth Police Department on April 5.  He began working the case by reviewing what the Fort Worth police had done.  He spoke with Fort Worth Police Officer Buck Wheeler once, calling him for information about Peter, who was Powell's son and Wheeler's stepson.  On April 6, 2016, the White Settlement police entered Kasey's identifiers into the National Crime Information Computer (NCIC) as a

---

[45]Potter testified that Sharlean had contacted the White Settlement police long before April to report Kasey's disappearance but that "it sat on the desk of an office." Her understanding was that because of Kasey's drug history, the disappearance was initially not taken seriously.

missing person. Kasey's name was also entered into the National Missing and Unidentified Persons System (NamUS), which could be searched internationally for any person by DNA or unidentified remains.

Based upon information he received from the Fort Worth police department, Detective Person contacted Peter and spoke to him over the phone for about an hour. Peter reluctantly shared some information with him but insisted that he did not want to put anything in writing or sign anything. According to Detective Person, Peter was "absolutely" afraid for his own safety.

According to Peter, he did not want to get involved, but the police "started telling [him] things that they already knew about," and Peter believed that the police thought he was involved. So Peter "ended up giving them a statement based on stuff that they already told [him] that they knew."[46]

Peter's information led the White Settlement police to check Powell's pawn history and to obtain some saws that Powell had pawned on March 22, March 25, and

---

[46]Because Powell challenges Peter's testimony at trial under the corpus delicti rule, we recount Peter's statements in only general terms here, and we focus primarily on the evidence uncovered by the police in their investigation as a result of Peter's statements to them. According to Detective Person, the main points that Peter told him were that (1) Kasey was killed about a week before Christmas, Powell did not clean up the mess for about a week, and Powell called a guy named Shock to come over and help clean up; (2) Kasey's body was then cut up in the master bedroom and the parts were put in a barrel in the back yard, dissolved with some chemicals, and then poured on the ground with plywood placed over it; and (3) Peter had seen blood halfway up the walls and onto the ceiling, with plastic down to protect part of the wall and the floor.

April 7. They collected four saws and a drill: a Stihl brand concrete saw, a gray and green Ryobi circular saw, a red and black Skil table saw, a Bausch blue and black fine cut saw, and a Roto-zip black and gray saw drill. On April 11, the saws and drill were tested for blood,[47] and, to some degree, blood was detected on each item, especially in the teeth of the saw blades.

The saws were tested with Luminol,[48] a reagent containing a chemical that reacts to blood, giving the blood a bluish-white glow in the dark (chemiluminescence).[49] Luminol can also react to certain metals, certain varnishes in paint, and cleaning solutions. For example, according to Investigator Simmons, "Bleach is something that will give you a very fast flash, almost like a lightening flash.

---

[47]White Settlement Police Department Crime Scene Investigator Laura Simmons explained why the saws were tested: "[W]e had a report that Mr. Powell used these saws or a series of saws on the victim to dismember her."

[48]As described by the Court of Criminal Appeals,

> Luminol is a highly sensitive blood reagent used to detect latent bloodstain evidence, usually associated in forensic investigations with a clean up subsequent to a bloodletting event. Investigators will typically spray a solution of luminol and the oxidant, and the iron in blood catalyzes the luminescence. This makes trace elements of blood visible to the naked eye in a bluish-green glow, even if someone has cleaned or attempted to remove it.

*Nisbett*, 552 S.W.3d at 251 n.7.

[49]State's Exhibits 221–252, photographs of the items tested with Luminol, were admitted into evidence.

It will luminesce and then very quickly go away within seconds. It doesn't stay illuminated."

After the red and black Skil table saw had been sprayed with Luminol, parts of it glowed in the dark with a "blue-white glow" that Investigator Simmons indicated showed that the saw was "reacting to a protein presumably in blood." Notably, the saw did not show the lightening-flash reaction that would have denoted a reaction to bleach, nor did it completely light up, which would have indicated a metal reaction. On the lower right-hand side of the saw, there was a circular pattern, as if something had been rubbed or wiped. Chemiluminescence was shown on the tips of the saw's teeth, the edge of the guide bar, underneath the guide bar, and on the surface of the saw's right side.

When the Stihl saw was tested, Investigator Simmons noted that some luminescence started to occur along the saw blade's teeth while the lights were still on. Most of the saw was metal, but not every portion of it glowed, which meant that the Luminol was not reacting to metal but rather to something on the blade's teeth. The Luminol revealed splatter on the blade's teeth and down the handle, and when the saw was turned over to show its wheel well,[50] the Luminol showed luminescence that was "pooled pretty heavily" in that area.

---

[50]Investigator Simmons said that she had been looking for areas of the saw that might not have been cleaned.

The Ryobi saw and Roto-zip saw drill showed only sparse Luminol results. And on the Bausch roto-zip, which had a plastic exterior, most of the chemiluminescence was concentrated in the fan belt area inside the saw, in the plug area, and inside the motor.

Investigator Simmons took a number of DNA swabs from the saws, which were submitted for DNA testing, but only one of the DNA tests came back positive for the presence of human blood.[51]

Based upon Peter's statements to Detective Person about the plywood in Powell's back yard, the detective also viewed aerial photos of Powell's residence from November 2015, January 2016, and February 2016 to confirm that the plywood was still present in the back yard.

Between April 5 and April 15, Detective Person also searched Kasey's Facebook records and talked with Sharlean and James. He also checked jail and hospital records, as well as the Tarrant County morgue, but he did not check the morgues in Dallas County or Collin County.

On April 15, Detective Person obtained a search warrant for Powell's home.[52] He and Investigator Simmons participated in the search. Investigator Simmons described the house, and the master bedroom, which was her primary focus, as very

---

[51]As we discuss below, however, the test was unable to determine the contributor.

[52]Powell was found inside, underneath a bed, and he was arrested for possession of drug paraphernalia.

messy and cluttered. According to Investigator Simmons, the house was full of trash—including bags of rotting trash on the floor—and the toilets needed flushing.

Detective Person, who had photos from the previous search warrants that were executed on November 3 and November 4, 2015, noted that changes had been made to the master bedroom since November 2015. For example, in November 2015, the bed was perpendicular to the inside door, the window had short drapes and an air-conditioning window unit, and the door to the back yard was accessible. In April 2016, furniture had been moved in front of the window, the bed had been repositioned to the right along the west wall, and the exterior door was blocked with bookcases, boards, and blankets. As Investigator Simmons explained, "when you were inside the bedroom, it didn't appear that there w[ere] any windows" and the door to the backyard was "boarded up." Additionally, Investigator Simmons noticed that there were "[a] lot of pictures off the wall and screwed to the wall in other places.

The most significant change, however, was that the bedroom walls had been repainted.[53] Investigator Simmons used Luminol to process the master bedroom for blood evidence. Only a few of the treated areas resulted in chemiluminescence, including a light spatter on the scraped-up and painted concrete floor and a few spots high on the wall. Investigator Simmons said that Powell had sustained an injury

---

[53]State's Exhibits 181–183 show two different colors of paint in the master bedroom—light gray over white—on the ceiling and obvious brush marks.

during a prior arrest and there was some blood left behind from that in a particular area,[54] but that they did not "Luminol" that area.

After applying the Luminol, some bright blue-white patches, including a linear drip pattern, appeared on the wall where an outlet, surge protector, and wall unit were located. When the cover of the electrical outlet was removed, the investigators found very clear spots of chemiluminescence. They also cut out a section of sheetrock "because [they] got such a good luminescence of that, [they] decided to collect that as evidence for testing."[55]

Regarding the door to the back yard that had been barricaded behind furniture, once it was cleared, Investigator Simmons stated that there was a "[v]ery bright luminescence" in the corner to the right of the door. A wrought iron door behind the wooden door was tested and also showed luminescence in an inconsistent pattern around the area. Detective Person said that most of the room's testing results were

---

[54]It is unclear from the record where this area was located in the room. At trial, the prosecutor appears to have shown Investigator Simmons a photograph and asked, "Was that this spot right here (indicating)?" She answered "Yes," but the record is silent as to which exhibit the prosecutor was referring or where on the exhibit the prosecutor was pointing.

[55]Justin Hall, a forensic engineer, later tested the sheetrock cuttings to identify how long ago the wall had been painted and to check for how many paint layers were on the wall. He explained that, microscopically, a wall is normally an extremely rough surface that will collect dust over time and that because there was no dust between the two finish coat layers he found and no abnormalities between the primer layer and first finish layer, the primer coat and the two finish coats had all been applied in close proximity in time to each other.

"on the east wall, with a large portion of it back around that door, underneath the threshold and along the bottom of the wall."

After performing the tests, Investigator Simmons took samples from the areas of the room that had lighted up for testing. She also collected some receipts from a basket full of receipts in the bedroom for the time frame they were investigating, including a Lowe's receipt for "20-min dry" purchased just a week prior to the search, on April 9, 2016.

Investigator Simmons said that she photographed the entire house during the first day's search, leaving the scene between midnight and 1:00 a.m. An officer stayed on site overnight to prevent anyone from entering the property, and the next day, Investigator Simmons searched the back yard.

Like the home's interior, there were piles of debris and clutter—including building supplies, weigh-lifting equipment, a chain saw, some corrugated sheeting, and other tools—throughout the home's perimeter. In a little back room that was inaccessible from any other part of the house, a bucket of gray paint—the same color that the master bedroom had been painted since November 2015—was found. Detective Person said that the back room had a make-shift plywood door and a ladder inside. Based upon what Peter had told him during the interview, he believed that Kasey's remains might have been stored there for a period of time. He climbed the ladder but did not find anything.

In the backyard, investigators found a large garbage can, or barrel, full of rainwater, which they dumped out. Investigator Simmons collected what remained in the bottom of the barrel, including a 9-inch strand of hair,[56] and sent it off for testing. What Investigator Simmons found interesting about the hair was that it "wasn't haphazardly hanging free in the barrel, it was stuck to the side with that same sludgy consistency, almost like a dried glue consistency." Referring to a photograph of the hair, she said, "you see those little sections still attached to that hair, which told [her] that the hair was down in the contents of that barrel at one point."[57]

Three bottles of chemicals—two bottles of Drano and one bottle of "Kleen-Out Sulfuric Acid Drain Opener"—were found nearby. The Kleen-Out bottle's label said that it "quickly dissolves grease, wood, cloth, napkins, hair, and organic matter." Kleen-Out's active ingredient is lye, which was significant to Detective Person because Peter had described chemicals to him, including lye.

Because investigators suspected that Kasey's remains could have been dissolved in the barrel and later poured out on the ground beside it, over which a piece of plywood had been placed, Dr. Dana Austin, a forensic anthropologist with the Tarrant County Medical Examiner's office, was brought in to help sift through the

---

[56]All of the photos of Kasey showed that she had long hair.

[57]At trial Investigator Simmons conceded that there was no forensic report that supported the theory that Kasey's body had been dissolved in that barrel.

area under the plywood. They found no human bones, and the soil samples taken from underneath the plywood tested negative for chemicals or human remains.[58]

As she sifted through the dirt, Investigator Simmons also found something that she thought looked like skin, and she showed it to Dr. Austin. Dr. Austin examined it, concluded that it was skin, and recommended that it be submitted for testing.

An executed search warrant on one of Powell's phones revealed four text messages about Peter dated between April 27 and April 28, 2016. The first message states, "Hey, this is [Powell]." The next says, "Hey, Little Mike, hit me back. My son, P[eter], is working for police. Don't deal with him. I'll show you the proof. I have 27 pages of statements." The third message, sent two minutes later, says, "Pick up, Mike." The last message states, "Damn, dude?" There was no response from Little Mike, and Detective Person did not know who Little Mike was. Additionally, Detective Person found an exchange of text messages with Powell's ex-wife Cheryl on Powell's cell phone in which the two briefly discussed the existence of a "snitch." In a May 1 text, Cheryl informed Powell that, "[Powell's bail bondsman] left message on Thursday. Mike call ASAP. Someone is snitching."

Powell was taken into custody on May 5, 2016. On June 9, 2016, Powell was charged with capital murder.

---

[58]Detective Person pointed out at trial that the investigation did not occur until four months later, "so there's a lot of time that could have been cleaned up, there's rain that happened."

Between April 15 and June 9, Detective Person ran Kasey's name through a database several times to see if she had tried to buy a house, lease an apartment, sign up for utilities, or apply for a driver's license, but he found no trace of her.

### b. Additional investigation by the District Attorney's Office

Investigator Nutt, the District Attorney's investigator who received the case after the capital murder charges were filed, also searched various other databases. Because Kasey had been a convicted felon, her fingerprints were within the NCIC database. But his search uncovered no record of her in the system or in other related systems after 2015, even though she had been a narcotics user who frequently interacted with law enforcement prior to her disappearance.

Investigator Nutt also used Kasey's social security number to check with the Texas Workforce Commission but found no employment record for Kasey after 2015. He inquired with the Department of Health and Human Services to see if Kasey had applied for any kind of government assistance and discovered that the last time Kasey had applied for benefits was in September 2015, when she was turned down after having failed to provide requested documentation. He checked Accurint, a law-enforcement-only database, but there was no sign of Kasey after 2015. Investigator Nutt agreed that as to the law-enforcement databases, if Kasey was staying out of trouble, she would not appear in them.[59]

---

[59]Investigator Nutt also acknowledged that Kasey might not appear if she was using an alias and was not using her own social security number, and he

Investigator Nutt met with Kasey's family and friends and learned that Kasey's grandfather had left her some money when he died[60] but that Kasey had never tried to claim it, even though it appeared that she could have used some money. He went to area strip clubs, including Illusions, and spoke with club managers who knew Kasey but had not seen her. He discovered that Dallas's real name was Randall Walter Westfall and that he was a pimp, but he found no information connecting Kasey to him.[61] Investigator Nutt also spoke with J.M., a woman who had regularly worked for Dallas from 2009 to 2017; J.M. did not identify Kasey as anyone she had ever seen.

Investigator Nutt conducted or at least participated in interviews with Fawcett, Fakas, Elliot, Drake, Sharlean, James, Johnson, and Hummell, but not a single interview provided a credible lead as to Kasey's whereabouts since December 2015. Fakas, the father of the child Kasey had put up for adoption, told Investigator Nutt that he knew many people in the strip club industry and that he had searched for Kasey as well.

---

acknowledged that during his medical records check while searching for Kasey, he did not check under the name Misty Manly. He conceded that it was possible that there could be records of Kasey under the Misty Manly name.

[60]Investigator Nutt testified that he believed that Kasey's grandfather was a somewhat wealthy individual.

[61]At the time of trial, Dallas was in federal custody in Fannin County, awaiting transport to the bureau of prisons for human trafficking.

74

Investigator Nutt also obtained a search warrant for Kasey's gmail account and found emails from Facebook in 2017 and 2019, warning her that someone had been trying to access her account. Aside from Bakouris's two emails about contacting her, all of the messages in Kasey's gmail account appeared to be spam.

Although Kasey had been "very active" on Facebook through November, 2015, there were no public updates from her after November 22. After obtaining a warrant, Detective Person examined Kasey's Facebook records but found no information related to her continued existence after December 12, 2015.[62]

### c. The cell phone investigation

Two search warrants had been executed on cell phones belonging to Powell. However, Detective Person did not order Powell's phone records because "[a]t the time, . . . [the police] did not know the actual phone that he was using during [the November-December time frame]." Investigator Nutt subpoenaed T-Mobile cell tower records but was told that cell tower information did not exist.

According to Michael Bassillo, the T-Mobile representative who testified at trial, Powell had two numbers on his account—one ending in 3167 (Powell's cell phone number), which was generated with the opening of the account in 2007, and one ending in 1088 (Kasey's cell phone number). Powell was the only subscriber, and Kasey's name was not mentioned at all in the records.

---

[62]Kasey's Facebook records were admitted into evidence.

75

Bassillo testified that T-Mobile records showed the last outgoing call for 1088 occurred on November 23, 2015, three days after 3167 checked 1088's voicemail messages. After November 23, number 1088 was transferred to a different cell phone provider—from T-Mobile to Verizon—and T-Mobile had no further records related to number 1088.[63]

According to Verizon account records, the 1088 account was opened on November 22, 2015, and was closed on May 21, 2016. It was a prepaid account, meaning that a name, address, or contact information was not required to set up the account. Even if such information was provided, because it was a prepaid account, there would be no reason for Verizon to verify any contact information provided.[64] Even though no contact information was required to set up the 1088 account with Verizon, contact information was provided: Kasey Rae Nutter, 602 North Walnut Street, Weatherford, Texas.

---

[63]The 3167 cell phone number did not move to Verizon, but stayed with T-Mobile after November 2015.

[64]As Timothy Gray, Verizon's custodian of records, expounded, when a customer transfers from one cell phone service provider to Verizon, the customer need only provide basic account information—"generally an account number [and] an account pin"—from the previous account and Verizon will contact the previous provider and "make sure it matches." Gray agreed that if Powell had the T-Mobile account information to give to Verizon, he would have had all of the information that was necessary to switch the 1088 phone over to Verizon. Gray also explained that a transfer of service with a prepaid account can be accomplished over the phone or even on the internet, and Verizon would not have verified that Kasey actually had possession of the 1088 phone when the transfer of service was made.

Verizon kept call records and cell site information for a rolling one-year period of time. Because the State waited too long to subpoena the records, there were no call records or cell site information for the 1088 account available at trial to show activity on the 1088 account between November 22, 2015, and May 21, 2016, when the account expired. But when Investigator Nutt obtained the five pages of records that Verizon was able to produce that included the contact information, he ran the 602 North Walnut Street address and determined that Rhonda Wright, to whom Kasey had sent the long October 2015 Facebook message, lived there. Based on his investigation and several interviews with Wright, Investigator Nutt concluded that Kasey had never lived at the North Walnut Street address.

While the records indicated that account 1088 was a prepaid account, the records did not reflect whether the account was prepaid for a six-month term or whether it was set up for a 30-day billing cycle. In other words, the account could have been prepaid for the entire six-month period starting November 22, 2015 and ending on May 21, 2016, or the account could have been set up to renew on a monthly basis, which would have meant that the April 21 bill was the last bill paid before the account expired on May 21, 2016. Either way, if the account holder does not pay at the end of the prepaid term, service stops and then, after a certain amount of time, the account is closed. And, whether prepaid for a six-month term or prepaid on a 30-day billing cycle, after Powell went into custody on May 5, 2016, no other payments were made to account 1088.

In June 2016, one of Kasey's friends commented on Kasey's Facebook page that she knew that Kasey's messages were being read by someone. The post stated, "someone is receiving messages because we can see that they have been read; get in touch maybe you're getting your life together." Kasey did not respond to this post, but on July 31, 2016, someone removed a phone number associated with Kasey's Facebook account. Both Powell's cell phone number and Kasey's cell phone number had been associated with Kasey's Facebook account.

### 4. Peter's testimony

As mentioned above, we set Peter's testimony apart here because Powell challenges Peter's testimony with regard to the corpus delicti rule.

At the time of Powell's murder trial in 2019, Peter was 21 years old and on probation for a 2017 possession-of-a-controlled-substance charge. Peter had moved in with Powell in August or September 2015, while he was still in high school, for a "change of scenery" and to live with fewer rules than in his mother's house. When Peter moved in with Powell, Powell had his own home-remodeling company, and Peter worked with him in the business. When Kasey later moved in, she also worked for Powell's company. Kasey did not have a job outside the house and rarely left because she did not have a car.

Peter said that when he first moved in, Powell worked hard and was not on drugs. Powell and Kasey's relationship seemed fine at first, but at some point, it changed. The two began to argue and fight, and Peter saw Powell "push, hit,

78

sometimes choke" Kasey. Peter described Kasey as "small" and testified that Powell was bigger than she was. And he did not recall her fighting back too much.

At first, Peter thought that Powell had been trying to help Kasey get off drugs, but eventually Powell started using drugs as well. According to Peter, Kasey used methamphetamine, and Powell smoked crack cocaine.[65] Peter testified that when Powell was under the influence of drugs, he would hallucinate that the house was on fire, that people were in the mattresses or the couch, that people were kicking in the doors, and that there were helicopters outside. In his paranoia, Powell would board up the windows and doors and stab the couches.

Peter recalled that on November 3, 2015, Kasey left and took Powell's Camaro. At some point, Kasey returned to the house, and he was "almost certain [his] dad went and got her. They were together when they came back." But later, Kasey called 911, and at that point Powell told Peter to leave the house. And when Powell said, "She called 911, Go. Go. Go," on the 911 call, he was speaking to Peter.

Peter said that when he left, he took two guns and marijuana with him. He identified the two guns as the ones that were later obtained by the police when the home was searched and said that Powell had given him the larger gun, which was jammed with a bullet in the chamber, to take with him. Peter said that Powell had told him that Kasey had stolen the gun and that when he went to get his Camaro

---

[65]Peter also smoked marijuana in the house and testified that no one tried to stop him.

79

back, she tried to fire it at him but it jammed, and he took it away from her. When Peter returned home later that evening, the police were searching the house, and Kasey had been issued a criminal trespass warning.

Later that evening, Peter rode with Powell to collect the Camaro from a Haverty's parking lot, and Peter drove the Camaro home. Eventually, Powell came back and, notwithstanding the criminal trespass warning, Kasey was with him. While Peter did not see physical violence that night, he heard a "couple of bangs" that sounded like "hitting a wall bangs." Powell later came into Peter's room and told him to come and look at Kasey, who was lying on the floor of Powell's bedroom.

Because Kasey appeared not to be breathing, Peter thought she was dead. Powell told Peter that he had choked her and said, "That's what she gets," or words to that effect. Peter said that he observed marks around Kasey's neck. Peter did not call 911 but went back into his room. He did not sleep much that night.

The next morning, Peter saw Powell but he did not see Kasey. Peter said he "didn't really want to think about" what had happened to Kasey and just wanted to leave. He was unwilling to leave, however, because he felt responsible for his nephew Max, who was 11 or 12 years old at the time. Peter considered himself Max's protector and did not want to leave him behind.

So that morning, Max took the bus to school, and Peter also went to school as usual. Peter was taking a test at school when he received a phone call from Powell. In that phone call, he could hear Kasey "screaming in the background," and Powell

80

told him that he was "probably fixing to go to jail." Powell instructed Peter to hide a wire for him. Peter described the wire as a metal wire with two handles that was used to cut PVC plumbing pipes. When Peter got home, he did what Powell had asked him to do; he hid the wire outside in a box of wooden floor panels.[66] Peter did not reveal this information until the day he testified at trial, and the police did not find the wire during their search of the residence.

Peter testified that he understood that Kasey had gone to a "mental hospital" after that. While she was away, Peter overheard Powell speaking to her on the phone. He recalled later listening to a recording of a conversation between Powell and Kasey while she was in the mental hospital, that it was "probably recorded on purpose for some type of evidence to benefit him," and that the conversation had been about Kasey's retracting the statement that she had made against Powell about an assault in November.

To Peter's surprise, Kasey returned to Powell's home after she was released from the mental hospital,[67] and Kasey and Powell continued to use drugs. Peter said that he believed that Powell gave Kasey drugs to keep her with him.

---

[66]In exchange for his truthful testimony, the State had agreed not to prosecute if Peter testified about anything that could be considered a criminal offense, such as tampering with evidence.

[67]Peter was surprised because he knew that she still had the criminal trespass warning against her and that she had a protective order against Powell.

Peter knew that Powell, his attorney, and the investigator were trying to get charges against Powell dropped, and Powell talked about Kasey's needing to write letters. While it was Peter's understanding that Kasey had retracted her statement, Powell had expressed concern to him that Kasey was talking to the police behind his back.

Peter also recalled hearing Powell discuss alternate stories to tell people about what had occurred on November 3 and November 4. According to Peter, these stories involved claiming that "someone else had did what happened to [Kasey]." Peter confirmed, however, that he was at Powell's residence when Powell showed him Kasey's unconscious body lying on his bedroom floor, that no one else came to the house that evening, and that Kasey did not leave that evening and go anywhere else. According to Peter, there were a couple of stories and names being floated out about what happened to Kasey and who did it.

Peter testified that as of Thanksgiving 2015, Kasey was still at Powell's house, but sometime after that—in December or January—Kasey was no longer there. Peter never saw Kasey pack up and leave, but he wondered where she had gone. At some point, Powell told Peter that Kasey "wasn't here anymore and you don't have to worry about her anymore," that she had been "taken care of." Powell showed Peter his bedroom, the walls of which were splattered with blood. According to Peter, blood was splattered everywhere and Powell told him that Kasey was "killed and chopped in pieces" with saws and that he had cut off her limbs and "run the limbs

82

through a table saw." Powell explained to Peter that he had killed Kasey "[b]ecause she wasn't going to retract her statement to the D.A." Powell also told Peter that Powell's friend Shock had killed Kasey, but Peter did not believe that was true. Peter said that the blood remained on the walls for a week or two until Cheryl showed up and helped Powell repaint the room. Peter said that there had been a variety of stories to account for Kasey's disappearance. One such "story" was that Kasey had moved to Florida.

In late February 2016, Peter left Powell's house and moved in with his girlfriend in Arlington. Not willing to leave Max in Powell's home, Peter arranged for Max to move in with his mother and Wheeler.[68]

### 5. Other evidence at trial

#### a. Expert testimony regarding chemicals

Dr. Austin testified at trial regarding the possibility of pouring a chemical on body parts and dissolving them or changing their composition. She testified that the chemicals found in Powell's back yard—common drain cleaners made from sulfuric acid and sodium hydroxide (lye)—could completely dissolve a body.

Sulfuric acid could dissolve hair and skin within a few hours and would cause bones to become gelatinous within a day and to dissolve within a week. Dr. Austin explained that sulfuric acid could be applied to a body to reach a consistency that could be flushed down a toilet. And adding water to sulfuric acid would keep the

---

[68]Peter stated, "I didn't leave without him . . . If I left, he was leaving, too."

solution's pH low enough to dissolve tissues. Over time, sodium hydroxide could also dissolve hair, skin, fat, fingernails, and toenails, but it does not dissolve bones and teeth.

Dr. Austin agreed that four months (December–April) would be enough time to dissolve a body sitting in an acid bath. But these chemical reactions could also be sped up by adding heat or by agitating, or stirring it up, to expose more of its surface to the chemical.

### b. DNA evidence

Amy Smuts, a forensic analyst at the UNT Health Science Center for Human Identification, testified that the lab had received multiple items to test—saw blades; swabs from the saws, walls, floor, sheetrock, and an outlet; a strand of hair; the miscellaneous contents of a barrel; kitchen sink pipes; and a buccal swab from Kasey's father.[69] Smuts explained that when asked to screen samples for any biological materials, presumptive testing is performed first to determine if the item might contain biological materials, and then if a positive result is obtained, the next step is a confirmatory test to determine if the substance is from blood or semen; DNA testing is the last step when appropriate. Smuts performed STR analysis, which involves DNA within the nucleus of a cell (nuclear DNA), while Kendra Felipe-Ortega,

---

[69]Detective Person took a DNA sample from James to compare with any DNA found while searching the house and saws.

another forensic analyst, performed mitochondrial DNA analysis, which involves organelles within a cell's cytoplasm.

A swab from the plug outlet area tested negative on the presumptive test. However, a swab of spots on the east wall above the plug outlet tested presumptively positive for blood, and the confirmatory test was also positive. A female DNA profile was detected, and when compared to James's DNA profile, the lab concluded that he could not be excluded as the biological father of the DNA's contributor.[70]

A swab from the southeast corner of the floor tested negative on the confirmatory test but a mixed DNA profile was obtained, with a major male contributor and a minor contributor for whom James could not be excluded as the biological father. A section of sheetrock from the bottom of the east wall tested positive for blood on the presumptive test, tested negative for blood on the confirmatory test, and resulted in a mixed DNA profile with a major female contributor and at least one minor male contributor. As to the female contributor, James could not be excluded as the biological father. A swab of the south wall near the southeast corner resulted in a presumptive positive, confirmatory negative, and a female DNA profile for whom James could not be excluded as the biological father.

_____

[70]According to Smuts, it was 500 times more likely that the sample belonged to Kasey than to anyone unrelated to James. Because James testified that he had one daughter (Kasey), it was 37,000 times more likely that the female DNA profile matched to James as the biological father was from Kasey.

85

The skin that was found in the back yard excavation tested negative on the presumptive test and resulted in inconclusive DNA results. Smuts explained that "inconclusive" could mean either that there was a mixture of too many individuals or that there was an insufficient sample to detect a good quality DNA profile. Smuts also explained that there was a distinction between "touch DNA," which arises from contact or transfer, and "potential high copy DNA," which comes from biological fluid.

Felipe-Ortega performed mitochondrial DNA analysis on the hair strand that was found inside the barrel. She said that if there had been root on the hair strand, they would have tried STR DNA first, because the root of a hair strand will have nuclear DNA most of the time. The mitochondrial DNA test was inconclusive.[71] Felipe-Ortega testified that age and chemicals like drain cleaner with sodium hydroxide could chemically degrade mitochondrial DNA.

The contents of the trash can or barrel that was found in the back yard were presumptively positive for blood but were negative on the confirmatory test, and no

[71]To put the "inconclusive" results in context, Felipe-Ortega explained that some retesting was performed on some of the presumptive tests in September 2018 because an analyst had noticed that the presumptive test reagents were turning negative control samples slightly positive, giving false-positive results. So all of the samples that originally tested positive were retested. (Felipe-Ortega was confident that those samples that had originally tested negative would stay negative.) For those samples where the second test was negative, Felipe-Ortega was unclear whether the sample was truly negative or whether it was negative because there was not enough left of the sample for testing, so she deemed the result as inconclusive. In other words, she explained, "We deemed it inconclusive because we have two different tests giving us different answers."

DNA was found.  Portions of kitchen sink pipes that were taken from Powell's house were presumptively positive but the confirmatory test was negative; a partial DNA profile and another low signal-level allele were detected.

Swabs of the saws resulted in a mixed bag of presumptive positives and negatives and confirmatory negatives with no DNA results.  A partial male DNA profile was obtained from the saw blade, along with an additional low signal level allele observed at one of the DNA markers being examined, "[b]ut there's not enough there to tell who it is coming from or what it is."

Smuts testified that the presumptive test on a ten-inch saw blade had been positive for blood but the confirmatory test was negative.  She explained,

> [W]hen we do this presumptive testing, there are other substances that might cause a positive reaction when it's not truly blood.  That can be things like rust or things that have a similar chemical composition to blood.  So that's why we move on to a confirmatory test.  That's going to be more specific.  In this case we are looking at higher primates and human blood.  So that will tell us with a much more definitive answer whether or not this is what we think it is.

Notwithstanding the negative confirmatory test, Smuts said that a DNA test was run anyway because "occasionally if we suspect that there may be DNA there that just isn't being detected, again, it could be epithelial cells that aren't showing up in that presumptive test for blood or if we think that the test may be more sensitive or less sensitive than our ability to get DNA, then we will go ahead and try that."

Smuts said that if the sample was very small, there would not always be a positive test on both the presumptive and confirmatory tests because the tests were

only sensitive to a degree. She also said that she believed Luminol could possibly interfere, as could cleaning the tested area, because certain cleansers could degrade hemoglobin. Painting over an item could also interfere with testing. She stated that for these reasons, a negative confirmatory test does not mean that no blood is present in the sample. Felipe-Ortega agreed, stating that hemoglobin is a protein, so—like DNA—it could be destroyed by heat, light, age, and cleaning products.

### c. Domestic violence expert testimony

Kathryn Jacob, SafeHaven's Chief Executive Officer, testified about intimate partner violence as a subset of domestic violence. She discussed the cycle of violence and the power-and-control wheel, which was admitted as demonstrative evidence, as well as the danger assessment used by SafeHaven and almost all Tarrant County law enforcement agencies to predict the likelihood of homicide. Kasey's score on the danger assessment was 18, a category that put her in extreme danger of homicide.[72]

The danger assessment had weighted questions, including gun ownership (the most weight) and strangulation.[73] Jacob said that strangulation triggered a second

---

[72]During cross-examination, Jacob agreed that the danger assessment had nothing in it regarding a person's credibility and that someone who had no other place to go and was motivated to find a place to stay at SafeHaven could make statements that were not true to score higher on the assessment.

[73]Jacob recounted that regarding Kasey's interactions with SafeHaven, the first time Kasey called, she reported that her abuser had threatened to kill her and mentioned strangulation, isolation, and her abuser's having taken her phone away. Then when Kasey called SafeHaven on November 4—on the occasion of the power outage—she mentioned a gun and a death threat.

assessment because it was "a prominent indicator of a future homicide. If you are strangled by your partner, you are 700 times more likely to be strangled a second time by that partner and 800 . . . times more likely to die at the hands of that offender, typically by gunshot." Jacob stated that strangulation "is the ultimate form of power and control because an offender can strangle their partner until they pass out and they can basically bring them to life again. We call it playing God," because it is an indication that the abuser can kill the victim and that the victim knows it.

Jacob also discussed emotional abuse, which she defined as "putting down your partner in front of others or shaming them publicly or embarrassing them," and "gas lighting" as commonly used in domestic violence relationships to make the victim feel "like she's the crazy one." Jacob added that offenders "can very easily use a [victim's] mental illness as a way to keep other people outside of their relationship" or tell the victim that she is crazy and try to isolate her from her friends.

Additionally, Jacob discussed economic abuse. According to Jacob, economic abuse occurs when the abuser either forces the victim to work or not to work so that the abuser can control any income coming in. Sometimes an offender will encourage addiction because it makes the victim rely on the offender as well.

Jacob also testified that the most dangerous time in a domestic violence relationship is when the victim leaves because it tends to be a "pretty strong trigger" for an abuser. She stated that it takes a victim six to nine attempts to leave an

offender permanently and that "[w]e often have domestic violence victims who come into shelter and leave shelter and come back several times."

Jacob said that recantation by victims—changing the story or saying that nothing occurred—happened frequently and that it was more likely to occur if the victim was still in a relationship with the abuser. Jacob explained that when a victim outcries about abuse to friends or family, the way the friend or family member reacts to the outcry affects how the victim moves forward. If the friend or family member tells the victim that she has to leave the relationship and the victim is not ready to do so, "she often believes that her friendship with this person is contingent on her leaving the relationship." Then she ends the friendship to continue with her relationship, resulting in more isolation. Jacob had seen situations in which a victim refused to leave regardless of offers of help from agencies, friends, or family.

She also testified that it would not surprise her if, after a victim was issued a criminal trespass warning and left the premises of her abuser, her abuser brought her back to the same premises. In fact, Jacob testified, that would fall in line with a power and control dynamic. "No matter how bad it gets"—even if a victim was choked to unconsciousness—according to Jacob, it would not surprise her if the victim did not leave.

Jacob also agreed that offenders and victims both lie to law enforcement to keep each other out of trouble.

## D. Analysis

To prove capital murder as alleged in the indictment, the State had to prove that Powell had intentionally caused Kasey's death while committing or attempting to commit the offense of retaliation or obstruction. *See* Tex. Penal Code Ann. §§ 19.02(b)(1), 19.03(a)(2). A person commits obstruction or retaliation if the person intentionally or knowingly harms or threatens to harm another by an unlawful act either (1) in retaliation for or on account of the service or status of another as a witness, prospective witness, informant, or person who has reported (or who the actor knows intends to report) the occurrence of a crime, or (2) to prevent or delay the service of another as a witness, prospective witness, informant, or person who has reported (or who the actor knows intends to report) the occurrence of a crime. *Id.* § 36.06(a).

### 1. Corpus delicti

In part of his first point, Powell contends that his extrajudicial confession to Peter, standing alone, is insufficient to establish his guilt for Kasey's murder and that the State failed to present independent evidence to corroborate the extrajudicial confession. Powell complains that neither Kasey's body "nor any physical or forensic evidence that she has been harmed" was ever found and that the evidence presented—that Kasey's family and friends had not heard from her since December 2015 and that investigators had not found her in various databases, local hospitals, or

91

the Tarrant County morgue—did not make it more probable than not that she was deceased, "much less that someone killed her."

Powell asserts that the evidence showed that Kasey had lived a transient life, had occasionally used a false name, which would have prevented her from showing up in databases, and that she may have become a victim of sex trafficking, as evidenced by Kasey's "Dallas" Facebook post. Powell also argues that

- Peter's testimony about what he saw in Powell's bedroom did not corroborate the confession because Kasey's DNA in Powell's bedroom was consistent with her having lived in the house for months, and the confession was otherwise wholly discredited by the physical and forensic evidence.

- Peter's description of Powell's bedroom was a gruesome, blood-splattered scene and yet after a search and forensic testing, only two spots of Kasey's blood, visible to the naked eye and obviously not painted over,[74] were found.

- No female DNA or blood was found on Powell's saws or in the barrel in his back yard, nor were chemicals found in the soil samples.

In our analysis, Powell asks us to compare Kasey's situation to the ones in *Winfrey v. State*, 393 S.W.3d 763, 771 (Tex. Crim. App. 2013), and *Nisbett*, 552 S.W.3d at 264.

---

[74]Powell also contends that a forensic analysis of the walls showed that they had not been recently repainted. That is not entirely correct. The forensic analysis merely showed that there was no delay between applying primer and finishing coats. However, photographic evidence—a comparison of the photographs taken in November 2015 with those taken in April 2016—indicated that, in fact, the walls of the bedroom had been repainted. Furthermore, the forensic analysis did not address whether Powell had replaced any drywall, but Investigator Simmons found a Lowe's receipt at Powell's house for "20-min dry" purchased just a week prior to the April 9, 2016 search.

92

### a. Case law

The facts present in *Winfrey* differ significantly from the facts in this case in that in *Winfrey*, the victim's body was actually found. *See* 393 S.W.3d at 764–65. Winfrey had been a teenager, and the victim, who was found dead in his home from multiple stab wounds and blunt-force injuries, was a man who worked at the high school Winfrey attended. *Id.* at 764. Three years later—after an investigation had been conducted that included dog-scent lineups—Winfrey, her father, and her brother were taken into custody and charged with the murder. *Id.* at 765. The Court of Criminal Appeals rendered a judgment of acquittal for Winfrey because the circumstantial evidence was more speculative than inferential as to her guilt. *Id.* at 771–73. None of the physical evidence—hair, blood, DNA samples, and fingerprints—collected at the crime scene connected Winfrey or her family to the crime scene, nor were she or any of her family members connected to the personal items assumed to have been missing from the victim's home. *Id.* at 765, 769. Although Winfrey's ex-boyfriend testified that she had shaved herself when she learned a search warrant was going to be issued for her pubic hair, she subsequently provided a pubic-hair sample and testified that she ordinarily shaved that area. *Id.* at 766, 769–70, 772. The ex-boyfriend also testified that she had called the victim an "easy lick," but this evidence did not implicate her in murder or place her at or near the scene at the time of the murder. *Id.* at 768, 771–72.

Two of Winfrey's teachers also testified as to statements Winfrey made to and about the victim. *Id.* at 766. According to the teachers, Winfrey had asked the victim, "When are you going to take me out and spend that money that you have? We know you have that money hid [sic] at home," and had suggested that "[s]omebody should beat the sh[-]t out of him." *Id.* at 766. Additional evidence showed that Winfrey and her brother lived near the victim and had, on occasion, visited the victim's house on the way to church. *Id.*

The "scent lineup" was the only direct evidence that purported to place Winfrey at the crime scene. *Id.* at 765. But the dogs' alert to her scent on the victim's clothing indicated only that Winfrey had had contact with the clothing, not when such contact occurred. *Id.* at 766 & n.3. Because the dog-scent lineup evidence, by itself, could not constitute sufficient evidence of guilt, *id.* at 770, the court held that the remaining evidence merely raised a suspicion of her guilt rather than proof beyond a reasonable doubt. *Id.* at 772–73.

*Nisbett* is more closely akin to the facts present in this case. In *Nisbett*, the Court of Criminal Appeals considered two murder cases that were factually unrelated, yet factually similar because in both cases the victim's body and the murder weapon were never recovered. 552 S.W.3d at 246. After consolidating the two cases, the court determined and provided guidance as to the appropriate analysis to be used in such circumstances and affirmed the convictions in both cases. *Id.*

94

In the first case, Nisbett and his wife had had a troubled relationship, had been in the process of divorcing, and had argued on the night of her company's Christmas party about her plans to attend the party. *Id.* at 247. She did not meet her co-worker as planned, never showed up at the party, and was not seen or heard from again after that date. *Id.* Nisbett had choked her earlier that day during their argument, according to what his wife had told her co-worker, and he had previously made statements suggesting a wish to murder her. *Id.* at 247–248. He also had engaged in suspicious activity, and, after his wife's disappearance, he had forged a check on her account and had made suspicious statements to law enforcement and others. *Id.* at 247, 250–51. There was also circumstantial evidence linking him to his wife's car after her disappearance and physical evidence indicating that she had been killed. *Id.* at 247. Specifically, the Luminol that police used in her apartment revealed blood stains, including a bloody handprint on the wall, although the State's expert indicated that not enough blood was found in the apartment to show a fatal blood loss. *Id.* at 251, 260. The bloodstains were from the wife's blood, and the bloody handprint matched Nisbett. *Id.* at 251–52.

In the second case, Delacruz and his wife also had a troubled relationship and were getting a divorce, and after going to Delacruz's house to pick up their daughter, Delacruz's wife was never seen or heard from again. *Id.* at 252. Electronic evidence showed that Delacruz had his wife's cell phone (geolocation data) and used her credit card to make purchases (surveillance video), and there were out-of-character text

95

messages and social media posts purporting to be from her that suggested that she was disillusioned and running away. *Id.* at 252, 257–58. Delacruz had also made disparaging statements about his wife and had engaged in suspicious activity and made suspicious statements to law enforcement and others on and after the date she disappeared. *Id.* at 252. There was evidence that he had dug a hole big enough to bury a human body, that cadaver dogs alerted near the hole, and that something had been burned near the hole, but his wife's body was never recovered, and the police never found a possible murder weapon. *Id.*

Nisbett's wife had three children, Delacruz's wife had one child, and both women had been known as caring mothers who would not abandon their children. *Id.* at 247, 249, 252. The court observed that in both cases, there were no eyewitnesses to murder, no confession by the defendant to murder, no body recovered, and no murder weapon found, and in both cases, the wives had disappeared, never to be seen or heard from again. *Id.* at 262. Likewise, in each case, the State had introduced evidence of the complete absence of any economic or electronic footprint involving the wife or her social security number—no property transactions, bank account activity, utility bills, phone bills, driver's license renewals, vehicle registrations, or the like. *Id.* at 262–63. In both cases, the spouses had been in a troubled marriage heading for divorce; each husband had a history of abusive and violent behavior toward his wife; each wife's activity or lack of activity on the date she disappeared was out of character and out of line with her previously expressed

intentions and goals; and the husband in each case expressed animus about his wife before she disappeared and made suspicious and inconsistent statements after her disappearance. *Id.* at 263. Both cases also involved physical evidence that supported the conclusion that the victim had been murdered. *Id.*

The court noted that even when the corpus delicti rule applies, if the evidence shows the death of a human being caused by the criminal act of another, the State is not required to produce and identify the decedent's body or remains. *Id.* After all, "[t]he notion that the careful and meticulous murderer might escape punishment by destroying or forever concealing the body of his victim is a distasteful one," and "the murderer's successful disposition of the victim's remains should not be rewarded." *Id.* at 264 (internal quotations omitted).

In determining that the evidence was sufficient to show the death of a human being, the court made five observations about the quantum of proof that existed in each case: (1) a significant amount of circumstantial evidence—including physical evidence—indicated that the victim was dead rather than kidnapped; (2) a voluntary disappearance would have been out of character and inconsistent with the victim's plans and circumstances; (3) family and friends of the victim never heard from her again; (4) a thorough search of various databases revealed no economic or electronic activity by the victim or any other sign that the victim was alive; and (5) evidence strongly connected the defendant to the victim's disappearance—including motive, opportunity, prior behavior towards the victim, the victim's expressed fear of the

defendant, inconsistencies in the defendant's story and his behavior after the disappearance, and the defendant's being the last person to see the victim alive—as well as physical or electronic evidence linking the defendant to the offense. *Id.* at 264–66. The court noted that because it is less likely in today's mobile and technological society that a person might vanish and never be heard from again, the absence of economic activity or any contact with family and friends would support the conclusion that the victim is dead. *Id.* at 265.

### b. Application

The categories of evidence set out in *Nisbett* overlap substantially with the evidence present in this case. Here, similar to *Nisbett*, the circumstantial evidence that Kasey was dead is also connected to Powell's having caused her death.

### (1) Physical evidence that Kasey had died

Even though DNA could be destroyed by heat, light, age, and cleaning products, some of the swabs taken from Powell's house contained Kasey's DNA. While Kasey's having lived in the house might account for the presence of her DNA, a long strand of hair was found in the barrel in the back yard, and traces of blood were discovered in Powell's master bedroom and possibly on his saws, corroborating Peter's accounts to the police and to the jury. Empty containers that had held chemicals capable of dissolving a human body were found nearby, and the forensic anthropologist testified that four months would be more than enough time to dissolve a body. Crime scene investigators on April 18, 2016, found a Lowe's receipt for a

98

purchase on April 9, 2016, of "20-min dry," and the defense expert testified that there was no dust between the primer and gray finish coats for the portion of drywall he examined. Although the defense expert opined that the primer and paint layers were painted close in time, he did not testify about the drywall clipping's age.

### (2) Out-of-character disappearance and lack of contact with family and friends; database searches

Other evidence indicated that Kasey would not have disappeared were she still alive. Kasey was described as "needy" and dependent on the kindness of her friends and family for rides and other support because she did not have a car or much money. But Powell had distanced her from her friends and family, many of whom testified that they believed she was dead. No one had heard from Kasey after December 15, even though she had traditionally called family members every Christmas, and no economic or electronic activity was revealed by the various database searches conducted by the police even though Kasey had been "very active" on Facebook before her disappearance, after which all of her public posting stopped. Although Kasey's grandfather had bequeathed some money to her when he died, she had never tried to claim it despite her poverty and drug addiction.

Further, even though Kasey's grandmother told Bakouris in early 2016 that Kasey sometimes disappeared and would probably resurface, every witness who testified about Kasey's relationship with her son agreed that Kasey's primary goal in life had been to regain custody of him and that a voluntary disappearance would have

been out of character and inconsistent with that goal. Elliot testified that Kasey had written to the child every day while she was in jail, and Fawcett testified that Kasey's main goal had been to see her son and that one of Kasey's only possessions was her photo album of him. Kasey's last medical records at JPS ended December 4, 2015, and no medical records related to Kasey were found at the 17 area hospitals after December 1, 2015.

### (3) Evidence strongly connecting Powell to Kasey's disappearance

Evidence also supported a finding that Powell was connected to Kasey's disappearance.

### (a) Motive and opportunity

Notwithstanding Kasey's affidavit of nonprosecution filed on December 10, 2015, Powell's November 3 assault charge was not dismissed. This provided some evidence of Powell's motive to eliminate Kasey as the victim and a potential witness in the case. Additionally, Kasey had told Fawcett and Drake that she had discovered something that would cause Powell to kill her. This also provides some evidence as to a motive, albeit an unknown one. As to opportunity, because Powell had bonded out of jail on November 23, he had ample time to kill Kasey in December 2015.

### (b) Powell's prior behavior toward Kasey and her expressed fear

The jury had before it substantial photographic evidence of the kinds of wounds Powell had previously inflicted on Kasey in September and November 2015,

100

and multiple people—both friends and strangers—had seen her injuries and had testified that she had expressed fear of him. *Compare Stobaugh v. State*, 421 S.W.3d 787, 865 (Tex. App.—Fort Worth 2014, pet. ref'd) ("[W]ithout evidence that wrongful conduct has occurred, there is nothing for motive and opportunity evidence to link the defendant to."), *with Fountain v. State*, 401 S.W.3d 344, 355 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd) (holding evidence sufficient to show that child had died from the criminal act of another when it showed the appellant's consistent abuse of the child, that the child had been in the appellant's care the night before and the day that he vanished, that the appellant told conflicting stories, ultimately contradicted by cell phone records and witness testimony, when questioned about the child's disappearance, and that the appellant had not been concerned about the child's disappearance and did not look for the child).

Kasey reported to medical and SafeHaven personnel in September 2015 that Powell had repeatedly told her that he would kill her and how he would dispose of her body so that no one would ever find her—chopping it up—and that he had strangled her with a "wire cord," or "metal wire with plastic handles." The domestic violence expert testified that if someone had been strangled by her partner, she was 700 times more likely to be strangled again and 800 times more likely to be killed by that partner. The record reflects that Powell had strangled Kasey—leaving visible cuts on her neck—at least once more before she disappeared.

After the assaults in November 2015, Kasey reported to MedStar and hospital staff that Powell had tried to kill her, and she told Franklin, the women's crisis advocate, that Powell had wrapped a wire around her neck. Kasey told Officer Payne that Powell had repeatedly told her that he was going to kill her and that he "had a metal cable wire that had handles on each end" that he used to strangle her. Hospital staff from that day testified that the ligature marks on Kasey's neck were consistent with strangulation, and Franklin testified that Kasey's case was "unforgettable" and "the worst case" she had ever seen.

On November 4, Kasey also filled out the family-violence packet questions that were scored to assess her risk of being killed or suffering serious bodily injury, and she answered "yes" to questions about Powell's previous domestic violence with her, his previous threats to kill her, his access to and use of weapons, his drug or alcohol use, his violence against her in public, his having strangled her, and his possessiveness and jealousy. Kasey also gave a written statement to the police containing her recollection of the events of November 3 and 4 that included that Powell had put a gun in her mouth and had wrapped a wire around her neck to strangle her, and Fawcett provided eye-witness testimony confirming that Powell had stuck a gun in Kasey's mouth.[75]

---

[75]The 911 recording from November 3, in which Powell could be heard telling someone to "go, go, go" because Kasey had called the police, corroborated Peter's testimony that Powell had said that to him and that Peter took off with two guns that Powell gave him. Peter said that one of the guns was jammed with a bullet in the chamber, and Powell told him that Kasey had stolen that gun and had tried to fire it at him, corroborating some of Kasey's and Fawcett's accounts.

On November 5, Kasey recounted to SafeHaven counselor Davis the same version of events set out above on November 3 and 4—Powell's sticking the gun in her mouth, his assault of her that night, his telling her the next morning that he had been going to kill her, and his abuse of her in front of others on the public roadway. Two days later, Kasey recounted the same information to another SafeHaven counselor, and she told Fort Worth police and MedStar personnel who responded to her call at Fawcett's house that her boyfriend had choked her out with a piano wire. She told the Freedom House screener that Powell had put a wire around her neck, beat her in the face, and told her that he was supposed to kill her and that she was afraid he might try to find her. When JPS discharged Kasey on November 17, her father told hospital staff that they were "signing her death warrant."

Kasey told her friend Elliot that she thought Powell could kill her, and she told Drake, Fawcett, and Hummell that Powell was going to kill her. Fawcett testified that Kasey had written a statement to the effect that if she died, Powell was the murderer, and that he had seen Powell threaten to kill her. Ruthesell, who did not know either Kasey or Powell, saw Powell beat Kasey and heard Kasey scream that he was going to kill her. And Powell assaulted Ruthesell when she tried to help Kasey. Scribner, like Ruthesell, witnessed the assault and heard Kasey say that Powell was trying to kill her. Scribner was thrown from the truck when Powell put it in drive and fled the scene. Scribner said that Kasey's neck had looked "like someone took a Weed Eater to it."

### (c) Inconsistencies in Powell's story and his behavior after Kasey's disappearance

There were inconsistencies in Powell's stories, both before and after Kasey's disappearance, and both he and Cheryl noted that someone was "snitching." *Cf. Stobaugh*, 421 S.W.3d at 868 (noting that the appellant, who was acquitted, had not threatened witnesses or told them to keep their mouths shut). Powell attempted to use Kasey's mental health to avoid assault charges, including asking James to sign a statement that she was mentally ill and asking Kasey's ex-boyfriend Johnson to support that account to Bakouris.

Kasey never mentioned "Dallas" until after she was released from the mental hospital, although Powell started laying the groundwork for the story by telling James about Dallas while Kasey was still in the hospital and insinuating to James that Dallas had been the cause of Kasey's problems. Johnson testified that when Kasey and Powell called him in November 2015, they tried to sell him on a story about Dallas that he did not find believable. And when Johnson questioned or challenged Powell on the story, Powell became defensive. Kasey later told him that they were trying to get Powell out of trouble. Potter referred to the Dallas story as a "goose chase" in terms of her search for Kasey, and Peter listed the Dallas story as one of the stories Powell had concocted to explain Kasey's disappearance.

Although Kasey later claimed that Dallas and his men, not Powell, had assaulted her on November 3, when Powell sought medical attention after his arrest

on November 4, Powell told JPS staff that he had had a confrontation with his spouse the night before, that she had kicked him in the chest, and that he was arrested that day in a subsequent confrontation with her. Thus, his own statements for medical attention confirmed Powell's status as Kasey's assailant on November 3 and 4.

James said that after November 17, Powell never came by his house to look for Kasey. Likewise, Elliot testified that Powell never contacted her to ask where Kasey might be.

### (d) Electronic and physical evidence linking Powell to Kasey's disappearance

Kasey's November 22 "Dallas" Facebook post was made just 45 minutes after the password to the account was changed, and Powell's cell phone had access to the account. While Powell bonded out of jail the next day on the November 3 aggravated assault charge, whoever had his phone while he was in jail could have made the post for him. Likewise, one of Kasey's friends posted in June 2016 that she could see that someone was receiving messages because "we can see that they have been read," and after that, a phone number associated with the account was removed. Powell's cell phone number was one of two numbers associated with Kasey's Facebook account.

Kasey's November 17 interaction with her father over using his phone with her sim card confirmed that she did not have a working cell phone at that time. Someone using Powell's cell phone checked Kasey's voicemail on November 20, and the last outgoing call on Kasey's cell phone account with T-Mobile, which Powell had paid

for, was on November 23, 2015—the same day that Powell bonded out of jail. Kasey's cell phone number was transferred to a prepaid account with Verizon that did not require name, address, or contact information but which had been provided—but not verified, as it was a prepaid account—as Kasey Rae Nutter, 602 North Walnut Street, Weatherford, Texas. That address belonged to Rhonda Wright, who was associated with Powell's daughter Misty and his ex-wife Cheryl, and Investigator Nutt concluded that Kasey had never lived with Wright. Transferring the T-Mobile account to Verizon required an account number and account pin from T-Mobile, which Powell, as the account holder, would have had. The prepaid Verizon account terminated May 21, 2016, after Powell had been arrested.

We have already recounted the physical evidence that not only supported finding Kasey's death but also linked that death to Powell: saws, blood, DNA, and chemicals that could dissolve a body, and descriptions of injuries and manner of corpse disposal that Kasey told others that Powell had described to her.

### (e) Powell was the last known person to see Kasey alive

Kasey sent private Facebook messages on December 9 and December 12, 2015, and in her final message, she listed Powell's landline phone number as her contact phone number, thus evidencing the fact that Kasey was at Powell's residence during that timeframe.

### c. Conclusion

Based on the above, we think that the circumstances of this case are more like the ones in *Nisbett* than in *Winfrey*, in that the State brought forth sufficient independent evidence to prove that Kasey was dead and to corroborate the portion of Powell's extrajudicial confession to Peter in which he claimed to have killed her. Accordingly, we overrule this portion of Powell's first point.

### 2. Obstruction or retaliation

In the remainder of his first point, Powell asserts that because Kasey fully cooperated with Bakouris and signed the affidavit of nonprosecution, the evidence is insufficient to establish the underlying obstruction or retaliation offense. Powell also points out that Kasey never claimed that Powell was going to harm her because she had called the police or because of any statement that she had refused to make. Then more than a month elapsed after Kasey told Officer Payne that Powell was supposed to kill her before she disappeared. Powell contends that it is "simply unreasonable to infer from [Kasey]'s single statement to police, which she made at least one month prior to her disappearance and weeks prior to her working with [his] defense to dismiss charges against him, that [he] killed her in the course of retaliation."

But Powell's argument ignores that there were multiple assaults against Kasey for which Powell could have been charged. For example, although Kasey did not pursue charges for the September 2015 assault—in which she alleged that Powell had beaten her and choked her with a wire—she nevertheless refused to make a false

statement about gun ownership to protect Powell from being charged with the gun, even though Powell had told her—while strangling her with a wire—that he would spare her life if she would do so.

Franklin, the women's crisis advocate, testified that on November 4, Kasey had been "adamant" that she was not going to prosecute Powell out of fear for her life. And Hummell stated that when he spoke with Kasey for 41 minutes that day, she told him that she was afraid, and he agreed that she had mentioned to him something about filing charges that she was afraid of. Kasey told a nurse that she wanted to file a police report about the November 3 assault at Powell's White Settlement home, and she told a SafeHaven counselor on November 5 that she had pressed charges against Powell after the November 4 assault.

Johnson said that when Kasey and Powell tried out the Dallas story on him in November 2015, it had seemed as if Powell "thought he was going to be able to get away from it, get out of it." The jury could have reasonably concluded that when the case was not dismissed after Kasey's affidavit of nonprosecution was filed, Powell had decided on an alternative method to make his legal problem permanently disappear. The jury could have concluded that Peter's testimony corroborated that Powell had strangled Kasey—before later killing her—for pressing charges when he told Peter, as they stood before Kasey's unconscious body, "That's what she gets." We hold that there is sufficient evidence to support the jury's capital murder verdict, and we overrule the remainder of Powell's first point.

### III. Speedy Trial

In his sixth point, Powell argues that he was denied his right to a speedy trial under the United States and Texas Constitutions[76] when almost 3 years passed between his June 2016 arrest and his May 2019 trial.

### A. Background

Counsel was appointed for Powell in June 2016. The following month, Powell filed a pro se motion to dismiss his counsel and for substitution of counsel. Powell amended these motions the following month and again three months later, and then he filed a variety of pro se motions that covered almost every aspect of the trial process over the course of three years. The trial court granted more than one of Powell's motions to substitute counsel.

On August 21, 2018, Powell wrote to the trial court expressing his desire to represent himself pro se. The trial court held a hearing on the matter in September 2018. In response to Powell's complaint that he had been in custody "for right at about 28 months straight, and there's never been any defense motions or constitutional protective motions or documents filed on [his] behalf in this case," one of his counsel replied that Powell himself had delayed his case because he had wanted

---

[76]Although Powell brings this challenge under both the federal and state constitutions, he acknowledges that both claims are analyzed under the factors set out in *Barker v. Wingo*, 407 U.S. 514, 530–33, 92 S. Ct. 2182, 2192–93 (1972). *See Zamorano v. State*, 84 S.W.3d 643, 648 (Tex. Crim. App. 2002).

a different lawyer "every other time he c[a]me[] to court, so he kind of did it to himself."

Powell's appointed co-counsel informed the trial court that according to some of Powell's pro se filings, Powell appeared to believe that his appointed counsel was not a lawyer and was working for the police. He cautioned that this sort of paranoia was "beyond the normal paranoia of a capital defendant," and suggested that the court should obtain a competency evaluation to make sure Powell had the ability to proceed pro se. After Powell was found competent and continued to insist that he wanted to represent himself, on October 2, 2018, the trial court allowed him to represent himself pro se.

Despite having filed a multitude of pro se motions over the course of the proceedings, Powell did not file his pro se motion for speedy trial until March 1, 2018 (at which time he still had appointed counsel). In October 2018, after Powell was allowed to proceed pro se, Powell filed amended motions to dismiss the case for violation of his right to a speedy trial. The trial court appointed standby counsel for Powell on October 4, 2018, and trial was set for October 15. On October 8, 2018, Powell requested a 30-day continuance because he had not yet met with a private investigator or standby counsel, among other reasons, and the trial court granted the motion.

On December 27, 2018, Powell filed a pro se motion to dismiss the prosecution, complaining that he had been incarcerated for two and a half years. In

January and February 2019, Powell filed pro se motions for forensic experts, which the trial court granted.

At a pretrial hearing on January 23, 2019, Powell told the court that he was "trying to explain to [the judge] right now with the speedy trial motion and hearing and the Motion to Suppress, both of those being very important to [him] to have heard in a pro se fashion at this time."

On February 20, 2019, the trial court held a pretrial hearing on, among other things, Powell's speedy trial motions.[77] In his March 1, 2018 motion, Powell complained that his rights had been violated when he did not receive a speedy trial. He asked for a speedy trial, for dismissal of the indictment, and for a reduction in bond and complained that he had been continuously confined since his arrest on May 12, 2016. He asserted that if trial were not held on or before his 24th month of detention, he would be severely prejudiced with regard to the availability of defense witnesses, his ability to impeach the State's witnesses, and materials to show bias and explain fabrications in the "[v]ery framework of the State[']s allegations."

---

[77]At that hearing, Powell stated that he assumed that the reason he had received no response to his March 1, 2018 motion was "because [he] was not acting in a pro se capacity at that time," and he acknowledged that he had not been entitled to hybrid representation. *See Pickett v. State*, No. 02-19-00090-CR, 2020 WL 2073733, at *1 n.3 (Tex. App.—Fort Worth Apr. 30, 2020, pet. ref'd) (per curiam) (mem. op., not designated for publication) (explaining that because a defendant has no absolute right to hybrid representation, courts "may ignore pro se motions filed by defendants with appointed counsel").

In his October 8, 2018 speedy trial motion, Powell complained that during the delay, the following had occurred to prejudice him:[78]

> (1) exculpating witnesses' memories were diminished; (2) contact data/information had expired or had changed; (3) cell phone records had become stale to retrieval; (4) rental receipts had become beyond retrieval; (5) retail receipts relevant to exculpating place and time were lost and made unavailable; (6) credit cards and their records were beyond reach from identifying particulars and had expired; (7) banking records had expired or made beyond reach; (8) medical analogies [sic] were made beyond reach; (9) cell phone records were made stale; beyond reach; and expired; (10) vehicle repair & maintenance receipts/invoices were made beyond reach and beyond explanation to direct others for retrieval; (11) toll charge invoices showing time and place were kept from reach, made stale, and expired; (12) inability to retrieve time-sensitive social media data that exculpated; (13) the impairment from retrieving time-sensitive video camera coverage that would exculpate him; (14) the impairment from having access to forensic expertise to enable or effectuate testing to form objective [exculpatory] findings; (15) the impairment from gathering logistic evidence regarding an alternate foul-play suspect name (Dallas) whom the alleged victim had declared and sworn revenge to prosecute for an assault that he was responsible for; (16) the impairment from timely retrieving voice messages of exculpatory nature before expiration; (17) the impairment from retrieval of wholesale material purchase invoices that have exculpatory time and place value; (18) the impairment from retrieval of ATM receipts that have potential to yield video, time, place, and financial exculpation; (19) the impairment from retrieval from fuel receipts/invoices showing time and place relevant to exculpation; (20) the impairment from retrieval of MoneyGram receipts that reflect exculpations; (21) the impairment from retrieval of valuable exculpating e-mails, both personal and business; (22) the impairments from interview and process of character witnesses; (23) the impairment of financial resources to hire investigators and private counsel; (24) the curtailment and impairment from producing income from defendant's fifteen-year-old business and his only stream of income.

---

[78]We have attempted to correct the spelling, grammar, capitalization, and punctuation in the following list for ease of comprehension.

At the February 20 hearing, Powell told the trial court that by the time that the grand jury was convened in the instant case, he had already been in custody on a separate aggravated assault offense.[79] He complained that "in the process of the 34 months that [he had] been incarcerated so far," he had been constrained by lack of income and "access to the free world society." He stated,

> I'm in a phase now in the proceeding where we're past the speedy trial and I have a trial date coming up. And I understand that. I don't want to delay it. I want to move forward through that if it turns out that we are 100 percent ready to proceed in that direction.
>
> And I just want to say that the prolonged restraint, it did impair my defense drastically. There's a lot of things that I was prejudiced with. And I want to say a lot with respect to having gone this far without getting access to the courts and speedy trial and the number of things that I've mentioned within this document [referring to either his March 2018 motion, his October 2018 motion, or both].

During the hearing, in addition to generally referencing "the number of things that [he had] mentioned within this document," Powell also listed orally how he had been prejudiced by the delay: (1) late retrieval of Kasey's phone records, for which he claimed he would have had access "if [he] would have been able to get in there sooner," and access to exculpatory cell tower data; (2) the loss of a cell phone that contained content regarding "exculpated matters"; (3) the loss of the attorney he had

---

[79]At the time of the hearing, the related aggravated assault allegation and two robbery allegations, as well as three misdemeanor offenses, were pending against Powell. The capital murder bond had been set at $1 million; no bond was set for the aggravated assault offense because it was the same alleged victim (Kasey) as the capital murder; one of the robberies had a $100,000 bond; and the other robbery had a $50,000 bond.

hired in connection with the aggravated assault case, who had withdrawn from that case when Powell had refused to pay him anything further; and (4) the loss of a packet of ten "exculpatory" documents that he had given to one of his appointed counsel, who had lost it, leading him to file complaints with the State Bar.

> Regarding the alleged loss of documents, Powell described these documents as
>
> some stuff concerning some of the witnesses that show the prejudicial bias degree . . . [t]hey were documents that were being mailed to [him] . . . coming from [Powell's] filing cabinets . . . so that [he] could use it to show the prejudicial, the bias, the stuff that was going on with some of the witnesses. . . . And not to mention there was some exculpating greeting cards that were left by the victim with [him], for [him] with her DNA all over the thing that [he] could have used to help process the DNA stuff that [they] wanted to process for the Defense that would have been beneficial because they don't have any DNA on this case that [he knew] of, and it is an exact match to her.

Powell also complained that he had been prejudiced by the fact that it had taken a whole year to get one of his court-appointed counsel removed "after [Powell] put in several things to try to get him removed, and he never would remove himself."

In response, the prosecutor attributed the delays to Powell, pointing out that as soon as Powell was appointed counsel on June 14, 2016, he had immediately tried to get counsel removed, seeking to get one fired for cause and filing grievances with the State Bar on the other. When new counsel was appointed for him in December 2016, Powell then began filing objections to this counsel as well.

The prosecutor also explained that capital murder cases were on an expanded, not expedited, track so that the State had time to secure any required testing, and

114

while the case had originally been set for trial in April 2017, at that time, there had been approximately 1,200 cases pending in the 213th District Court. Additionally, the prosecutor had been carrying a caseload of 13 capital murders, of which three were older than Powell's case. As the prosecutor explained, "[J]ust because you file a speedy trial motion, you don't get to jump to the top of the line. We're still going in order, but we're getting to you as fast as we can, basically, is the way that the law works here in state court." Powell's standby counsel informed the trial court that the only problem with the April 1, 2019 trial date was that he had not received confirmation from a lab that materials from the State had been received for retesting.

At the conclusion of the hearing, the trial court denied Powell's motions and reminded the parties that the trial was set for April 1, 2019. The trial court also noted that it "appears as though the State is ready," cautioned Powell again about the dangers of self-representation, and warned him that if he wanted his standby counsel to convert to representation, that attorney would need sufficient time to prepare.[80] Powell then decided he wanted appointed counsel after all and asked for his standby counsel to be appointed to represent him. The trial court granted Powell's request for appointed counsel.[81]

---

[80]The trial court noted that Powell was putting it "in a really tough spot between making sure [Powell] ha[d] adequate representation and making sure that [Powell] g[o]t a speedy trial."

[81]On March 29, 2019, when his appointed counsel filed an unopposed motion for continuance to delay the trial until May 13, 2019, Powell signed a statement that

115

## B. Standard of review and applicable law

In reviewing the trial court's ruling on an appellant's speedy trial claim, we apply a bifurcated standard of review: an abuse of discretion standard for the factual components, and a de novo standard for the legal components. *Zamorano*, 84 S.W.3d at 648; *Murphy v. State*, 280 S.W.3d 445, 452 (Tex. App.—Fort Worth 2009, pet. ref'd). If the trial court should have sustained a motion to set aside the indictment for failure to provide a speedy trial, we must reverse the trial court's judgment of conviction and render a judgment dismissing the prosecution with prejudice. *See Cantu v. State*, 253 S.W.3d 273, 281 (Tex. Crim. App. 2008) ("Dismissal of the charging instrument with prejudice is mandated only upon a finding that an accused's Sixth Amendment speedy trial right was actually violated.").

In determining whether an accused has been denied his Sixth Amendment right to a speedy trial, we must use a balancing test to weigh the conduct of both the prosecution and the defendant. *Dragoo v. State*, 96 S.W.3d 308, 313 (Tex. Crim. App. 2003) (citing *Barker*, 407 U.S. at 530, 92 S. Ct. at 2192). The factors to be weighed include, but are not limited to, the delay's length; the reason for the delay; the defendant's assertion of his speedy trial right; and the prejudice to the defendant resulting from the delay. *Id.* (citing *Barker*, 407 U.S. at 530, 92 S. Ct. at 2192). No

---

although he was consenting to the continuance, he was "in no way withdrawing [his] previously filed motions alleging a violation of [his] right to a speedy trial" but that he understood that any delay resulting from the continuance "will likely be excluded from any speedy trial analysis should an appellate court be asked to review the issue."

single factor is necessary or sufficient to establish a violation of the right to a speedy trial. *Id.* (citing *Barker*, 407 U.S. at 533, 92 S. Ct. at 2193).

The *Barker* balancing test imposes dual burdens. The State has the burden of justifying the length of the delay, while the defendant has the burden of proving the assertion of the right and showing prejudice. *See Barker*, 407 U.S. at 531, 92 S. Ct. at 2192. The defendant's burden varies inversely with the State's degree of culpability for the delay. *Cantu*, 253 S.W.3d at 280. Thus, the greater the State's bad faith or official negligence and the longer its actions delay a trial, the less a defendant must show actual prejudice or prove diligence in asserting his right to a speedy trial. *Id.* at 280–81.

Review of the individual *Barker* factors necessarily involves fact determinations and legal conclusions, but the balancing test as a whole is a purely legal question. *Id.* at 282; *see also Henson v. State*, 407 S.W.3d 764, 769 (Tex. Crim. App. 2013) (observing that at least two of the *Barker* factors—the reason for the delay and the prejudice to the accused—are fact-specific inquiries). Courts are directed to apply the balancing test with common sense and sensitivity to ensure that charges are dismissed only when the evidence shows that a defendant's actual and asserted interest in a speedy trial has been infringed. *Cantu*, 253 S.W.3d at 281. We must also be mindful that the constitutional right is that of a speedy trial, not dismissal of the charges. *Id.*

117

## 1. Length of the delay

The length of the delay is measured from the time that the defendant is arrested or formally accused, and a speedy trial claim will not be heard until the passage of a period of time that is, on its face, unreasonable under the circumstances. *Dragoo*, 96 S.W.3d at 313–14. The State acknowledges here that the 35-month delay between arrest and trial "is significant enough to trigger further speedy trial analysis and weigh against the State" but asserts that Powell nonetheless failed to show "more than minimal prejudice related to this delay." The length of the delay weighs in Powell's favor.

## 2. Reason for the delay

When considering the reason—or reasons—for the delay, different weights should be assigned to different reasons because some reasons are valid and serve to justify appropriate delay. *Id.* at 314. While in the absence of an assigned reason for the delay a court may not presume either a deliberate attempt on the State's part to prejudice the defense or a valid reason for the delay, the court nevertheless must determine whether the State or the defendant is more to blame for the delay. *Id.*; *see Hopper v. State*, 520 S.W.3d 915, 924 (Tex. Crim. App. 2017). The State's deliberate delay to hamper the defense or to gain a tactical advantage in the defendant's case is weighed heavily against the State, while more neutral reasons, such as negligence or overcrowded courts, still weigh against the State, but less heavily. *Hopper*, 520 S.W.3d at 924. Delay caused by the defense weighs against the defendant. *Id.*

118

Here, at the hearing on the speedy trial motion, the prosecutor attributed much of the case's delay to Powell's actions in auditioning several different appointed counsel before finally settling on defending himself pro se. The comments of Powell's previous appointed counsel at the September 2018 hearing on whether Powell should be allowed to represent himself—that Powell himself had delayed the case because he had wanted a different lawyer every time he came to court—supported the prosecutor's attribution.

The prosecutor also explained that capital murder cases are not expedited and that when the case was originally set for trial in April 2017, there had been approximately 1,200 cases pending in the 213th District Court, and the prosecutor had been carrying a caseload of 13 capital murders, of which three were older than Powell's case. No evidence was offered at the hearing that the State had deliberately delayed prosecuting Powell, and nothing on the record before us indicates that the State acted in bad faith with any unnecessary delays.

Another reason reflected in the record for the duration of the delay is that in January and February 2019, Powell filed pro se motions for forensic experts, which the trial court granted, and Powell's standby counsel advised the trial court at the speedy trial hearing that the only problem with the April 1, 2019 trial date was that the defense was still waiting on retesting the materials provided by the State.

Although an overcrowded court docket weighs against the State, we think the trial court could have reasonably concluded that Powell's own actions and

circumstances counterbalanced that weight to such an extent that this factor weighs slightly against him. *See id.*

### 3. Defendant's assertion of his right

Although a defendant's failure to assert his speedy trial right does not amount to a waiver of that right, failure to assert the right makes it difficult for him to prove that he was denied a speedy trial because his lack of a timely demand indicates strongly that he did not really want a speedy trial and was accordingly not prejudiced by the lack of one. *Dragoo*, 96 S.W.3d at 314. And the longer the delay, the more a defendant's inaction weighs against him. *Id.*; *see Balderas v. State*, 517 S.W.3d 756, 771 (Tex. Crim. App. 2016) (observing that from 2009 to 2013, defense counsel consistently sought additional time for investigation and negotiation and did not assert the right to a speedy trial until after a jury had been selected in 2014). Likewise, filing for a dismissal instead of a speedy trial generally weakens a speedy trial claim because it shows a desire to have no trial rather than a speedy one. *See Murphy*, 280 S.W.3d at 454. Thus, if a defendant fails to first seek a speedy trial before seeking dismissal of the charges, he should provide cogent reasons for this failure. *See id.*

Powell began complaining about his various appointed counsel in July 2016, a month after the first one was appointed, and he continued to do so until he began representing himself pro se in October 2018. Powell did not file his first motion for speedy trial until March 1, 2018 (during which time he still had appointed counsel), and he did not file his amended motion until October 8, 2018, even though he had

120

filed over 165 other pro se motions—not counting the pro se letters that he sent to the court—over the course of the case. Powell also filed a number of pro se motions seeking to dismiss the prosecution and for bond reductions and for habeas corpus relief. We think this factor weighs against Powell because he waited almost two years before filing his first speedy trial motion, which sought dismissal of the charges.

### 4. Prejudice to defendant resulting from the delay

We must assess this factor in light of the interests that the speedy trial right was designed to protect: prevention of oppressive pretrial incarceration, minimization of the accused's anxiety and concern, and limitation of the possibility that the accused's defense will be impaired. *Dragoo*, 96 S.W.3d at 315. The last item is the most serious because a defendant's inability to adequately prepare his case skews the fairness of the entire system. *Id.* But because excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove—or for that matter, identify— affirmative proof of particularized prejudice is not essential to every speedy trial claim. *Id.* This "presumption of prejudice" diminishes when the defendant acquiesces in the delay. *Id.* The prejudice to the accused is a fact-specific inquiry. *Henson*, 407 S.W.3d at 769.

In September 2016, the State opted to waive seeking the death penalty, so Powell was under the threat of losing his life if found guilty for no longer than three months at the beginning of his pretrial incarceration. Further, notwithstanding Powell's multiple efforts at finding appointed counsel that suited him, after he secured

permission to proceed pro se and the appointment of standby counsel, Powell also requested a 30-day continuance to prepare for trial. He subsequently informed the trial court that he was unwilling to let standby counsel "take over the steering wheel" in his case until he had been heard pro se on his speedy trial motions (as well as his pro se motions to suppress) because his previous appointed attorneys had balked at how Powell, a non-lawyer, wanted the motions to be handled.

And although in his motions and at the hearing Powell listed a number of ways he had been prejudiced by the delay in general, he failed to identify whom he had wanted to secure as a witness, what those witnesses would have testified, and how that testimony would have cleared him of the capital murder charge. *See Phipps v. State*, 630 S.W.2d 942, 947 (Tex. Crim. App. [Panel Op.] 1982) (stating that before the contention that undue delay made defendant unable to locate witnesses will amount to "some showing of prejudice," defendant must "show that the witnesses were unavailable, that their testimony might be material and relevant to his case, and that he has exercised due diligence in his attempt to find them and produce them for trial").

Powell likewise provided no explanation of how the various, allegedly "exculpatory" items he listed—receipts, banking and cell phone records, toll charge invoices, time-sensitive social media data and video footage, and personal and business emails—would have helped his defense. And Powell described the "exculpatory" documents, which one of his appointed counsel had allegedly lost, as "some stuff" to show witness bias, but he provided no description of what that bias

122

would have been or how the documents would have shown it. *Cf. Hurdsman v. State*, No. 02-17-00319-CR, 2018 WL 5832116, at \*8 (Tex. App.—Fort Worth Nov. 8, 2018, pet. ref'd) (mem. op., not designated for publication) ("While it may be fairly argued that the delay in trying Hurdsman allowed a computer virus to destroy photographs of the stolen property, it is not so apparent that the loss of the photographs hindered Hurdsman's defense.").

Powell also claimed that the delay had impaired his ability to hire investigators and to pay for forensic experts to test evidence, yet the record reflects that the court granted his motions for those items and approved the charges to pay for them.

While we do not dispute the oppressive nature of three years of pretrial incarceration or attempt to minimize Powell's anxiety and concern about his capital murder charge, loss of income, and the loss of his business while incarcerated, in light of the sufficiency of the evidence—as set out in extensive detail above—and without more information beyond Powell's description of the lost items as "exculpatory," we do not think this factor weighs heavily in Powell's favor in showing that his defense was impaired, particularly when he caused or acquiesced in at least part of the delay.

## C. Analysis

The weight of the four factors set out above, when balanced together, is against finding a violation of Powell's right to a speedy trial. Powell was complicit in delaying his own case as he auditioned a variety of appointed counsel, and his focus—at least in part—was on dismissal of the charge rather than on obtaining a speedy trial.

123

Moreover, the record does not reflect such prejudice from the delay that his defense was actually impaired. Accordingly, we overrule Powell's sixth point.

## IV. Evidentiary Rulings

In his second, third, fourth, and fifth points, Powell argues that the trial court abused its discretion by admitting portions of the State's evidence and by prohibiting him from impeaching Peter with his prior inconsistent statements. He acknowledges that we primarily review a trial court's decision to admit or exclude evidence for an abuse of discretion. *See Wells v. State*, 611 S.W.3d 396, 427 (Tex. Crim. App. 2020) (applying abuse-of-discretion standard to trial court's decisions applying evidentiary rules).

## A. Suppression

In his fourth point, in a variety of sub-points, Powell complains that the trial court erred by denying his motions to suppress.

The trial court heard Powell's pro se consolidated motion to suppress on February 20, 2019. To this motion, Powell attached a copy of the April 15, 2016 search warrant of his home and the sponsoring affidavit written by Detective Person. Powell's counsel filed another motion to suppress on May 17, 2019, but he did not attach any of the affidavits or search warrants. Powell now complains about the following in his challenge to the trial court's denials of his motions to suppress: (1) the search and seizure of his saws from pawnshops, which led, at least in part, to the issuance of the April 2016 search warrant for his house; (2) the April 2016 search

124

of his house; (3) the April 2016 seizure of a cell phone from his house during the search; (4) the May 2016 search of his Camaro; and (5) the subsequent search of a cell phone found in his Camaro.

### 1. Standard of review

We apply a bifurcated standard of review to a trial court's ruling on a motion to suppress evidence. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We defer almost totally to a trial court's rulings on questions of historical fact and application-of-law-to-fact questions that turn on evaluating credibility and demeanor, but we review de novo application-of-law-to-fact questions that do not turn on credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002). When reviewing the trial court's ruling on a suppression motion, we must view the evidence in the light most favorable to the ruling. *Wiede v. State*, 214 S.W.3d 17, 24 (Tex. Crim. App. 2007); *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006).

### 2. Powell's saws

#### a. Search warrant allegations and suppression hearing

The April 15, 2016 search warrant affidavit referenced, among other things, Peter's statements about Powell to Detective Person. Peter told Detective Person that Powell had told him in vivid detail how he had cut Kasey's body up "limb by limb" at every major joint and then wrapped the parts in black trash bags and cut

them up even smaller with a table saw and that "multiple saws" were needed to cut Kasey's body into "little chunks."

Detective Person stated in the affidavit that an April 8, 2016 pawn history check revealed that Powell had recently pawned several saws at various pawnshops near his residence: a Skil brand table saw on April 7, a Ryobi brand circular saw on March 25, a Stihl brand Cut-Off saw on March 22, and a Rotozip brand saw on March 22. The saws were collected on April 11, 2016, and tested with Luminol, and all but one (the Ryobi saw) "showed a clear indication of possible blood presence."[82]

Powell argued pro se at the hearing that his saws had been seized from the pawnshops without a warrant "on the falsehood pretense that they were being seized for a theft investigation," and that he discovered this when he went to retrieve his saws and could not because the White Settlement Police Department had put a hold on them. Powell stated, "[M]y goal today was to show how these particular tools were seized at a pawnshop and how they activated as the initial fuse that lit the fire basically to the entire search warrant."

At the hearing, Detective Person testified that the saws were confiscated from the pawnshops as homicide evidence and that the police had told the pawnbrokers to put a hold on the tools and then sent someone to pick them up without a warrant.

---

[82]Video surveillance from Cash America Pawn Shop confirmed that Powell had pawned the table saw that contained blood evidence, and the pawnshop clerk remembered that when Powell pawned it, he told the clerk that he had just gotten out of court that day.

Detective Person explained that a warrant was not required because the pawnshops had the items in their possession and had consented to the seizures. The prosecutor then argued that Powell had abandoned any privacy interest in the saws when he pawned them, that the pawnshops had had a greater right of possession because they had given Powell money in exchange for the property, and that a warrant had been rendered unnecessary by the pawnshops' consent. The trial court denied suppression of the pawnshop items.

### b. Powell's arguments

In the first sub-point of his fourth point, Powell argues that the warrantless search and the seizure of his saws from the pawnshops did not fall within any exception to the Fourth Amendment's warrant requirement because the officers seized and searched them within the first 30 days after Powell pledged them, when he still had the right to redeem them under the state laws and regulations governing pawnshops. Powell contends that he still had an expectation of privacy in the property (standing) because his privacy interest was not negated when he left the saws with the pawnbroker for less than 30 days; that the pawnshops could not consent to the search of the saws under "the unique laws governing pawnshops"; and that the State had failed to prove consent or actual or apparent authority to consent to the search when neither the pawnshop employees nor the officer who retrieved the saws testified. Powell further contends that the search of his house should be suppressed as fruit of the unlawful search of his saws.

127

The State responds that the police properly took custody of these tools because there is only a limited expectation of privacy in pawned goods and the police received consent from a person with concurrent or apparent authority. Powell counters that the pawnshop regulations allowing police to place a hold on pawned goods did not provide a basis for actual or apparent consent of a third party based on the facts of this case.

We begin our analysis with a review of the general Fourth Amendment law on standing and consent, followed by the statutes and regulations governing pawnshops in Chapter 371 of the Finance Code and in Title 7, Chapter 85, Subchapter A of the Administrative Code, *see generally* Tex. Fin. Code Ann. §§ 371.001–.306; 7 Tex. Admin. Code §§ 85.101–.703 (Office of Consumer Credit Comm'r, Pawnshop Operation), and then the cases to which Powell has referred us.

### c. Standing and consent

As a threshold matter, a reasonable expectation of privacy must exist to support a challenge to a search or seizure under the Fourth Amendment. *See California v. Ciraolo*, 476 U.S. 207, 211, 106 S. Ct. 1809, 1811 (1986). That is, the complaining individual must have manifested a subjective expectation of privacy in the object of the challenged search and society must be willing to recognize that expectation as reasonable. *Id.* at 211, 106 S. Ct. at 1811. The rights protected by the Fourth Amendment are personal, *Matthews v. State*, 431 S.W.3d 596, 606 (Tex. Crim. App. 2014), and a defendant has no standing to complain about the invasion of someone

128

else's personal rights. *Kothe v. State*, 152 S.W.3d 54, 59 (Tex. Crim. App. 2004). Instead, the defendant must show that *his* rights were violated. *Matthews*, 431 S.W.3d at 606; *see State v. Betts*, 397 S.W.3d 198, 203 (Tex. Crim. App. 2013) ("[A]n accused has standing to challenge the admission of evidence obtained by an 'unlawful' search or seizure only if he had a legitimate expectation of privacy in the place invaded.").

The owner or operator of a business has an expectation of privacy in commercial property that society is prepared to consider reasonable, but the expectation "is particularly attenuated in commercial property employed in 'closely regulated' industries." *New York v. Burger*, 482 U.S. 691, 699–700, 107 S. Ct. 2636, 2642 (1987); *see Marshall v. Barlow's, Inc.*, 436 U.S. 307, 313, 98 S. Ct. 1816, 1821 (1978) (explaining that "certain industries have such a history of government oversight that *no* reasonable expectation of privacy . . . could exist for a proprietor over the stock of such an enterprise" (emphasis added)).

When the privacy interest of such a business owner is accordingly weakened and the government interest in regulating a particular business is concomitantly heightened, a warrantless inspection of a commercial premises may well be reasonable within the meaning of the Fourth Amendment. *Burger*, 482 U.S. at 702, 107 S. Ct. at 2643–44. In *Burger*, the Court concluded that, with regard to the warrantless inspection of a vehicle dismantler, a New York regulatory scheme fell within the well-established exception to the warrant requirement for administrative inspections of "closely regulated" businesses. *Id.* at 2649, 107 S. Ct. at 712. It based its decision on

the fact that the junkyard was closely akin to a secondhand shop (a type of business that had been closely regulated for many years), the State had a substantial interest in eradicating automobile theft, and the business owner was informed in the statute that inspections, limited to business hours and to records and any vehicles or parts on premises that were subject to the record-keeping requirements, would be made on a regular basis, which was a constitutionally adequate substitute for a warrant. *Id.* at 2646, 2648, 107 S. Ct. at 706–07, 710–12 (noting that frequent and unannounced inspections were necessary to detect stolen cars and parts).

"[T]hose engaged in highly regulated businesses are aware of the government supervision and in effect consent to the restrictions by engaging in the business." *Robinson v. State*, 728 S.W.2d 858, 861 (Tex. App.—Austin 1987, no pet.) (referencing *Marshall*, 436 U.S. at 313, 98 S. Ct. at 1821). In 2015, the U.S. Supreme Court noted that in over four decades, it had identified only four industries that have such a history of government oversight that no reasonable expectation of privacy could exist for the proprietor over the stock of such an enterprise: liquor sales, firearms dealing, mining, and running an automobile junkyard. *City of Los Angeles v. Patel*, 576 U.S. 409, 424, 135 S. Ct. 2443, 2454–55 (2015) (noting that closely regulated industries are the exception and concluding that nothing inherent in hotel operation poses a clear and significant risk to the public welfare).

Notwithstanding administrative searches, generally, an owner who turns property over to a third party for some period of time provides standing to that third

party "during the duration of bailment." *Matthews*, 431 S.W.3d at 607. Assuming that the third party has a reasonable expectation of privacy in that property, he can validly consent to a search to the detriment of the owner's privacy interest if he has actual authority and equal control over the thing to be searched. *See State v. Rodriguez*, 521 S.W.3d 1, 19–20 (Tex. Crim. App. 2017). The third party may, in his own right, give valid consent when the third party and the absent, non-consenting person share "common authority," or if the third party has some "other sufficient relationship" to the property. *Id.* at 19. That is, the individual who shares common authority with the third party assumes the risk that the third party might permit the search. *See id.*

Actual authority is not even necessarily a prerequisite for a valid consensual search. *Id.* If an officer reasonably, though mistakenly, believes that a third party purporting to provide consent has actual authority over the item to be searched, apparent authority exists, and the third party's purported consent can serve to make the search reasonable. *Id.* Apparent authority is judged under an objective standard: "Would the facts available to the officer at the moment warrant a man of reasonable caution in the belief that the consenting party had authority?" *Id.* Reasonableness hinges on "widely shared social expectations" and "commonly held understanding about the authority that co-inhabitants may exercise in ways that affect each other's interests." *Id.* at 19–20.

Finally, no one has a reasonable expectation of privacy in property that he abandons. *Matthews*, 431 S.W.3d at 608. Thus, a defendant who voluntarily abandons

131

property lacks standing to contest the reasonableness of a search of it, but it must be shown that the defendant intended to abandon the property and that the abandonment was voluntary. *Id.* at 608–09. The issue is not whether the defendant intended to discard the property permanently, but rather whether he abandoned it in such a way that he could no longer retain a reasonable expectation of privacy in it at the time of the search. *Id.* at 609.

### d. Pawnshop statutes and regulations

In Texas, pawnshops have long been the subject of close governmental supervision, and a review of the statutory regulations of the pawnshop industry reveals "that it has never been limited to the consumer credit aspects of the business."[83] *Kipperman v. State*, 626 S.W.2d 507, 510 (Tex. Crim. App. 1981) (noting that since 1874, pawnbrokers had been required by statute to register their transactions in a book or registry to be kept open for inspection and that the details of transactions to be recorded in the book and on a pawn ticket have long been regulated by statute). Chapter 371 of the Finance Code governs pawnshops with the intent to, among other things, prevent transactions in stolen property "and other

---

[83]Pawnshops are not the only closely regulated industry in Texas. In *Baggett v. State*, our sister court held that the fishing industry was "a closely, pervasively regulated one, licensed by the State," and "deeply rooted in regulation." 673 S.W.2d 908, 913 (Tex. App.—Beaumont 1984, no pet.). In its analysis, the court compared the Parks and Wildlife Code provisions to "similar statutes relating to inspection of pawn shops." *Id.*; *see also* Note, *Rethinking Closely Regulated Industries*, 129 Harv. L. Rev. 797, 805–06 (2016) (listing pawnshops among pervasively regulated commercial industries like banking and insurance).

unlawful property transactions" through licensing and regulating. Tex. Fin. Code Ann. § 371.002.

In furtherance of its statutory purpose, pawnbrokers are required to monitor the goods they purchase, accept in pawn, or otherwise acquire "in order to identify and prohibit transactions involving stolen goods." *Id.* § 371.181(a); *Robinson*, 728 S.W.2d at 862 ("[W]ith respect to pawnshop inspections, the State's supervision of pawnshop activities and inspection of pawnshop business records is justified to detect stolen property and prevent theft."). And pawnbrokers must work with law enforcement agencies regarding matters relating to stolen goods and must aid in the prompt resolution of official investigations by providing, if available, information to appropriate law enforcement officers such as additional descriptions of pledged and purchased goods, physical descriptions of pledgor or seller, and copies of all documents surrounding the transaction; physical inspection of the goods; a copy of any surveillance recording relating to the transaction; access to pawnshop employees for information; and cooperation with any court order. 7 Tex. Admin. Code § 85.418(a)(5); *see Burger*, 482 U.S. at 712–13, 107 S. Ct. at 2649 ("An administrative statute establishes how a particular business in a 'closely regulated' industry should be operated, setting forth rules to guide an operator's conduct of the business and allowing government officials to ensure that those rules are followed."); *see also Marshall*, 436 U.S. at 313, 98 S. Ct. at 1821 (explaining that a "businessman in a regulated industry in effect consents to the restrictions placed upon him" because he

has "voluntarily chosen to subject himself to a full arsenal of governmental regulation").

Among the plethora of regulations governing pawnshop operations, Subchapter E of Chapter 371 authorizes inspections and examinations. Tex. Fin. Code Ann. §§ 371.201–.208. Pawnbrokers must preserve their books and records "at least until the second anniversary of the date of the last transaction recorded," consistent with accepted accounting practices. *Id.* § 371.152; *see also* 7 Tex. Admin. Code § 85.402(b) (stating, for purposes of record retention, the date of the last recorded event "is the date a pledged item is taken into inventory, redeemed, renewed, seized, or voided"). And those books and records are subject to inspection by law enforcement: "A pawnbroker shall allow a peace officer to inspect the pawnbroker's books, accounts, papers, correspondence, or other records that relate to the business of the pawnbroker at any reasonable time without judicial writ or other process." Tex. Fin. Code Ann. § 371.204. Indeed, a pawnbroker's license can be suspended or revoked for failing or refusing to permit the examination or copying of books or other documents by the police or for failing or refusing to permit the examination or inspection of goods by the consumer credit commissioner. *Id.* § 371.205; *see also id.* §§ 371.003(2), .201(3). And the Court of Criminal Appeals has held that this statutory warrantless inspection does not violate the Fourth Amendment. *Kipperman*, 626 S.W.2d at 509, 511–12 (holding that this Texas Pawnshop Act provision did not violate the Fourth Amendment or Texas Constitution "[i]n light of the important

governmental interests furthered by the regulatory inspection of pawnshop records, and the limited threat these inspections pose to the reasonable expectations of privacy of businessmen choosing to enter into this closely regulated business").

Another regulation requires that when a person enters into a pawn transaction, the pawnbroker must deliver to the pledgor a "pawn ticket" that includes, among other things, the pledgor's name, address, physical description, and an official identification number;[84] the date of the transaction; an identification and description of the pledged goods, including serial numbers, if reasonably available; the amount of cash advanced or credit extended; the pawnshop's service charge; the total amount that must be paid to redeem the pledged goods on the maturity date; the annual percentage rate; the maturity date of the pawn transaction; and a statement that the pledgor is not obligated to redeem the pledged goods and that "the pledged goods may be forfeited to the pawnbroker on the 31st day after the maturity date." Tex. Fin. Code Ann. § 371.157; *see also id.* § 371.170 ("A pledgor is not obligated to redeem pledged goods or to make a payment on a pawn transaction."); 7 Tex. Admin. Code

---

[84]A pawnbroker must require government-issued photo identification from a pledgor if the transaction is a pawn transaction or from a seller if the transaction is a purchase of goods by the pawnbroker. Tex. Fin. Code Ann. § 371.174(a)–(b); 7 Tex. Admin. Code § 85.405(a)(6)(A). The pawnbroker must make his or her best effort to determine whether the photo identification is genuine and unaltered and properly identifies the pledgor or seller, Tex. Fin. Code Ann. § 371.174(c), and has an incentive to do so because a pawnshop "does not receive compensation from the [S]tate when the authorities confiscate stolen property." *Hernandez v. State*, No. 03-03-00456-CR, 2005 WL 2043641, at *1 (Tex. App.—Austin Aug. 26, 2005, no pet.) (mem. op., not designated for publication).

§ 85.405(b) (stating that the maturity date of a pawn transaction may not be greater than one month from the date of the transaction). This information must be made available to law enforcement electronically or through the production of a separate copy of the pawn ticket. 7 Tex. Admin. Code § 85.406(a).

The regulations allow a pledgor to redeem the pledged goods before the maturity date for a return of some of the pawn service charge. Tex. Fin. Code Ann. § 371.161. If the pledgor opts to redeem the goods, the pawnbroker must return the pledged goods to the pledgor on payment of the total amount due the pawnbroker in connection with the pawn transaction. *Id.* § 371.165. If the pledgor does not opt to redeem the goods on or before the maturity date, the pawnbroker must hold those goods "for at least 30 days after that date" to allow a grace period in which the pledgor may redeem the goods with an additional charge. *Id.* § 371.169(a)–(b); s*ee also id.* § 371.182 (stating that the commissioner may designate a reasonable hold period during which a pawnbroker may not sell or otherwise dispose of an item of goods acquired and offered for sale or other disposition by the pawnbroker). If not redeemed during the grace period, the pledged goods "may, at the option of the pawnbroker, be forfeited to the pawnbroker." *Id.* § 371.169(c).

Additionally, law enforcement agencies may place a hold order on pledged property, and the Texas Administrative Code provides suggested guidelines for the placement of such hold orders, to give pawnshops "considerable flexibility to fit individual needs while providing some guidance." 7 Tex. Admin. Code § 85.419(a)–

136

(b).  The hold order should be in writing and not exceed 60 days, although it may be extended for additional 30-day increments by notifying the pawnshop in writing.  *Id.* § 85.419(b)(1).  The hold order or extension should specify the pawnshop's name and address; the name, title, case number, and phone number of the responsible law enforcement officer; a complete description of the property to be held, including model number and serial number, if applicable, and the related pawn or purchase ticket number; the expiration date of the hold order or extension; and the name of the law enforcement agency that prepared the investigative report and the associated number of the report.  *Id.* § 85.419(b)(2).  Property subject to a hold order should not be released, sold, redeemed, or disposed of except under release authorization from the official placing the item on hold; expiration of the hold order and any applicable extensions; court order, including a search warrant; or seizure by a law enforcement official.  *Id.* § 85.419(b)(4)(A)–(D).

As particularly pertinent here, property under a hold order may be released to the law enforcement agency that placed the hold order on the property

> for use in a criminal investigation if the officer has provided a written receipt for the property.  The release of the property to the custody of the law enforcement agency is not considered to be a waiver or release of the *pawnbroker's* rights or interest in the property.  Upon the earlier of the completion of the criminal investigation or the expiration of the hold order and any applicable extensions, the property should be returned to the pawnshop unless a court order provides for other disposition.  If other disposition is ordered, the court may order the pledgor or seller to pay restitution in the amount received by the pledgor or seller for the property, plus accrued pawn service charges.

*Id.* § 85.419(b)(5) (emphasis added).

We have not found a Texas case that specifically addresses what, if any, reasonable expectation of privacy under the Fourth Amendment a pawnbroker might have in the pawned goods that it holds. *Cf. Sanders v. City of San Diego*, 93 F.3d 1423, 1426 (9th Cir. 1996) ("[A] pawnbroker may challenge the seizure of property in his possession under the Fourteenth Amendment."); *G & G Jewelry, Inc. v. City of Oakland*, 989 F.2d 1093, 1098 (9th Cir. 1993) ("[T]he pawnbroker, as pledgee, has a legitimate possessory interest in the property as against the rest of the world except the person having title to the property."); *Gem Fin. Serv., Inc. v. City of New York*, 298 F. Supp. 3d 464, 482–83 (E.D.N.Y. 2018) (holding that the pawnbroker had a reasonable expectation of privacy in pawned items and physical records but not in the information contained in the records pursuant to the required-records doctrine). However, to the extent—if any—that the pawnshops could challenge the seizure, Powell is not entitled to rely on the pawnshops' standing. *See Kothe*, 152 S.W.3d at 59; *see also Matthews*, 431 S.W.3d at 606.

### e. Powell's cases

Powell refers us to *Stokvis v. State*, 147 S.W.3d 669, 672 (Tex. App.—Amarillo 2004, pet. ref'd), to support his argument that he had standing to challenge the seizure of the saws because he had an expectation of privacy in that property and that the pawnshop's consent was invalid because it had no authority to use the property. In *Stokvis*, the appellant, a female passenger in a pickup truck, sought to suppress

138

methamphetamine found in her purse after the male driver gave consent to a vehicle search. *Id.* at 670. "That the purse was appellant's, that appellant was the only female in the truck, and that no one asked her permission to search it is . . . clear," and the only witness to testify at the suppression hearing (the purse-searching officer) did not know if, when the appellant exited the vehicle, anyone had told her about the officers' intent to search the vehicle or whether anyone had told her that the driver had consented to the vehicle search. *Id.* The witness agreed that the appellant probably did not hear the request for consent directed to the driver or the driver's giving consent. *Id.*

In its analysis, our sister court first recited that standing—a question of law—requires a defendant to show not only that she had an expectation of privacy in the property that was searched but also that the expectation is one that society is prepared to recognize as reasonable. *Id.* at 671 (citing *Jackson v. State*, 745 S.W.2d 4, 7–8 (Tex. Crim. App. 1988)). It acknowledged that while a third party may give consent to search another's property, for that consent to be valid, that third party must have standing to dispute the search, which is something the State must prove, either by showing that the third party either had a legitimate expectation of privacy in or had authority to jointly use the searched item. *Id.* at 672. And it noted that the fact that the purse's owner left the purse in a vehicle owned by a third party did not ipso facto negate the existence of her privacy interest in it, especially when the record lacked

evidence to show that she had intended to abandon or otherwise relinquish her interest in the property. *Id.* at 671.

In concluding that the appellant had a legitimate expectation of privacy in her purse that society had deemed reasonable (and thus that she had standing to challenge its search while the male driver did not) and in reversing the trial court's decision to deny the appellant's motion to suppress, the court noted that the record showed that the purse was located on the passenger seat, that the appellant never left the vehicle's vicinity after exiting it, that she had claimed the purse, that she had never consented to its search, and that the record did not show that she had known that the police were going to search the vehicle or that the vehicle's owner had consented to the search. *Id.* "[W]ithout proof that she left her purse in the vehicle while having the aforementioned knowledge, one cannot reasonably infer that the act of leaving the purse in the vehicle evinced some indicia of intent to relinquish her expectation of privacy in it." *Id.* And since nothing suggested that the male driver had exerted or claimed to exert some aspect of control over or interest in the purse, his consent was invalid and the search was improper. *Id.* at 672.

The comparison to the instant case is inexact at best. In *Stokvis*, the court noted that case law had acknowledged that a purse is "intended as a general repository of *personal* effects." *Id.* at 671 (emphasis added) (citing *Coronado v. State*, 835 S.W.2d 636, 640 (Tex. Crim. App. 1992) (purses, wallets, letters, diaries); *Wilson v. State*, 99 S.W.3d 767, 770 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd) (purse and

140

backpack); and *Dawson v. State*, 868 S.W.2d 363, 370 (Tex. App.—Dallas 1993, pet. ref'd) (purse)). In contrast, a pawnshop is a repository of various items, including (but not limited to) personal effects, held for a specified time in exchange for money and that may (or may not—at the option of the pledgor) be redeemed through the money's return and payment of a service charge at the end of a month or longer. The owner of a purse could pawn it, but by releasing the purse to the pawnshop in the pawn transaction, to the extent that the owner retained *any* rights in the purse other than the right to redeem it within the applicable statutory time period, those rights would be substantially diminished because he or she had voluntarily relinquished possession of the purse to a third party.

Further, if the purse were placed into the pawnshop's custody, it could be subjected to a police hold order "for use in a criminal investigation," preventing the item's return for some period of time beyond the initial pawn transaction. *See* 7 Tex. Admin. Code § 85.419(b)(5). And since "[f]or over a century, it has been clear that '[e]very one is conclusively presumed to know the law, both as to civil and criminal transactions,'" *Hicks v. State*, 419 S.W.3d 555, 558 (Tex. App.—Amarillo 2013, pet. ref'd), ignorance of the laws and regulations governing pawnshops with regard to property placed into their custody is no excuse.

Powell also directs us to *Hubert v. State*, 312 S.W.3d 554, 560 (Tex. Crim. App. 2010), in support of his argument that the pawnshop had no reasonable expectation of privacy in or authority over the saws until they were deemed forfeited under the

141

pawnshop laws and regulations. In *Hubert*, the appellant's grandfather allowed police to enter the house that he and the appellant shared and allowed the police to search the appellant's bedroom. *Id.* at 556. The trial court denied the appellant's motion to suppress, and the appellate court reversed this decision, holding that there was no evidence that the grandfather exercised actual control over the appellant's bedroom. *Id.* at 558. The Court of Criminal Appeals disagreed, reversing our sister court's decision with respect to the grandfather's authority to consent to the search, and holding that the appellant—lacking any proprietary interest in the house or even any possessory right other than by the grace of his grandfather—had assumed the risk that his grandfather might permit the search of any area of the house that he might reasonably suspect the appellant was using for criminal purposes in the absence of any indicium of exclusion, such as a lock on the bedroom door. *Id.* at 564.

We think that pawnshops have more in common with the grandfather in *Hubert* than with the grandson. While pawnshops are highly regulated, the fact that those regulations are spelled out provides pawnshops with defined interests in the property in their custody, including the right or requirement to grant access to that property. And those are interests that the party pawning the property voluntarily gives up when exchanging custody of that property for money and a right of redemption. Absent a modification of the statutory pawn contract by the pawnshop and the pledgor (an indicium of exclusion), the pawnshop has greater authority over the property than the pledgor when the pawned item is properly placed into the pawnshop's custody. *See id.*

Further, although Powell complains that neither pawnshop employees nor the officer who retrieved the property testified, the statutes and regulations governing pawnshop, as well as Detective Person's testimony, allowed the trial court to reasonably conclude that the pawnshops, which had actual access to and control of the saws, had consented to the search and seizure of the saws.

### f. Conclusion

While the statutes and regulations governing pawnshops pertain in large part to preventing theft, to the extent that the pawnshops in question here could have contested the seizure of Powell's property—either before or after the expiration of the redemption period, the record does not reflect that any of them did so. Instead, the trial court could have reasonably concluded that they consented to the seizure, and Powell cannot rely on their standing to object to the admission of those items into evidence.

As for Powell's right to grant or deny access to the saws, he gave up that right when he abandoned them by pawning them. Powell may have intended to redeem his pawned property, but when he ceded control of it, he exposed it to the discretion of the pawnshop into whose possession he had placed it. Just as a theft defendant who pawns stolen goods risks their seizure, a murder defendant cannot expect to maintain privacy when he pawns goods that were either used to commit a murder or to conceal one. And because we have concluded that the saws were not improperly seized or searched, Powell was not entitled to suppression of evidence obtained under the

April 2016 search warrant on that basis as fruit of the poisonous tree. We overrule

the first sub-point in Powell's fourth point.

### 3. April 2016 search warrant omissions and scope

In the April 2016 search warrant affidavit, Detective Person averred that

Powell had possession of and was concealing at his home and surroundings:

> Deoxyribonucleic acid (DNA) belonging to Kasey Rae Nutter, in the form of blood spatter, on the walls and ceilings of the room used as [Powell's] bedroom at the time of the offense; Deoxyribonucleic acid (DNA) belonging to Kasey Rae Nutter, in the form of blood or actual human remains, on or in the ground of the back yard of the residence; any barrels, drums, buckets or other similar type containers on the property that would be capable of concealing a human body; any barrels, drums, buckets or other similar type containers on the property that would be capable of concealing dismembered body parts, cut into small slices and/or chunks, of a human body; *any item(s) that could have been used as a weapon to kill and/or to assist in the disposal and/or dismemberment of a human body.* [Emphasis added.]

As the basis for his belief that Powell had intentionally and knowingly caused

Kasey's death by unknown means and then "proceeded to cut her body into pieces

using multiple saws," Detective Person referenced Sharlean's telling the Fort Worth

Police in her missing person report that she had not seen or spoken with Kasey since

November 2015. Detective Person stated that Kasey's last known address had been

Powell's address and that Powell had been Kasey's fiancé.

Additionally, Detective Person recited how he had come to be in contact with

Powell's son Peter, who told him that Kasey had been killed in Powell's house a week

or so before December 25, 2015; that Powell had told Peter that he did it; that Peter

144

had seen blood splattered "all over the room" in the house; that Peter had seen a "stain" on the ground in the back yard where Powell had dumped the bucket in which Kasey's body had been soaked in lye; that Powell had placed plywood over the dumping spot; and that Powell had told Peter that he used saws to cut up Kasey's body "limb by limb." Detective Person checked aerial maps from November 8, 2015, January 29, 2016, and February 7, 2016, and noted that the plywood was there in January and February as Peter had stated. He also referenced Powell's having pawned several saws at various pawnshops between March 22 and April 7, that the saws were collected by the police for testing on April 11, and that four of the five saws showed possible blood presence when sprayed with Luminol.

### a. Sufficiency-of-affidavit standard of review

In assessing the sufficiency of an affidavit for a search warrant, the reviewing court is limited to the affidavit's four corners. *Jones v. State*, 833 S.W.2d 118, 123 (Tex. Crim. App. 1992). The reviewing court should interpret the affidavit in a commonsense and realistic manner, recognizing that the magistrate could draw reasonable inferences. *Davis v. State*, 202 S.W.3d 149, 154 (Tex. Crim. App. 2006).

### b. Alleged material omissions

In part of the second sub-point of his fourth point, Powell argues that the affidavit supporting the search warrant of his house contained material omissions and that the fruits of the search should have been excluded under *Franks v. Delaware*, 438 U.S. 154, 98 S. Ct. 2674 (1978).

## (1) Powell's list of "omitted" information

Powell asserts that the affidavit supporting the search warrant of his house omitted or misstated information (1) implicating a man named Dallas in Kasey's disappearance; (2) that Kasey was not allowed on Powell's property under a criminal trespass warning; (3) that Kasey's last known address was not Powell's residence;[85] (4) that Kasey had lived in Powell's house for eight months;[86] and (5) that Peter had pending charges when he gave his statement to the police.[87] The State responds that there were no material omissions.

## (2) Analysis

To obtain a *Franks* evidentiary hearing, the defendant must (1) allege a deliberate falsehood or reckless disregard for the truth by the affiant, specifically pointing out the portion of the affidavit claimed to be false; (2) accompany these allegations with an offer of proof stating the supporting reasons; and (3) show that when the portion of the affidavit alleged to be false is excised from the affidavit, the

---

[85]In his pro se motion, Powell stated that Kasey's last known address was her father's address because her father was the person to whom she was released by JPS.

[86]In his pro se motion, Powell complained that the affidavit did not disclose that for eight consecutive months, Kasey had slept, eaten, engaged in sexual intercourse, injected and ingested drugs, applied make-up, used a curling iron and blow dryer, rearranged furniture, made renovations, crafted, and cleaned and vacuumed in the area where the State wanted to harvest DNA. Powell said that failing to disclose these details "clearly indicate[d] a reckless disregard for the truth."

[87]In his pro se motion, Powell stated that Peter was a "17 year old out-on-$26-thousand-dollar-bond-teenager" who was in desperate need of leniency while facing a five-year mandatory sentence.

remaining content is insufficient to support the issuance of the warrant. *Cates v. State*, 120 S.W.3d 352, 356 (Tex. Crim. App. 2003). To suppress evidence lawfully obtained by a warrant based on an alleged omission in the affidavit supporting the warrant, the defendant must establish by a preponderance of the evidence that the omission was made knowingly, intentionally, or with reckless disregard for the truth in an attempt to mislead the magistrate. *Darby v. State*, 145 S.W.3d 714, 722 (Tex. App.—Fort Worth 2004, pet. ref'd).

Powell argues that Detective Person testified at the *Franks* hearing that the omitted information was not relevant to the investigation and that this is proof that Detective Persons "therefore knew about this information and deliberately omitted it from the supporting affidavit." He further argues that the affidavit would not have been sufficient to establish probable cause to search Powell's house if the magistrate had been aware of evidence implicating another man in Kasey's disappearance, that Kasey did not live at Powell's residence when she disappeared and had been legally prohibited from going there, that her DNA would be found in the bedroom apart from any crime because she had lived there, and that Peter had a vested interest in providing police information helpful to their investigation.

As set out below, we do not think the five items listed by Powell constituted material omissions or that they were made in a knowing, intentional, or reckless attempt to mislead the magistrate. However, even if any or all of them had been material omissions, the remaining content would be sufficient to support the warrant's

issuance because the remaining facts showed that Kasey had been missing for several months; that Powell had been her fiancé; that at some point before her disappearance, she had lived with Powell; and that Powell had pawned saws that had reacted to Luminol to show the possible presence of blood. *See Darby*, 145 S.W.3d at 722; *see also Cates*, 120 S.W.3d at 356.

With regard to Powell's complaint that Detective Person did not mention Dallas in the affidavit, during the February 2019 *Franks* hearing, Detective Person said that he was unaware of Kasey's Facebook post about Dallas.[88] But he acknowledged having reviewed the missing person report, which included Sharlean's statements that Kasey had said that she had lied when she attributed her injuries to Powell, that Dallas had assaulted her, and that she was afraid of Dallas and believed he was going to hurt her. Powell read to the trial court the missing person report made to Fort Worth Police Detective Gomez stating that some of Kasey's fellow strippers had told Sharlean that Kasey was a victim of human trafficking and had been taken out of the area by a man named Dallas, who was affiliated with several area strip clubs.

Detective Person said that the information he had received directly from Sharlean "was similar, yet it did differ" and that the missing person report provided to the Fort Worth police department "did not match anything that was in the aggravated assault report that was made by Kasey" to the White Settlement police department.

[88]By the time Detective Person testified during trial on May 20, 2019, he had seen the November 22, 2015 Facebook post. This is the same post that Potter referred to when she expressed disbelief that Kasey had actually authored it.

148

Detective Person characterized the information about Dallas as "irrelevant in terms of providing probable cause for the investigation [they] were conducting" and stated that he had not included Sharlean's statements from the missing person report because that information had not been provided to him directly by Sharlean. And while Kasey's father later testified that he had mentioned Dallas to Detective Person at some point in April 2016, it is unclear whether he did so before or after Detective Person applied for the April 15, 2016 search warrant.

We do not think omitting information about Dallas was material when neither the presence nor the absence of information about another potential suspect would have reduced the need at that point to investigate Peter's claims that Kasey was dead, that Powell had killed her at his house, and that Powell had cut up her body with saws that he subsequently pawned and that showed the possible presence of blood. Likewise, with regard to Powell's complaint that Detective Person's affidavit did not mention that Kasey was not allowed on Powell's property pursuant to a criminal trespass warning,[89] assuming this information was material, it did nothing to negate that Peter had alleged that Kasey had died a gruesome death there or the fact that a criminal trespass warning merely notifies the potential trespasser that she will be subject to criminal liability (generally a misdemeanor) if she returns to the forbidden

---

[89]At the *Franks* hearing, Detective Person testified that he had not been aware of the criminal trespass warning at the time he applied for the search warrant and that it was not relevant to his investigation.

habitation after receiving that notice. *See* Tex. Penal Code Ann. § 30.05(a), (d) (describing criminal trespass offense).

With regard to Powell's complaints that the affidavit stated that Kasey's last known address was his residence despite Kasey's transient status after the issuance of the trespass warning, there is ample evidence in the record that Powell's home had been Kasey's last known address.[90] Accordingly, we do not think Detective Person's referring to Powell's home as Kasey's last known address was a deliberate falsehood.[91] As to his complaint that the affidavit failed to state that Kasey had lived in his house for eight consecutive months, we do not think that the failure to state that she had lived there for eight months was a material omission when it would have been realistic

---

[90]Sharlean testified at the suppression hearing that Kasey's last known address had been Powell's home. Detective Person testified that he had been aware of Kasey's mental health stay in JPS but that while JPS would have been "an address," during his investigation, it was not Kasey's last known address. During trial, Peter testified that after Kasey was released from JPS, she returned to living in Powell's house, notwithstanding the criminal trespass warning against her and the protective order that she had secured against Powell, and on December 12, 2015, Kasey sent a private Facebook message to someone, listing the landline phone number at Powell's house as the way to contact her.

[91]Detective Person testified that he did not participate in the investigation of the aggravated assault and that although he had reviewed the White Settlement Police Department's aggravated assault report, he had not noticed that the report listed a different address than Powell's for Kasey. He also stated that he had not been aware that Kasey had resided in multiple locations during November and December 2015, although he had been aware that Kasey had, for a period of time, resided in a women's shelter in Weatherford. As factfinder at the hearing, the trial court had the responsibility to evaluate Detective Person's credibility and could have reasonably found this testimony to be credible. *See Wiede*, 214 S.W.3d at 24–25 (stating, in the suppression context, that the trial judge is the sole trier of fact and judge of the witnesses' credibility and the weight to be given their testimony).

for the magistrate to assume that, as her last known address, she had performed there all of the activities that Powell referenced.

Finally, with regard to Powell's complaint that Detective Person had failed to include in the affidavit that Peter had pending criminal charges, Detective Person agreed at the *Franks* hearing that he had been aware that Peter had had pending charges against him but said that Peter's criminal history—according to Powell, possession of stolen property, possession of a firearm, and possession of marijuana and drug paraphernalia in a drug-free zone—was irrelevant to establishing probable cause to search Powell's home for evidence of a murder. Detective Person said that he did not offer Peter anything in exchange for his statements and acknowledged that he had no corroboration or reliability indicators of Peter as an informant based on past cases. We do not see how Peter's criminal history could have been relevant to the magistrate's determination of probable cause to search Powell's home for evidence of a gruesome murder of Powell's former fiancée, particularly in light of the corroboration provided by Sharlean that Powell had been Kasey's fiancé and the indication of the possible presence of blood on saws alleged to have been used in disposing of Kasey's body. We overrule this portion of Powell's second sub-point of his fourth point.

### c. Scope

In the third sub-point of his fourth point, Powell argues that the search and seizure of his cell phone during the April 2016 search of his house did not fall within

151

the search warrant's scope because the warrant authorized the search for weapons that could assist in disposing of a body, as well as blood and DNA evidence. Specifically, the warrant authorized the search for "any item(s) that could have been used as a weapon to kill and/or to assist in the disposal and/or dismemberment of a human body."

Powell argues that the phrase "to kill and/or to assist" used in the affidavit modified the term "weapon" and states, "Saws can be weapons; a cellphone is not a weapon." Powell further complains that the State "wholly failed to prove that the cellphone was properly seized as evidence in plain view" because the State failed to prove that the cell phone's incriminating character was immediately apparent to the seizing officer.

### (1) Suppression hearing

On the fourth day of trial on the merits, the trial court heard Powell's motion to suppress the phone. Powell argued that the search warrant indicated that the police were looking for DNA and other trace evidence and "[a]ny items that could be used as a weapon to kill and/or assist in the disposal and/or dismemberment of a human body," and that there was no mention in the warrant or its sponsoring affidavit of any cell phones or any electronic devices being used as a weapon or to dismember or dispose of a body, making it improper for the White Settlement police to have seized the phone that day.

The trial judge asked whether Powell conceded that a cell phone could be used to dispose of a body or to Google what effects acid would have on skin.[92] Powell replied that was a possibility if there was evidence that a phone had been used to call someone to assist in disposing of the body but that there was nothing cited in the affidavit. The trial judge responded that he thought a reasonable officer could conclude that a phone could be used in an effort to dispose of the body because

> [i]t's clear if you read the affidavit and the warrant, they are looking for -- they heard that someone has been killed and disposed of in a unique and bizarre way. So as I read the warrant, I read, We are looking for any evidence of this. And anything that could have been used to help to kill and/or to assist in the disposal of this alleged incident. And so it seems to me an officer could have reasonably concluded that a phone could have been used to aid the Defendant in disposing of the body. That's -- I think that's just reading, you know, reading in -- I think, reasonable conclusion in this affidavit and warrant.

The trial court observed, "A reasonable conclusion is the officer might think, Hey, we found a phone. It's near where Kevin Powell is." Or, as the trial court noted, a reasonable officer could have thought that it might have been Kasey's phone, and the prosecutor pointed out that the affidavit contained Peter's statement that Kasey's family had been trying to get in touch with her after not hearing from her at Christmas.

The prosecutor stated that the police did not search the phone immediately after seizing it but instead sought a separate warrant to search it. *See generally* William

---

[92]Dr. Austin, the forensic anthropologist, subsequently testified that she ran an internet search to see if information on pouring acid on a body was available and that she "did find references to both the acids and the sodium hydroxide."

Clark, *Protecting the Privacies of Digital Life: Riley v. California, the Fourth Amendment's Particularity Requirement, and Search Protocols for Cell Phone Search Warrants*, 56 B.C.L. Rev. 1981, 1983–84, 1997–2007 (2015) (discussing search protocols for cell phone search warrants). That search warrant is not challenged on appeal.

## (2) Analysis

The general Fourth Amendment rule is that the police cannot seize property that is not particularly described in a search warrant, with limited exceptions for various exigencies that require or make it reasonable for the police to seize the "not-described-in-the-warrant property." *State v. Powell*, 306 S.W.3d 761, 766 (Tex. Crim. App. 2010). The "particularity" requirement is primarily meant to prevent general searches and the seizure of property under a warrant that describes something else. *Id.* at 765.

We addressed the issue of whether a cell phone's seizure was outside the scope of a search warrant in *LopezGamez v. State*, 622 S.W.3d 445, 455 (Tex. App.—Fort Worth 2020, pet. ref'd), which involved another capital murder. In that case, the investigating officer's affidavit to search the defendant's trailer had alleged that the victim had communicated with potential jewelry buyers using a cell-phone app; that in the surveillance video of the area where the victim had agreed to meet a stranger to sell her jewelry (a Target store), the defendant was seen "using his cell phone and appear[ed] to be using it to message another person"; that a witness had recognized the defendant as someone who had robbed her after setting up a transaction through

154

a similar cell phone app; and that based on the detective's experience, it was common for suspects involved in thefts and aggravated robberies to store proceeds "and other evidence from their crimes in their residences." *Id.* at 456. The investigating officer, having seen what appeared to be the shoes that the suspect wore in plain view, sought to search the trailer for "other evidence of the crimes of Capital Murder, Aggravated Robbery, and Theft." *Id.* He found the cell phone on a shelf in the trailer's laundry area, just above his eye level. *Id.* at 457.

We concluded that it was clear that the warrant was sought to search for the proceeds and instruments used to commit the crime and that the affidavit referred to the use of a cell phone in the crime's commission. *Id.* It was also found in plain view and the investigator had probable cause to believe that it might hold incriminating evidence related to the crime. *Id.*

While the instant case is less clear cut, we think that the nature of today's cell phone usage and the manner in which Kasey's body was alleged in the affidavit to have been dismembered and dissolved demonstrates the reasonableness of the trial court's observation that the cell phone could have assisted Powell's disposal or dismemberment of the human body when Powell was not known to have any specialized expertise in anatomy or in the disposal of human remains.

The U.S. Supreme Court has noted that a cell phone—a "misleading shorthand" name for a device that is a minicomputer that can be used as a phone, camera, video player, rolodex, calendar, tape recorder, library, diary, album, television,

map, or newspaper—is "now such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude [that it is] an important feature of human anatomy." *Riley v. California*, 573 U.S. 373, 385, 393, 134 S. Ct. 2473, 2484, 2489 (2014) (noting that a significant majority of American adults now owns a smart phone). And while digital data stored on a cell phone cannot itself be used as a *physical* weapon, *id.* at 387, 134 S. Ct. at 2485, immediate access to the world's knowledge on a variety of subjects can make that data an *intellectual* weapon. *See id.* at 395–96, 134 S. Ct. at 2490 (observing that an internet search and browsing history on an internet-enabled phone "could reveal an individual's private interests or concerns—perhaps a search for certain symptoms of disease, coupled with frequent visits to WebMD").

Indeed, many cell phones may contain some sort of evidence of an alleged offense. As noted by the Supreme Court, a distinguishing feature of a modern cell phone is its immense storage capacity for historical data, including text messages and internet browsing history. *Id.* at 393–95, 134 S. Ct. at 2489–90 (noting that "it is no exaggeration to say that many of the more than 90% of American adults who own a cell phone keep on their person a digital record of nearly every aspect of their lives— from the mundane to the intimate"). The Court noted that cell phones "have become important tools in facilitating coordination and communication among members of criminal enterprises[] and can provide valuable incriminating information about dangerous criminals." *Id.* at 401, 403, 134 S. Ct. at 2493, 2495 (holding that police

generally must obtain a warrant before searching a cell phone, even when the cell phone is seized incident to arrest).

Powell refers us to *Joseph v. State*, 807 S.W.2d 303, 307 (Tex. Crim. App. 1991) (en banc), to support his argument that the cell phone was not discoverable within the warrant's scope and that it was not "plain view" incriminating evidence. In that case, the appellant was convicted of two counts of possession of a controlled substance (LSD and cocaine). *Id.* at 305. During the trial, the jury was read incriminating statements from a letter seized by a police officer during the execution of a search warrant seeking "a usable quantity of marijuana" in the appellant's home. *Id.* The investigating officer testified that he first checked the letter's envelope for marijuana and then read the letter because at that point he was looking for incriminating statements. *Id.* at 305–06.

The court observed that the scope of a search during which "mere evidence"— items not specifically listed in the warrant that may be connected to a crime but are not fruits, instrumentalities, or contraband—may be found is restricted to the object of the search and the places in which there is probable cause to believe it may be found. *Id.* at 305–07. The letter was "mere evidence" because it contained incriminating statements potentially linking the appellant with possession of illegal substances, and thus it was not the fruits or instrumentalities of crime or contraband, and the warrant did not include "written or printed material," so it was not described in the search warrant. *Id.* at 307. The court further concluded that the search and

157

seizure of the letter had exceeded the scope of the authorized warrant because the investigating officer read it after determining that its envelope did not contain the marijuana for which he was searching. *Id.*

The court recited what was the plain view exception at the time; concluded that because it was not immediately apparent that the envelope contained incriminating evidence, the exception did not apply; and reversed the lower court's ruling and remanded the case for a harm analysis. *Id.* at 308–09. The court subsequently held, however, that so long as police develop probable cause to believe that an item found in plain view constitutes contraband while police are still lawfully on the premises, and any further investigation into the nature of those items does not entail an additional and unjustified search of, or unduly prolonged police presence on, the premises, the seizure of those items is permissible under the Fourth Amendment. *State v. Dobbs*, 323 S.W.3d 184, 185 (Tex. Crim. App. 2010).

We think this case is more like *LopezGamez* in that the warrant authorized the search for and seizure of not only any items that could have been used as a weapon to kill but also any items that could have been used to assist in the disposal or dismemberment of a human body, which would have included a cell phone found near Powell. *See* 622 S.W.3d at 455–57. Accordingly, the trial court did not err by denying Powell's motion to suppress the cell phone seized during the April 2016 search of his residence, and we overrule this portion of his fourth point.

## 4. Powell's Camaro and the Camaro Cell Phone

On rehearing, because Powell has supplemented the record with the Camaro and Camaro-cell-phone warrants, we reconsider his argument that the Camaro cell phone should have been suppressed.

The police investigated Powell for two robberies and an attempted robbery in May 2016. Powell was in the Camaro when the police arrested him, and he argues that the four corners of the search warrant failed to establish a nexus between the Camaro and the robberies.[93] Without such a nexus, he complains that the trial court should have suppressed the cell phone found in the Camaro. He then asserts that even if the Camaro had been searched under a valid search warrant, the subsequent search warrant for the cell phone was not supported by probable cause because no facts tied the cell phone to the robberies.[94]

---

[93]The May 9, 2016 search warrant by the Lake Worth police alleged that between May 2, 2016, and May 5, 2016, Powell had robbed a Lake Worth Wells Fargo, attempted to rob a Wells Fargo on Camp Bowie in Fort Worth, and had robbed a White Settlement business. On May 5, Powell was arrested by the Fort Worth police "for unrelated charges and a felony warrant," and his Camaro was impounded at that time. The Lake Worth police sought to search the Camaro for evidence of the Lake Worth Wells Fargo robbery, fingerprints, and DNA evidence. The search warrant return reflected that the hat, mask, and weapon associated with the robbery were found in the Camaro, along with an LG cell phone bearing serial number 681VTAX1194736.

[94]The May 9, 2016 cell phone search warrant asserted that the LG cell phone bearing serial number 681VTAX1194736 belonged to Powell and was discovered in his Camaro while executing a search warrant.

159

Assuming, without deciding, that the trial court erred by denying Powell's motion to suppress these items, we disagree with Powell that the text messages from the Camaro cell phone significantly contributed to his conviction. Powell complains about the admission of April 27 and 28, 2016 text messages exchanged between Powell and "Little Mike" about Peter's "working for the police," and the text message from Powell's ex-wife Cheryl on May 1, 2016, in which she warned him that "someone is snitching."

Under the standard for constitutional harm set out in Rule of Appellate Procedure 44.2(a), we must reverse the conviction unless we determine beyond a reasonable doubt that the admission of the text messages did not contribute to Powell's conviction. *See* Tex. R. App. P. 44.2(a); *Williams v. State*, 958 S.W.2d 186, 194 (Tex. Crim. App. 1997). That is, "[i]f there is a reasonable likelihood that the error materially affected the jury's deliberations, then the error was not harmless beyond a reasonable doubt." *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000); *see also Neal v. State*, 256 S.W.3d 264, 284 (Tex. Crim. App. 2008).

Our harmless error analysis should not focus on the propriety of the trial's outcome—that is, whether the jury verdict was supported by the evidence. *Scott v. State*, 227 S.W.3d 670, 690 (Tex. Crim. App. 2007). Instead, we determine the likelihood that the constitutional error was actually a contributing factor in the jury's deliberations—in other words, whether the error adversely affected "the integrity of the process leading to" the conviction. *Id.*; *see also Wesbrook*, 29 S.W.3d at 119 ("[T]he

160

appellate court should calculate as much as possible the probable impact of the error on the jury in light of the existence of other evidence.").

We "should take into account any and every circumstance apparent in the record that logically informs an appellate determination whether 'beyond a reasonable doubt [that the evidentiary] error did not contribute to the conviction or punishment.'" *Snowden v. State*, 353 S.W.3d 815, 822 (Tex. Crim. App. 2011) (quoting Tex. R. App. P. 44.2(a)). While the most significant concern must be the error and its effects, the presence of overwhelming evidence supporting the finding in question can be a factor in the evaluation of harmless error. *Wesbrook*, 29 S.W.3d at 119. Other factors to consider may include, if applicable, the nature of the error, the extent that the State emphasized it, its probable collateral implications, and how a juror would probably weigh the error. *Snowden*, 353 S.W.3d at 822. This harmless error test requires us to evaluate the entire record in a neutral, impartial, and even-handed manner, not in the light most favorable to the prosecution. *Harris v. State*, 790 S.W.2d 568, 586 (Tex. Crim. App. 1989), *disagreed with in part on other grounds by Snowden*, 353 S.W.3d at 821–22.

Powell argues that no direct evidence showed that Kasey was murdered or that he murdered her and that any evidence linking him to her disappearance was essential to the State's case. Accordingly, he argues, the text messages about snitching "undoubtedly carried great weight for the jury" because they showed that Powell was concerned about the police finding out something and tended to corroborate Peter's

161

statements to the police, which were the State's primary evidence and direct link between Powell and Kasey's disappearance.

As Powell argued during the suppression hearing, however, the Little Mike texts could have pertained to Peter's pending drug charges and a reference "to potentially snitching on his drug supplier." He also argued that Cheryl's "snitch" text could refer to some other crime, stating, "there's an assumption of this [murder] crime. But we know that within a day or so there's allegations that he was robbing a bank. So we have no idea what this relates to." But the jury had the opportunity to observe Peter during his testimony and to judge his credibility and heard Detective Person's testimony about Peter's accounts to the police.

Additionally, although the extraneous-bank-robbery evidence was not admitted during guilt-innocence, there was evidence during the trial that Powell was engaged in other criminal activities involving drugs. Accordingly, we conclude that the April and May 2016 text messages about snitching were merely drops in the bucket of evidence that connected Powell to Kasey's disappearance and death. We hold that these drops were harmless beyond a reasonable doubt, and we overrule the remainder of Powell's fourth point.

## B. Kasey's out-of-court statements

In his second point, Powell argues that the trial court abused its discretion by admitting Kasey's out-of-court statements. Specifically, he complains that (1) the doctrine of forfeiture by wrongdoing did not apply to exempt Kasey's out-of-court

statements from his right of confrontation or the hearsay rule; (2) that the admission of her out-of-court testimonial statements violated his right of confrontation; and (3) that her out-of-court statements were inadmissible hearsay. Because we conclude that the doctrine of forfeiture by wrongdoing applies, we do not reach subpoints (2) and (3). *See* Tex. R. App. P. 47.1.

### 1. Background

Before trial, the State filed a memorandum regarding the admissibility of Kasey's statements to a variety of individuals—police, friends, family, and social workers—under the doctrine of forfeiture by wrongdoing and exceptions to the hearsay rule. Powell filed a brief in response, arguing that Kasey's statements were not admissible under the doctrine of forfeiture by wrongdoing or under any other theory.

### 2. Forfeiture by wrongdoing

Powell argues that the trial court abused its discretion by admitting Kasey's out-of-court statements because the doctrine of forfeiture by wrongdoing did not apply to exempt them from the constitutional right of confrontation or from the hearsay rule. The State responds that Powell forfeited any confrontation or hearsay complaints by his wrongdoing, that Kasey's statements were neither testimonial nor hearsay, and that Powell and Kasey's prior relationship showed his connection to her disappearance and death. Powell replies that the trial court erred by admitting Kasey's out-of-court

163

statements because the evidence presented at the hearing does not show that he killed

Kasey with the intent to prevent her from testifying against him.

### a. Applicable law

Under the doctrine of forfeiture by wrongdoing, a defendant is barred from asserting his right of confrontation[95] or complaining about hearsay[96] when he has wrongfully procured the witness's unavailability. *Colone v. State*, 573 S.W.3d 249, 264–65 (Tex. Crim. App. 2019). This exception applies only when the defendant "engaged in conduct *designed* to prevent the witness from testifying." *Giles v. California*, 554 U.S. 353, 359, 365, 128 S. Ct. 2678, 2683, 2686 (2008) (explaining that the absence of a forfeiture rule for such conduct "would create an intolerable incentive for defendants to bribe, intimidate, or even kill witnesses against them").[97]

---

[95]The Confrontation Clause of the Sixth Amendment guarantees the accused the right to confront the witnesses against him. *Paredes v. State*, 462 S.W.3d 510, 514 (Tex. Crim. App. 2015). Under the Confrontation Clause, "testimonial" statements— statements that were made under circumstances that would lead an objective witness to reasonably believe they would be available for use at a later trial—are inadmissible at trial unless the witness who made them either takes the stand to be cross-examined or is unavailable and the defendant had a prior opportunity to cross-examine the witness. *Id.*

[96]Hearsay is an out-of-court oral or written statement offered in evidence to prove the truth of the matter asserted in the statement. Tex. R. Evid. 801(a), (d). Hearsay is not admissible unless a statute or rule provides otherwise. Tex. R. Evid. 802.

[97]In *Giles*, the appellant shot and killed his ex-girlfriend, claiming self-defense. 554 U.S. at 356, 128 S. Ct. at 2681. The State sought to introduce statements that the victim had made to a police officer responding to a domestic-violence report three weeks before the shooting. *Id.*, 128 S. Ct. at 2681. The victim had told the officer

Code of Criminal Procedure Article 38.49 codifies the doctrine, stating,

(a) A party to a criminal case who wrongfully procures the unavailability of a witness or prospective witness:

(1) may not benefit from the wrongdoing by depriving the trier of fact of relevant evidence and testimony; and

(2) forfeits the party's right to object to the admissibility of evidence or statements based on the unavailability of the witness as provided by this article through forfeiture by wrongdoing.

(b) Evidence and statements related to a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of a witness or prospective witness are admissible and may be used by the offering party to make a showing of forfeiture by wrongdoing under this article, subject to Subsection (c).

(c) In determining the admissibility of the evidence or statements described by Subsection (b), the court shall determine, out of the presence of the jury, whether forfeiture by wrongdoing occurred by a preponderance of the evidence. If practicable, the court shall make the determination under this subsection before trial using the procedures under Article 28.01 of this code[98] and Rule 104, Texas Rules of Evidence.[99]

---

that the appellant had accused her of having an affair, choked her, punched her in the face and head, and threatened her with a knife that he would kill her if he found her cheating on him. *Id.* at 356–57, 128 S. Ct. at 2681–82. The trial court admitted the statements over the appellant's objection. *Id.* at 357, 128 S. Ct. at 2682. The U.S. Supreme Court determined that intent to prevent witness testimony was critical in depriving a defendant of his confrontation rights under the forfeiture doctrine and remanded the case for consideration of the appellant's intent. *Id.* at 377, 128 S. Ct. at 2693.

[98]Article 28.01 addresses what matters may be heard during a pretrial hearing. Tex. Code Crim. Proc. Ann. art. 28.01.

[99]Texas Rule of Evidence 104 addresses preliminary questions that the trial court decides, such as whether a witness is qualified, whether a privilege exists, or whether evidence is admissible. Tex. R. Evid. 104(a).

(d) The party offering the evidence or statements described by Subsection (b) is not required to show that:

(1) the actor's *sole* intent was to wrongfully cause the witness's or prospective witness's unavailability;

(2) the actions of the actor constituted a criminal offense; or

(3) any statements offered are reliable.

(e) A conviction for an offense under Section 36.05[100] or 36.06(a),[101] Penal Code, creates a presumption of forfeiture by wrongdoing under this article.

(f) Rule 403, Texas Rules of Evidence, applies to this article.[102] This article does not permit the presentation of character evidence that would otherwise be inadmissible under the Texas Rules of Evidence or other applicable law.

Tex. Code Crim. Proc. Ann. art. 38.49 (emphasis added).

The doctrine of forfeiture by wrongdoing is based on the principle that tampering with a witness "should . . . estop the tamperer from making any objection based on the results of his own chicanery." *Colone*, 573 S.W.3d at 264. In particular,

---

[100]Penal Code Section 36.05 sets out the offense of tampering with a witness. Tex. Penal Code Ann. § 36.05(a).

[101]We have previously set out the elements of Penal Code Section 36.06(a), the offense of obstruction or retaliation. *See* Tex. Penal Code Ann. § 36.06(a).

[102]Texas Rule of Evidence 403 states that a trial court may exclude evidence if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence. Tex. R. Evid. 403.

the doctrine applies when evidence indicates that the defendant killed the victim and that the victim's death was motivated, at least in part, by the defendant's desire to permanently silence her and prevent her from identifying him.[103] *Id.* at 264; *see Schindler v. State*, No. 02-17-00241-CR, 2018 WL 4924946, at *3 (Tex. App.—Fort Worth Oct. 11, 2018, pet. ref'd) (mem. op., not designated for publication). The desire to prevent identification and testimony need not be the sole reason for harming the witness. *See Colone*, 573 S.W.3d at 264. "[F]orfeiture by wrongdoing applies even when the defendant has multiple reasons for harming the witness, as long as one of the reasons is to prevent the witness from testifying." *Schindler*, 2018 WL 4924946, at *3. "In a murder case, a prior history of family violence may show that the murder not only caused the victim's absence, but that it was designed to do so." *Brown v. State*, 618 S.W.3d 352, 358 (Tex. Crim. App. 2021).[104]

---

[103]In *Colone*, the victim was killed two days after the appellant was indicted for another offense and the appellant was overheard accusing the victim of "telling on him." 573 S.W.3d at 264. Accordingly, the appellant's confrontation claim against her statements about his prior commission of an aggravated robbery was barred, and the same rationale applied to the out-of-court component of his hearsay, due process, and Rule 403 objections. *Id.* at 264–65.

[104]In *Brown*, the appellant was indicted for family violence assault against the victim. 618 S.W.3d at 353. He also had a prior conviction for family violence assault against her. *Id.* During the pendency of his assault charge, the district attorney's investigator went to the victim's last known address to subpoena her as a witness in the appellant's trial. *Id.* The appellant answered the door and gave elusive answers about the victim's whereabouts. *Id.* A week later, while the appellant was at court, the investigator returned to the appellant's home and located the victim. *Id.* at 353–54. When he told her that he had a subpoena, she slammed the door on him, and he called out to her that she had to be in court the following Monday. *Id.* at 354. The

The U.S. Supreme Court has observed that the domestic-violence context is particularly suitable for the application of the forfeiture by wrongdoing doctrine:

> Acts of domestic violence often are intended to dissuade a victim from resorting to outside help[] and include conduct designed to prevent testimony to police officers or cooperation in criminal prosecutions. Where such an abusive relationship culminates in murder, the evidence may support a finding that the crime expressed the intent to isolate the victim and to stop her from reporting abuse to the authorities or cooperating with a criminal prosecution—rendering her prior statements admissible under the forfeiture doctrine. Earlier abuse, or threats of abuse, intended to dissuade the victim from resorting to outside help would be highly relevant to this inquiry, as would evidence of ongoing criminal proceedings at which the victim would have been expected to testify.

*Giles*, 554 U.S. at 377, 128 S. Ct. at 2693.

### b. Evidence

We must determine whether the trial court could determine that forfeiture by wrongdoing occurred by a preponderance of the evidence at the conclusion of the pretrial hearing that it held on the matter.

During the pretrial hearing, the trial court heard testimony from Investigator Nutt and reviewed State's Exhibits 21–23, 28–33, and 67–68. Nutt, who had been a

---

victim did not appear in court. *Id.* The trial court admitted the victim's statements to the police based on the appellant's having been untruthful with the investigator about the victim's location, as well as the prior assault and their prior conduct. *Id.* In concluding that the forfeiture-by-wrongdoing doctrine did not apply in the case, the Court of Criminal Appeals distinguished the facts from "a case where a defendant murdered the victim—an offense that would necessarily cause the victim to be absent from trial." *Id.* at 358–59. The court stated that "without a murder, or some other offense that necessarily causes a victim's absence, there needs to be more than simply the past commission of family-violence assaults to show causation" under the forfeiture-by-wrongdoing doctrine. *Id.*

peace officer for over 24 years, testified that he had been assigned to the case three years before trial; that to his knowledge, Kasey's remains had never been located; and that he had found no indication that she was alive after 2015. He testified that in addition to the capital murder charge, Powell had had a pending aggravated assault charge based on his having allegedly strangled Kasey in November 2015 and that the conditions of Powell's November 23, 2015 bond agreement had required that Powell have no contact with Kasey. Based on his research, Investigator Nutt said that despite the no-contact bond condition, Powell had been in contact with Kasey after his release from jail, specifically trying to get her to drop the aggravated assault charges. He described communications between Bakouris and Kasey, including an email in which Kasey was asked to sign a release of records from JPS on December 7, and he stated that Kasey had attempted to file an affidavit of nonprosecution in the aggravated assault case and made allegations that someone named Dallas was to blame for her injuries.

Investigator Nutt had subpoenaed and received Kasey's cell phone records and Powell's cell phone records, as well as Kasey's records from SafeHaven, the Women's Crisis Center of Tarrant County, Weatherford's Freedom House, and Facebook, all of which we have previously summarized above in our sufficiency review. Many of the records showed that on more than one occasion, and to more than one audience, Kasey had claimed that Powell had tried to strangle her with a wire around her neck. The trial court reviewed State's Exhibit 30, photographs of Kasey's neck taken by

169

police at the hospital on November 4, showing several deep red cross-cutting ligature marks.

During her November 4 conversation with the police, Kasey told them that Powell had told her he would spare her life if she would claim ownership of a gun found in his home by White Settlement police officers and state that she had brought it into his home without his knowledge.[105] When she refused, he hit her and struck her head on the dash of his vehicle before other motorists came to her assistance. The responding officer verified that Powell had assaulted one of the bystanders who had tried to help Kasey and that others had seen Powell's beating Kasey while she was in the vehicle. Powell had been arrested for the assault on the rescuer.

Investigator Nutt also testified about other incidents involving Kasey and Powell between September and November 2015, which he identified as a period when she was actively being abused by and trying to flee from Powell and believed he was going to kill her. And he stated that Powell's phone records showed that until Kasey's cell phone service was transferred in November 2015, Powell was still communicating with Kasey after the aggravated assault charge was filed.

---

[105]The White Settlement police report from the November 4 aggravated assault included a statement from Kasey that Powell told her that he would spare her life if she filed an affidavit claiming that a gun found in his home was hers. Powell was a felon, and possession of a firearm could send him back to prison, which Investigator Nutt said was a reason why Powell would want Kasey to take responsibility for the gun.

Investigator Nutt said that he was unable to locate any evidence that Kasey was alive after December 12, 2015, even though, as a known methamphetamine addict, she might have otherwise turned up in the state or national criminal justice system or in the national missing-and-unidentified-persons system. He had also issued subpoenas to the various hospitals in North Texas and checked with the Department of Health and Human Services to try to locate her. He had contacted her son's father, who had not seen her. Kasey had not tried to contact her son, even though she had been trying to regain custody of him in 2015.

Investigator Nutt had met with Kasey's father, grandmother, godfather, cousin, and friends; friends or acquaintances of Powell's son Peter; and Powell's daughter and grandson. He had also visited the strip clubs where Kasey had previously worked. No one had seen her. Kasey's grandfather had died during the search, and although he had left her some money, she had never showed up to claim it.

On cross-examination, Investigator Nutt acknowledged that it was possible that Powell had allegedly killed Kasey for some motive other than trying to prevent her from coming to court on the November 4 aggravated assault charge. He also acknowledged that Kasey had also attributed her injuries to an individual named "Dallas," whom he had identified as a pimp named Randall Walter Westfall, who was in federal custody for human trafficking unrelated to Kasey. But he said that he did not believe that Dallas was responsible for Kasey's disappearance, based upon his research to determine whether Kasey had interacted with Dallas in November and

December 2015. In his research, Investigator Nutt contacted managers at the strip clubs where Kasey had worked, and none of those managers were aware of Kasey's being associated with Dallas. He also showed photos of Kasey and Powell to one of Dallas's "girls," who likewise indicated that she knew of no association between Kasey and Dallas.

The prosecutor argued that it was Powell's wrongdoing (murder) that had caused Kasey to be unable to testify about the aggravated assault with a deadly weapon, the underlying offense for the retaliation-or-obstruction portion of the capital murder charge. Defense counsel responded that the State had not been able to show by a preponderance of the evidence that Powell's motive for hurting or killing Kasey had been to keep Kasey from testifying.

The trial court found that the State had met its burden on that issue and granted Powell a running objection but revisited the issue after two days of trial. In reaffirming its prior ruling that the forfeiture by wrongdoing doctrine applied, the trial court said it relied on "quite a bit of research" and the testimony that had been offered up to that point at trial, including "almost 20 witnesses." Specifically, the trial court pointed to Kasey's written statement that Powell told her he would spare her life if she would claim that the gun found at his house was hers; that he beat her when she refused to claim the gun was hers; and that Powell expressed surprise that Kasey was still alive after one of his assaults her in November; and to Peter's testimony,

which the trial court found "credible," that Powell had said that he killed Kasey because she was not going to retract her statement to the district attorney.

### c. Analysis

Powell refers us to *Davis v. State*, 268 S.W.3d 683, 706 (Tex. App.—Fort Worth 2008, pet. ref'd), and to Article 38.49,[106] to support his argument that the forfeiture by wrongdoing doctrine did not apply because the State failed to prove that he killed Kasey "or even that she is dead." In *Davis*, the State proved that the appellant had murdered the victim but did not prove that he had done so to prevent her from testifying about a domestic violence incident that she had reported to police six months before her death. *Id.* at 702, 705–06. Because there was no evidence that the appellant had murdered the victim to prevent her from testifying, we concluded that under the common law doctrine of forfeiture and *Giles*, the trial court erred by overruling the appellant's Confrontation Clause objection to the officer's testimony about the victim's statements. *Id.* at 706.

Here, in contrast, the trial court could have found by a preponderance of the evidence offered that one of Powell's motivations for killing Kasey was to cause her unavailability, even if it was not his sole motivation. *See* Tex. Code Crim. Proc. Ann. art. 38.49(b), (d). The evidence showed that Powell had tried to secure an affidavit of

---

[106]We decided *Davis* before Article 38.49 was enacted, codifying the doctrine. *See* Act of May 8, 2013, 83rd Leg., R.S., ch. 165, § 3, 2013 Tex. Sess. Law Serv. 716, 717, *amended by* Act of May 26, 2015, 84th Leg., R.S., ch. 848, § 1, 2015 Tex. Sess. Law Serv. 2715, 2715 (current version at Tex. Code Crim. Proc. Ann. art. 38.49).

nonprosecution from Kasey for an aggravated assault that he committed against her[107] and had tried—but failed—to convince her to take responsibility for a weapon to prevent his being charged as a felon in possession of a firearm. While Powell could have assaulted and threatened Kasey for additional reasons beyond his criminal charges for abusing her and possessing weapons, because the record reflects a connection between the abuse and the criminal charges, we conclude that the trial court did not abuse its discretion by admitting this evidence, and we overrule the dispositive portion of Powell's second point without reaching his confrontation and hearsay arguments. *See* Tex. R. App. P. 47.1.[108]

## C. Bad acts evidence

In his third point, Powell argues that the trial court abused its discretion by admitting evidence of his bad acts in violation of Rules of Evidence 403 and 404(b).

Evidence of a person's bad acts is not admissible to prove the person's character to show action in conformity therewith, but it may be admissible to establish intent or rebut a defensive theory. *See* Tex. R. Evid. 404(b). If relevant to a non-character-conformity issue, the evidence is still properly excluded under Rule 403

---

[107]As set out above in our sufficiency review, the record reflects that Powell received an affidavit from Kasey but that the charges were not dismissed.

[108]Powell argues that the forfeiture by wrongdoing doctrine does not apply here because "[i]t is axiomatic that someone cannot kill another in order to prevent that person from testifying at the murder trial." As set out above, we disagree with his interpretation of the law. *See Colone*, 573 S.W.3d at 264–65.

when its probative value is substantially outweighed by the danger of unfair prejudice. *See* Tex. R. Evid. 403.

Powell acknowledges that Code of Criminal Procedure Article 38.36 provides that in all murder prosecutions, testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense, is admissible. Tex. Code Crim. Proc. Ann. art. 38.36(a). However, he argues that Article 38.36 is not an exception to Rules 404(b) and 403, referring us to *Garcia v. State*, 201 S.W.3d 695 (Tex. Crim. App. 2006), and *Smith v. State*, 5 S.W.3d 673 (Tex. Crim. App. 1999), to support his argument that the trial court abused its discretion by admitting bad acts evidence in violation of those rules.

The State initially sought the admission of 50 bad acts, but at the hearing on their admissibility, the prosecutor stated that there were only 13 items the State wanted admitted under Article 38.36. Powell narrows his complaint to three of those items, in addition to "evidence generally that Powell had abused [Kasey] for weeks":

- Evidence of the September 11, 2015 assault;

- the November 3 incidents that resulted in the police searching Powell's house and charging him with possession of marijuana; and

- the November 4 incident that ended with Powell's arrest for aggravated assault.

175

Rules 403 and 404 limit the admissibility of some Article 38.36(a) relationship evidence, but rather than conflict with that article, the rules work in harmony with it. Even when Article 38.36(a) applies, the State is still prohibited from presenting evidence if the probative value is substantially outweighed by unfair prejudice, confusion of the issues, misleading the jury, considerations of undue delay, or needless presentation of cumulative evidence, and from presenting evidence for the sole purpose of showing that the accused acted in conformity with his bad character and murdered the victim. *Garcia*, 201 S.W.3d at 703 ("While Rule 404(b) limits the admissibility of specific acts used to show only the defendant's character, and may keep a prosecutor from trying the case not on the charged offense but on the past acts of the accused, it certainly does not block the admission of all relationship evidence.").[109]

We think, as in *Garcia*, that the evidence here was admissible under Rules 404(b) and 403 as relevant to material issues in the case—to explain the parties' relationship at the time of the offense and demonstrate proof of motive, intent, opportunity, and Powell's identity as Kasey's murderer, and to explain why the State

[109]In *Garcia*, the appellant was convicted of murdering his estranged wife, and on appeal, he argued that the prior bad act of pushing his wife out of his car and stranding her on the side of the road more than a year before she died had been improperly admitted by the trial court. 201 S.W.3d at 697. After Garcia admitted during a counseling session to the bad act and admitted that he could get physical with his wife if she nagged him, the counselor suggested that the wife file for divorce, and she did. *Id.* The court held that the bad act was admissible under Rule 404(b) because it explained the circumstances surrounding the divorce, which was relevant to the nature of the parties' relationship at the time of the offense. *Id.* at 703–04.

had no body to show to the jury—and that, while prejudicial, the evidence was not substantially more prejudicial than probative. *See id.* at 704–05; *Zafar v. State*, No. 02-17-00119-CR, 2018 WL 2248483, at *4 (Tex. App.—Fort Worth May 17, 2018, pet. ref'd) (mem. op., not designated for publication) (holding, under *Garcia*, that testimony about the appellant's prior bad acts was not substantially outweighed by the danger of unfair prejudice "because the nature of [the appellant's] abusive and controlling relationship with [the victim] prior to her death was inherently probative of the circumstances surrounding her death"); *see also Jackson v. State*, No. 02-11-00414-CR, 2012 WL 6049074, at *4 (Tex. App.—Fort Worth Dec. 6, 2012, pet. ref'd) (mem. op., not designated for publication) ("[E]vidence of prior extraneous offenses committed by the defendant against the victim of the charged offense are admissible to show the defendant's ill will or hostility toward the victim and to therefore establish motive.").

That is, the September 11 assault established the parties' pattern of behavior, including strangulation; the November 4 assault included evidence by objective, third party witnesses that Powell's intent was to dominate and control Kasey; and—as set out in extensive detail above—Kasey was aware that if she pressed charges, Powell could cut her up into pieces and make her disappear.[110] The trial court also gave

---

[110]Further, in light of all of the evidence of the extremely violent nature of the parties' relationship, the fact that marijuana was also found in Powell's house and that he was charged with its possession was ultimately harmless because the jury was unlikely to have convicted Powell of murdering Kasey just because he possessed

177

limiting instructions about the evidence when requested and included a limiting instruction in the jury charge, instructing the jury that bad acts had to be found beyond a reasonable doubt and considered only "in determining the proof of the defendant's motive, opportunity, intent, or identity."[111] We conclude that the trial court did not abuse its discretion by admitting the evidence over Powell's objections, and we overrule Powell's third point.

## D. Prior inconsistent statements

In his fifth point, Powell complains that the trial court abused its discretion by prohibiting the defense from impeaching Peter with prior inconsistent statements. The State responds that Powell did not fully lay the foundation for admitting Peter's alleged prior inconsistent statement.

Rule of Evidence 613(a) permits a party to impeach a witness with a prior inconsistent statement if the proper predicate is laid. *Ex parte Saenz*, 491 S.W.3d 819, 827 (Tex. Crim. App. 2016). Proper predicate requires that when examining a witness about his prior inconsistent statement—whether oral or written—the party must first

marijuana. *See* Tex. R. App. P. 44.2(b) (requiring a nonconstitutional error—such as the wrongful admission of extraneous offense evidence—to have a substantial and injurious effect or influence in determining the jury's verdict before it may be considered harmful); *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002) (requiring court to review the record as a whole in determining whether the alleged error had a substantial and injurious effect).

[111]As a general rule, in the absence of evidence to the contrary, we will assume that the jury followed the court's written instructions. *Elizondo v. State*, 487 S.W.3d 185, 208 (Tex. Crim. App. 2016) (citing *Reeves v. State*, 420 S.W.3d 812, 818 (Tex. Crim. App. 2013)).

tell the witness: (A) the contents of the statement; (B) the time and place of the statement; and (C) the person to whom the witness made the statement. Tex. R. Evid. 613(a)(1). The witness must then be given the opportunity to explain or deny the prior inconsistent statement. Tex. R. Evid. 613(a)(3). The plain language of Rule 613(a) does not require the witness to deny the statement; rather, it provides that extraneous evidence of the prior inconsistent statement may not be admitted unless the witness is first examined about the statement and then fails to unequivocally admit making the statement. Tex. R. Evid. 613(a)(4). If the impeaching party does not lay a proper predicate, the prior inconsistent statement should not be admitted. *Harris v. State*, 152 S.W.3d 786, 795 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd).

During Peter's cross-examination, the following dialogue occurred:

Q. Do you recall in November going back down and meeting with an investigator to talk about what you knew about the aggravated assault?

A. No, I do not recall.

Q. You recall meeting with a woman by the name of Donna and giving her a statement about what you saw on November the 3rd and 4th?

A. I do not recall.

Q. Do you recall meeting with her and telling her that your dad -- that she never came back to the house, that your dad did not hurt her?

A. I do not recall that.

Q. Are you -- you don't recall it or it didn't happen?

179

A. I'm almost certain it didn't happen.

Q. That you never met with an investigator?

A. I don't believe so.

Q. And never talked with that investigator about the events of November 3rd or 4th?

A. I don't believe so.

Q. Do you recall taking [Max] with you to talk to the investigator?

A. I don't believe so.

Q. Do you recall [Max] ever meeting with the investigator and giving a statement about November 3rd or 4th?

A. I don't believe so.

Q. In fact, was it on November the 23rd of 2015 that you met with Donna Bakouris?

A. I do not remember doing that.

The defense later sought to introduce testimony by Bakouris to impeach Peter's testimony. Defense counsel stated that Bakouris would testify that Peter told her a different story about November 4 than the one he gave the jury, specifically, that Peter told Bakouris that he had never seen Powell hit Kasey, that he had never seen Kasey laid out, and that he had never told Bakouris that he stared at Kasey for minutes and that she was almost dead; instead, he had told Bakouris that he did not see Kasey get hurt and never saw her bloodied on November 4.

In response, the prosecutor argued that Peter had said he did not recall meeting with Bakouris and that using Peter's prior unrecorded and unadopted statement to Bakouris would be improper impeachment with a prior inconsistent statement because he was not asked about specific statements during his testimony. After a brief recess, during which time the trial court reviewed the transcript of Peter's testimony, the trial court opined that calling Bakouris to try to impeach Peter's prior inconsistent statement would violate Rule 613.

On appeal, Powell argues that the record affirmatively shows that the defense laid the proper foundation as required by Rule 613. He asserts that "[a]lthough defense counsel did not question [Peter] on every statement he made to Bakouris, counsel did ask specifically about the events of November 3" and told Peter (A) the contents of the statement—that Powell did not hurt Kasey on the night of November 3; (B) where the statement was made—at the November 23 meeting with Bakouris; and (C) that the statement was made to Bakouris. *See* Tex. R. Evid. 613(a)(1). He acknowledges that defense counsel did not state where the meeting took place. *Cf. id.*; *Baldree v. State*, 248 S.W.3d 224, 232 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd) (holding defendant laid proper predicate when the officer was told the contents of the statement at issue, to whom it was made, and the time and place it was made).

We think that the trial court correctly determined that Powell did not comply with Rule 613(a)'s predicate requirements because the record reflects that Peter was

never told the place where the prior inconsistent statement occurred. *See* Tex. R. Evid. 613(a). Accordingly, we conclude that the trial court did not abuse its discretion, and we overrule his fifth point.

## V. Conclusion

Having overruled all of Powell's points, we affirm the trial court's judgment.

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: November 18, 2021